**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
MICHAEL QUEEN                                               :
313 Booth Street,                                          :
Gaithersburg, Maryland 20878                               :
                                                           :
            Plaintiff,                                     :
                                                           :
v.                                                         :        Case No.:
                                                           :
ED SCHULTZ                                                 :
2032 Longbridge Road,                                      :
Detroit Lakes, Minnesota 56501                             :
                                                           :
            Defendant.                                     :
———————————————————————  :

**COMPLAINT**

        Plaintiff Michael Queen, by and through counsel, files this Complaint against the above-

named defendant and alleges as follows:

**PARTIES**

   1.  Plaintiff Michael Queen, hereinafter Queen, is an adult resident of the State of Maryland.

   2.  Defendant Ed Schultz, hereinafter Schultz, is an adult resident of the State of Minnesota.


**JURISDICTION AND VENUE**

   3.  This Court has jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C.

s.1332 and because this is an action for money damages, and other appropriate relief, in excess

of $100,000.

4.   Venue lies in this district pursuant to 28 U.S.C. s.1391, in that during material times the Defendant was present and regularly transacted business in the District of Columbia and a substantial amount of the events and wrongful acts of the Defendant took place in the District of Columbia.

## STATEMENT OF FACTS

5.   During 2007, Queen thought that a television show featuring Ed Schultz would be marketable and profitable and he began to develop a strategy and treatment to promote his idea.

6.   Queen did not know and had not met Schultz at that time.

7.   During January, 2008, Queen spoke to Timothy "Tim" J. Russert, hereinafter Russert, who at that time was the Senior Vice President of NBC News and Washington Bureau Chief, pitching the idea for an NBC television show with Schultz.

8.   Schultz was then a radio talk show host.

9.   Shortly thereafter, still during January of 2008, Michael Queen met Ed Schultz in the lobby of the NBC Washington office building and gave Schultz a tour of the studio.

10.   During that tour Queen pitched his concept of the aforementioned show to Schultz.

11.   Schultz agreed that the concept very much interested him and he asked Queen to continue his development plans.

12.   Queen asked Schultz if he had anyone working for him to make a TV show happen and Schultz replied "No," and then said to Queen, "Now you're it!"

13.   James Holm, Ed Schultz's radio producer, is believed to have been present.

14.   Queen, on behalf of Schultz, met again with Russert to develop the show.

15.     Russert agreed that Queen was free to shop the concept around to other networks and outlets, but that NBC retained the right of first refusal.

16.     During February 2008, with Schultz's specific and enthusiastic approval, Queen began to develop the concept for a TV show with Russert.

17.     Queen began taping Schultz's guest appearances on various broadcasts, including CNN's Larry King Live Show, Fox News and MSNBC among many others in order to create a demonstration reel to sell the show.

18.     Queen enlisted the help of a former co-worker, Max Schindler, hereinafter Schindler, who had been the director of NBC News and Meet the Press, to partner with Queen and Schultz in the development of the project.

19.     A series of telephone conference calls and e-mails followed regarding the formulation of a contract between Queen and Schindler and Schultz regarding ownership percentages for the three participants.

20.     Queen, Schindler and Schultz agreed that, in addition to salaries, Queen would receive 25%, Schindler would receive 25% and Schultz would receive 50% of income realized by the program after expenses, should it be sold.

21.     On March 5, 2008, in an exchange of e-mails regarding the contractual division of ownership of the show, Ed Schultz sent an e-mail about what Queen might get paid.  In the e-mail he stated that he "will agree to a 50-25-25 percentage formula of profits after expenses of the show."

22.     Schultz also stated in that e-mail that "each of us will have a salary for working on the show although that needs to be figured out."

23.     On March 16, 2008, Schultz's attorney Jeffrey B. Landa, hereinafter Landa, in an e-mail stated that that "document memorializes an exclusive representation or agency agreement wherein Michael Queen and Max Schindler will have exclusive authority to negotiate a television show with CNN to be based on the nationally syndicated Ed Schultz radio show."

24.     In that e-mail, Landa, on behalf of Schultz, further stated that Michael Queen and Max Schindler will have exclusive authority to negotiate a television show with CNN and that Schultz would not utilize the services of others and that if plaintiff was successful in obtaining an offer from CNN, Schultz would enter into an exclusive agreement with them for the production of the show at terms to be negotiated according to industry standards.

25.     Queen and Schindler repeatedly asked Schultz to execute a contract, but Schultz made excuses to delay signing a contract.

26.     During this same time, Schultz continued to encourage the development of the treatment by Queen and Schindler and continued to tell Queen and Schindler that the three of them were partners in the project.

27.     Shortly thereafter, Schindler left the project, stating that he did not trust Schultz.

28.     Queen spoke with Schultz about concerns of trust throughout Spring 2008.

29.     On April 5, 2008, Schultz sent Queen an e-mail that promised "I understand your concern about a financial arrangement moving forward" and that "any TV deal will obviously involve you. I will not do a TV deal without your involvement and that includes a financial involvement. Rest assured we are together on this."

30.     Queen spoke in person with Jeff Zucker, CEO of NBC Universal, in Washington's Studio A in late March or early April of 2008.

31.     Queen informed Zucker of his efforts to bring Ed Schultz to NBC.

32.     Zucker told Queen to contact Benjamin "Ben" N. Silverman, hereinafter Silverman, chairman of NBC Entertainment, in order to pitch the show featuring Schultz.

33.     On April 17, 2008, Queen sent an inter-office package with his DVD of the demonstration reel he had completed of Ed Schultz's guest appearances and an introductory cover letter to Silverman

34.     On April 18, 2008, Queen called the NBC offices in Burbank, California and spoke with Jimmy Fox, assistant to Silverman, asking him to make sure Silverman saw his proposal for an Ed Schultz TV show.  Fox said he would.

35.     Queen then informed Ed Schultz of the conversation via email on April 19, 2008.

36.     Schultz responded with thanks and that "it sounds great."  On April 22, 2008, Queen wrote to Roger Ailes, the Chairman of FOX Media Group, pitching the Schultz show to him.

37.     On April 28, 2008, at Russert's suggestion, Queen sent the President of MSNBC, Phil Griffin, hereinafter Griffin, an e-mail pitching an Ed Schultz show.

38.     A few days later, Queen spoke to Griffin by phone.

39.     During that telephone conversation, Griffin said "thanks, but no thanks" to a show featuring Schultz and that the "schedule was already full for the year."

40.     Telephone records exist to demonstrate this exchange.

41.     On March 20, 2008, Queen sent an e-mail to NBC Senior Vice President, Russert, telling him about the plan to shoot a pilot of the Ed Schultz show in Studio A of NBC.

42.     In that e-mail Queen told Russert that NBC4 General Manager Michael Jack had suggested to him that he contact NBC's Barry Wallach "for the possibility of domestic distribution, should the project be so blessed."   Queen also told Russert, "I feel very strongly that should Ed join the NBC family; he could bring a huge draw to NBC platforms."

43.     On May 30, 2008, Queen sent an e-mail to Schultz confirming the availability of NBC's Studio A in Washington for the production of the pilot on June 26, 2008.

44.     Schultz responded in an e-mail, "wow…I'll have a drink on that tonight! Good work."

45.     On or about May 30, 2008, Queen again voiced his concerns about trust.

46.     On June 7, 2008, Schultz sent him an e-mail saying, "I'll get right to it. It was your idea. What's that worth?...let's draw up a short letter to join forces to produce the pilot with the intention of doing a structured deal down the road if the show has potential."

47.     On June 8, 2008 Schultz sent Queen an e-mail saying, "I really want you to be a partner but you seem to have a hard time trusting me…You have  TALENT AND CONNECTIONS.  Let's move forward…"

48.     In the June 8, 2008, e-mail discussed above, Schultz stated "Jeff (Landa) and I will pay for the pilot."

49.     However, Queen paid the expenses, $11,500, to NBC from his personal home equity loan.

50.     On June 26, 2008, the pilot for "The Ed Show" was shot.

51.     Schultz had copies of the pilot made by Queen and was sending them out throughout the industry in an attempt to promote the show.

52.     On August 11, 2008, Queen pitched the show to former NBC General Manager Allan S. Horlick, now President and General Manager of WUSA TV 9, the CBS affiliate station in Washington D.C., hereinafter Horlick.

53.     During December 2008 and January 2009, Michael Queen acted as Ed Schultz's agent in Washington DC, performing tasks for Schultz including searching for apartments in the

District of Columbia for Schultz and his wife, Wendy Schultz, with assistant producer Susan

O'Connell, hereinafter O'Connell.

54.     O'Connell secured an apartment for Mr. and Mrs. Schultz in January.

55.     After O'Connell secured the apartment, Wendy Schultz sent a list to Queen and

O'Connell of objects needed for the apartment, including bedding and toiletries.

56.     O'Connell and Queen procured the items for Mr. and Mrs. Schultz.

57.     On Jan. 17, 2009, Michael Queen sent an e-mail to Schultz and his wife, Wendy

Schultz, telling them that they "are moved in" to their new apartment in DC, and mentioned that

they went shopping for bedding and got everything from Wendy's list "but the Curel Lotion."

58.     Schultz e-mailed back, "we owe you guys so much."

59.     On Sunday, January 18, 2009, Ed and Wendy Schultz moved to Washington to live

and to foster their growing TV prospects.

60.     Queen met them at Reagan National Airport and drove them to their apartment in

Southwest Washington D.C.

61.     Queen later drove them to Ed's speaking engagement at George Washington

University.

62.     O'Connell loaned Mr. and Mrs. Schultz her personal car when they arrived in

Washington.

63.     Mr. and Mrs. Schultz utilized O'Connell's car for three months without compensation,

reimbursement or other payment for her production work on their behalf.

64.     In February 2009, a few months after Queen had pitched the show to CBS with the

approval of Schultz, Horlick offered Ed Schultz the show with Michael Queen as Executive

Producer.

65.     Horlick was concerned about ad time on the channel, so during March 2009 Queen, Schultz and Horlick agreed that Queen and Schultz would continue to own the show but would rent the studio for one year and work on a syndication deal.

66.     As part of this deal, Schultz and Queen agreed that because they were both owners, Queen would be responsible for getting advertisers, selling ads and renting the studio and Schultz would be responsible for being the on-air talent.

67.     However, in March of 2009, almost a year after Queen had pitched the show to Phil Griffin, the president of MSNBC, and Griffin had turned the show down, Griffin called Schultz directly and hired him for "The Ed Show."

68.     "The Ed Show" is currently on MSNBC five nights a week.

69.     On June 1, 2009, Schultz met in person with Queen and told Queen that he would pay the money he owed to Queen.

70.     At this meeting, Schultz also agreed to pay for other expenses incurred in the production of the pilot.

71.     However, almost immediately after Schultz entered into an agreement with MSNBC, Schultz virtually ceased contact with Queen and would not respond to Queen's repeated inquiries about compensation as part owner of "The Ed Show" and for his outstanding expense bills.

72.     Queen wrote to Schultz's lawyer, Landa, regarding his compensation.  Landa responded that he would advise his clients to seek "judicial relief from your harassment including a prayer for related fees and costs," in an attempt to intimidate Queen from seeking compensation due to him.

73.     Queen wrote to the parent company of MSNBC, NBC Universal, to alert them to the fact that he, Queen, was entitled to compensation as he had a contract with Schultz.

74.     NBC Universal stated that the situation did not involve them and was a dispute between Schultz and Queen.

75.     According to Schultz, MSNBC management ordered Ed Schultz to pay Michael Queen $12,000 to pay for the 2008 pilot.

76.     Schultz issued a personal check to Queen for $12,000 as partial payment for the expenses incurred in producing the pilot of "The Ed Show."  To date, Schultz has refused to compensate Queen with a percentage of the income that Queen is entitled to as part owner of the show and as an agent for Schultz.

77.     Ed Schultz stated to Michael Queen that he, Ed Schultz, was being paid a salary of $1,000,000 soon after "The Ed Show" was aired.

78.     Upon information and belief, the plaintiff asserts that Ed Schultz is now receiving a substantially higher salary.

<u>FIRST CAUSE OF ACTION</u>
<u>[Breach of Contract]</u>

79.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 78 above as if set forth fully herein.

80.     Plaintiff and defendant entered into a valid and enforceable verbal and written agreement through telephone calls and e-mail exchanges, even though the final agreement was not signed by defendant, which entitled plaintiff to twenty-five percent of the income after expenses of "The Ed Show."

81.     Defendant's contract with Plaintiff was supported by adequate consideration including, but not limited to, continued substantial detrimental reliance and as a direct and proximate result of Defendant's breach of this contract, Plaintiff suffered damages. Specifically,

Defendant breached the conditions of that contract by failing to make payments to the plaintiff equal to twenty-five percent of the income after expenses from said show.

82.     As a result of Defendant's defaults under and breaches of the contract, Plaintiff is entitled to a judgment in the amount equal to (i) the outstanding principal of twenty-five percent of the income after expenses of "The Ed Show" made to defendant, plus (ii) accrued interest on the principal amount from the inception of "The Ed Show" to date, with interest accruing until payment is made, plus costs.  The exact amount of these damages is unknown, but is in excess of $100,000.  The information necessary to calculate these damages has been withheld from Plaintiff by Defendant.

83.     Moreover, Defendant's wrongful conduct, as set forth in the Statement of Facts, constitutes bad faith and involves such willfulness and maliciousness that it rises to the level of an independent tort or torts, entitling Plaintiff to recover punitive damages from Defendant, which were proximately and foreseeably caused by Defendant's breach.

SECOND CAUSE OF ACTION<br>[Breach of Implied-In-Fact Contract]

84.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 83 above as if set forth fully herein.

85.     Plaintiff and defendant entered into a valid and enforceable implied-in fact contract as demonstrated above and through telephone calls and e-mail exchanges, which entitles Plaintiff to twenty-five percent of the income after expenses of "The Ed Show" received by Defendant.

86.     In addition, the numerous actions by Queen, all approved by Schultz and set forth in the Statement of Facts, were unequivocally referable to the written and oral agreement.

87.     Defendant's words and conduct toward Plaintiff constituted an implied promise to pay to Plaintiff twenty-five percent of the income after expenses of "The Ed Show" received by Defendant.  Defendant's breach of that promise was without good cause and in bad faith. Defendant's promise in this respect was supported by adequate consideration including, but not limited to, continued substantial detrimental reliance, and as a direct and proximate result of Defendant's breach, Plaintiff suffered general damages.

88.     As a result of Defendant's defaults under and breaches of the implied contract, Plaintiff is entitled to a judgment in the amount equal to (i) the outstanding principal of twenty-five percent of the income after profits of "The Ed Show," plus (ii) accrued interest on the principal amount from the inception of "The Ed Show" to date, with interest accruing until payment is made, plus costs.  The exact amount of these damages is unknown, but is in excess of $100,000.  The information necessary to calculate these damages has been withheld from Plaintiff by Defendant.

89.     Moreover, Defendant's wrongful conduct, as set forth above in the Statement of Facts, constitutes bad faith and involves such willfulness and maliciousness that it rises to the level of an independent tort or torts, entitling Plaintiff to recover punitive damages from Defendant, which were proximately and foreseeably caused by Defendant's breach.


THIRD CAUSE OF ACTION
[Fraud in the Inducement]

90.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 89 above as if set forth fully herein.

91.     Schultz misled Queen as to facts upon which he relied in basing his decision to produce a pilot for "The Ed Show."  Queen entered into an agreement with Schultz, knowing it

was a contract, and Queen only entered into that agreement because Schultz gave Queen false information that Queen would own twenty-five percent of all sums realized by the program after deducting expenses.  Queen would not have entered into this agreement and produced a pilot for the show and provided all of the other services for Schultz set forth in the Statement of Facts unless Schultz had promised him ownership in the show.

92.     As a result of Defendant's fraud, Plaintiff is entitled to a judgment in the amount equal to (i) the outstanding principal of twenty-five percent of the profits of "The Ed Show" made to defendant, plus (ii) accrued interest on the principal amount from the inception of "The Ed Show" to date, with interest accruing until payment is made, plus costs.  The exact amount of these damages is unknown, but is in excess of $100,000.  The information necessary to calculate these damages has been withheld from Plaintiff by Defendant.

93.     Moreover, Defendant's wrongful conduct, as set forth in the Statement of Facts, constitutes bad faith and involves such willfulness and maliciousness that it rises to the level of an independent tort or torts, entitling Plaintiff to recover punitive damages from Defendant, which were proximately and foreseeably caused by Defendant's breach.


FOURTH CAUSE OF ACTION
[Tortious Interference with Business Relationships]

94.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 93 above as if set forth fully herein.

95.     Plaintiff and defendant entered into a valid and enforceable verbal and written agreement for a business relationship through telephone calls and e-mail exchanges that entitled plaintiff to twenty-five percent of income after expenses of "The Ed Show."  Plaintiff and

Defendant had a business relationship in which they hoped to have "The Ed Show" produced and income realized for each of them as owners.

96. As a result of this contract, Plaintiff contacted and pitched "The Ed Show" to the President of MSNBC, Phil Griffin.  However, Defendant later improperly directly entered into a contract with MSNBC and Griffin, excluding Plaintiff from any participation in the show even though Plaintiff was a part owner of said show.  Schultz acted purposefully and maliciously with intent to injure Plaintiff and induced a third party, MSNBC/Griffin not to enter into or continue a business relationship with the Plaintiff and caused the Plaintiff financial injury.

97.      As a result of Defendant's defaults under and breaches of the contract causing tortuous interference with Plaintiff's business relations, Plaintiff is entitled to a judgment in the amount equal to (i) the outstanding principal of twenty-five percent of the income after expenses of "The Ed Show" made to defendant, plus (ii) accrued interest on the principal amount from the inception of "The Ed Show" to date, with interest accruing until payment is made, plus costs. The exact amount of these damages is unknown, but is in excess of $100,000.  The information necessary to calculate these damages has been withheld from Plaintiff by Defendant.

98.      Moreover, Defendant's wrongful conduct, as set forth in the Statement of Facts, constitutes bad faith and involves such willfulness and maliciousness that it rises to the level of an independent tort or torts, entitling Plaintiff to recover punitive damages from Defendant, which were proximately and foreseeably caused by Defendant's breach.


FIFTH CAUSE OF ACTION
[Intentional Infliction of Emotional Distress]

99.      Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 98 above as if set forth fully herein.

100.    Plaintiff and defendant entered into a valid and enforceable verbal and written agreement for a business relationship, through telephone calls and e-mail exchanges, that entitled plaintiff to twenty-five percent of income after expenses of "The Ed Show."  Plaintiff and Defendant had a business relationship in which they hoped to have "The Ed Show" produced and income realized for each of them as owners.

101.    Schultz has refused to honor this contract and has acted intentionally and recklessly to deny compensation to Plaintiff.  Defendant's conduct is extreme and outrageous in that Schultz intended to injure Plaintiff by inducing a third party, MSNBC/Griffin, not to enter into or continue a business relationship with the Plaintiff.  Plaintiff suffered and continues to suffer from Defendant's conduct, and said conduct was the cause of Plaintiff's severe emotional distress and caused the Plaintiff financial injury.

102.    As a result of Defendant's defaults under and breaches of the contract causing intentional infliction of emotional distress, Plaintiff is entitled to a judgment in the amount equal to (i) the outstanding principal of twenty-five percent of the income after expenses of "The Ed Show" made to defendant, plus (ii) accrued interest on the principal amount from the inception of "The Ed Show" to date, with interest accruing until payment is made, plus costs.  The exact amount of these damages is unknown, but is in excess of $100,000.  The information necessary to calculate these damages has been withheld from Plaintiff by Defendant.

103.    Moreover, Defendant's wrongful conduct constitutes bad faith and involves such willfulness and maliciousness that it rises to the level of an independent tort or torts, entitling Plaintiff to recover punitive damages from Defendant, which were proximately and foreseeably caused by Defendant's breach.

WHEREFORE, Plaintiff respectfully requests judgment as follows:

i.      On the First Cause of Action, a judgment in the amount to be determined at trial, and interest, costs and attorneys' fees, as well as an award of punitive damages;

ii.     On the Second Cause of Action, a judgment in the amount to be determined at trial, and interest, costs and attorneys' fees, as well as an award of punitive damages;

iii.    On the Third Cause of Action, a judgment in the amount to be determined at trial, and interest, costs and attorneys' fees, as well as an award of punitive damages;

iv.     On the Fourth Cause of Action, a judgment in the amount to be determined at trial, and interest, costs and attorneys' fees, as well as an award of punitive damages;

v.      On the Fifth Cause of Action, a judgment in the amount to be determined at trial, and interest, costs and attorneys' fees, as well as an award of punitive damages;

vi.     On all causes of action, interest and costs and attorneys' fees, as well as such other and further relief as the court deems just and equitable; and

vii.    Trial by jury is requested.


Respectfully submitted


_____
MARK LANE
Member of the Bar of the District of Columbia
#445988
The Lane Law Firm
4 Old Farm Road
Charlottesville, VA 22903
Office: [434] 293-2349
Facsimile: [434] 293-9013
Email: mlane777@cs.com

_____
FRAZER WALTON, JR.
Member of the Bar of the District of Columbia
#374301
920 Burns Street, S.E.
Washington, DC 20019
Office: [202]584-7572
Email: frawalton@verizon.net

Attorneys for Plaintiff

Dated: May 10, 2011