# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL QUEEN )
313 Booth Street )
Gaithersburg, Maryland 20878 )
)
       Plaintiff, )
)   Case No. 1:11-cv-00871 BAH
  vs. )
)
ED SCHULTZ )
2032 Longbridge Road )
Detroit Lakes, MN 56501 )
)
       Defendant )
_____)
)
ED SCHULTZ )
)
       Counterclaimant, )
)
  vs. )
)
MICHAEL QUEEN aka MICHAEL ANDERSON )
)
       Counterdefendant. )
_____)

## ANSWER OF DEFENDANT ED SCHULTZ

Defendant Ed Schultz, ("Schultz") by and through his attorneys, as Answer to the Complaint generally denies each and all of the allegations except as specifically admitted below.

Schultz answers the allegations of the complaint as follows:

1. Upon information and belief, Schultz admits paragraph 1.

2. Schultz admits paragraph 2.

3. Schultz admits diversity of citizenship but denies jurisdictional damages in excess of $100,000 as alleged in paragraph 3.

4. Schultz denies the allegations in paragraph 4.

5. Schultz lacks the knowledge or information sufficient to form a belief about the truth of the allegation and therefore denies paragraph 5.

6.   The allegation is vague and ambiguous as to the time-frame of the allegation; and Schultz lacks the knowledge or information sufficient to form a belief as to when Queen first knew Schultz; and, therefore, denies paragraph 6.

7.   Schultz lacks the knowledge or information sufficient to form a belief about the truth of the allegation, has never been made aware of any such meetings by Queen, Russert or anyone at NBC; and, therefore denies paragraph 7.

8.   The allegation is vague and ambiguous as to the time-frame referred to; and Schultz lacks the knowledge or information sufficient to form a belief about its truth; and, admits only that he began his radio career in 1978 and his television career in 1980, his nationally syndicated radio show in January 2004 and *The Ed Show* on MSNBC in April, 2009.

9.   Schultz denies paragraph 9 as it pertains to a "tour;" and, admits only that Queen intercepted him as he was leaving the studio after an appearance on *Hardball*, invited him into the old Meet the Press studio for the purpose of asking Schultz if he was interested in getting into television.

10. Because the allegations in paragraph 10 are vague and ambiguous as to "pitch," "concept" and the "aforementioned show;" Schultz admits only that Queen asked him if he was interested in getting into television.

11.  Schultz denies discussing any specific concepts with Queen as alleged in paragraph 11; denies asking Queen to continue his development plans; denies having any knowledge or information sufficient to form a belief that Queen had any development plans to continue; and admits only that he told Queen he was interested in getting into television.

12. Schultz denies ever hiring Queen generally for any purpose and/or specifically "to make a TV show happen" as alleged in paragraph 12.

13. Schultz lacks the knowledge or information sufficient to form a belief regarding the content of Queen's beliefs in regard to Jomes Holm's presence; and, therefore denies paragraph 13.

14. Because Paragraph 14 is vague and ambiguous as to the identity of "the show" being referred to, and because Schultz lacks knowledge or information sufficient to form a belief as to

whether Queen ever met with Russert or whether Russert was ever involved in developing a show for Schultz, and because Schultz has never been informed of such meetings by Russert, Queen or NBC, Schultz denies it in its entirety.

15. Schultz lacks the knowledge or information sufficient to form a belief about the truth of paragraph 15; and, because Schultz has never been given any information by Russert, Queen or NBC that Queen was free to shop the concept around to other networks and outlets; and, because Schultz has never been given notice of any right of first refusal in favor of NBC; and, because Schultz is aware that Queen was conducting business under a false identify and email address, i.e.,  Michael Anderson "inspire808@gmail.com," for the purpose of precluding NBC from becoming aware Queen was attempting to produce a weekly Sunday morning television show with CNN and/or the CBS affiliate in Washington, D.C., Schultz denies the allegations of paragraph 15.

16. Schultz lacks the knowledge or information sufficient to form a belief about the truth of paragraph 16; and, because Schultz has never been given any information by Russert, Queen or NBC that Russert worked with Queen to develop the concept for a TV show; and, because Queen's prior allegations at paragraph 10 alleged Queen had already started to develop the concept in January, 2008 as opposed to February 2008 as alleged here, Schultz denies the allegations in paragraph 16.

17. Schultz admits he made guest appearances on various broadcasts including CNN's Larry King Live Show, Fox News and MSNBC among many others but has no knowledge or information sufficient to form a belief as to whether or when Queen began taping such appearances or for what purposes; and, in that regard Schultz denies paragraph 17.

18. Schultz admits that any and all dealings with Max Schindler were instigated solely and entirely by Queen and without Schultz' knowledge and/or approval; and, that any and all partnership offers to Schindler were made exclusively by Queen; and, that Schultz to his recollection and belief has never personally met Schindler and lacks knowledge as to Schindler's employment history; and, therefore, Schultz denies paragraph 18 but admits to the following:

- On March 3, 2008, Queen forwarded Schindler's email to Queen; and, in that email Schindler requested clarification as to whether Schindler and Queen were to be agents for Ed Schultz, Ed Schultz Productions or Executive Producers and Schindler further requested to talk to Schultz' attorney.

- On March 11, 2008, Queen emailed Schultz a "form" partnership agreement for a proposed partnership called Ed Schultz Television Production with the proposed principal place of business in Washington, D.C. proposed to commence on March 12, 2008 with an initial contribution of $100 each by Schultz, Queen and Schindler and ownership was proposed to be 1/3 each; and, such partnership agreement was never executed and no initial contributions were made.

- On March 16, 2008, Schultz refused the proposed partnership and Schultz' attorney emailed Michael Anderson/Queen an offer memorializing an exclusive representation or agency agreement to Queen and Schindler for the sole purpose of negotiating a television show with CNN based on the nationally syndicated Ed Schultz radio show.

- On May 29, 2008 Queen sent an email to Schultz' attorney requesting a contract for an equal partnership between Schultz, Queen and Schultz' attorney along with Queen's proposal that he receive 10% of Schultz' television salary for the duration of any TV production formed from their agreement; and, additionally, that Queen be included in any Schultz television enterprise.

- On June 1, 2008, Schultz' attorney responded in Queen's email stating he would discuss Queen's proposal with Schultz and then discuss it with Queen.  Schultz' attorney added "as I told you and Schindler previously, 30% ownership is out of the question"

- On June 6, 2008, Schultz' attorney sent an email to Queen stating that (1) as Queen has previously been told, 30% ownership is out of the question and 40% is even more unacceptable; (2) as Queen has previously been told, Schultz is not interested in having Queen's salary based on Schultz' salary; (3) Schultz is not interested in giving Queen any salary not allotted to ongoing responsibilities to be negotiated; and (4) as Queen had been

told previously, to cease and desist all possibly illegal efforts at raising capital for the proposed show using Schultz' name.

- On June 7, 2008, Queen emailed Schultz telling him that he did not have the energy to deal with lawyers and wanted Schultz to enter into an agreement without his attorney's involvement.

19. Schultz denies having a series of telephone conferences and any emails with Schindler regarding any matter; does not recall ever meeting Schindler in person and based on information and belief believes that Schindler may have participated in a May 24, 2008 telephone conference to discuss the possibility of producing a Sunday morning television show on WUSA, the CBS affiliate in Washington, D.C.

20. Schultz denies paragraph 20. [See paragraph 18, incorporated by reference.]

21. Schultz denies paragraph 21 as it pertains to *The Ed Show*; and denies entering into any agreement as alleged in paragraph 21; and any such negotiations, if any, were superseded by correspondence dated March 11 and 16, May 29, and June 1, 6 and 7 [See paragraph 18 incorporated by reference.]

22. Schultz denies paragraph 22 as it pertains to *The Ed Show*; and denies entering into any agreement as alleged in paragraph 22; and any such negotiations, if any, were superseded by correspondence date March 11 and 16, May 29, and June 1, 6 and 7 [See paragraph 18 incorporated by reference.]

23. Schultz admits paragraph 23.

24. Schultz admits paragraph 24 as it pertains to the March 16, 2008 email.

25. Schultz denies paragraph 25 as it pertains to Schultz' "delay" in signing a contract; and, admits only that he at all times refused to enter into the March 11, 2008 "form" partnership contract and/or any such other contract with Queen and/or Schindler. [See paragraph 18 incorporated by reference.]

26. Schultz denies paragraph 26 because (1) no such agreement was entered into; and to the extent any such negotiations may have been discussed, they were superseded by correspondence dated March 11 and 16, May 29, and June 1, 6 and 7 [See paragraph 18

incorporated by reference]; and, (2) Schultz denies having a series of telephone conferences and/or other correspondence with Schindler regarding any matter; does not recall ever meeting Schindler in person and based on information and belief believes only that Schindler may have participated in a May 24, 2008 telephone conference to discuss the possibility of producing a Sunday morning television show on WUSA the CBS affiliate in Washington, D.C.; and, Schultz admits only that (1) on March 16, 2008, Schultz' attorney sent an email rejecting Schindler's request to secure an agreement that Schultz, Queen and Schindler would form an equal partnership for any broadcast opportunities resulting from Ed Schultz Production partnership; (2) Schultz agreed to terminology for a proposed "letter of understanding" that was to be result in a partnership agreement to be negotiated within the following 30 days; (3) No "letter of understanding" was ever agreed to and executed; and (4) no partnership agreement was negotiated within the stated timeframe or any subsequent timeframe.

27.  Because it is hearsay, because Schultz lacks the knowledge or information sufficient to form a belief about the truth of what Schindler told Queen, and, because there was no project from which Schindler could withdraw, Schultz denies paragraph 27.

28. Schultz denies that Queen spoke of his concerns about Shultz' trust issues as alleged in paragraph 28; and, admits only that on June 7, 2008 Schultz received an email from Queen stating "Thanks for getting back to me.  I feel comfortable dealing with you and your wife, (who impresses me as a very special human being). . . ."

29. The allegations, as stated, are ambiguous as to the subject matter of the April 5, 2008 email and, Schultz denies that the email pertained to *The Ed Show*;  and, Schultz admits only that paragraph 29 pertains to the March 16, 2008 email giving Queen and Schindler exclusive rights to promote or sell a proposed weekly television show based on Shultz' nationally syndicated radio show to CNN.

30. Schultz lacks the knowledge or information sufficient to form a belief about the truth of the matter alleged; and because Schultz has never been informed by Zucker, NBC or Queen that such conversations occurred, Schultz denies paragraph 30.

31. Schultz lacks the knowledge or information sufficient to form a belief about the truth of the matter alleged, and because Schultz has never been informed by Zucker, NBC or Queen that such conversations occurred, Schultz denies paragraph 31.

32. Schultz lacks the knowledge or information sufficient to form a belief about the truth of the matter alleged, and because Schultz has never been informed by Zucker, NBC or Queen that such conversations occurred, Schultz denies paragraph 32.

33. Schultz lacks the knowledge or information sufficient to form a belief about the truth of the matter alleged regarding whether Queen sent an inter-office package, what purpose Queen may have sent an inter-office package, and, if such inter-office package was sent, its contents; and, therefore, Schultz denies paragraph 33.

34. Schultz lacks the knowledge or information sufficient to form a belief about the truth of the matter alleged, and because Schultz has never been informed by Zucker, Fox, Silverman, NBC or Queen that such conversation occurred, Schultz denies paragraph 34.

35. Schultz has no independent recollection of the April 19, 2008 email referenced in paragraph 35; and, Schultz admits only that on July 17, 2009 Schultz' attorney sent Queen an email including an undisputed statement referencing Queen's prior admission that some package he sent to NBC was returned unopened because NBC does not accept or consider unsolicited projects.

36. Schultz denies paragraph 36 because he has no independent recollection of the response referred to therein; does not know what the alleged comment "it sounds great" refers to; and, Schultz lacks the knowledge or information sufficient to form a belief about the truth as to whether Queen pitched Roger Ailes of FOX Media Group and/or what the content or context of the pitch was.

37.  Schultz lacks the knowledge or information sufficient to form a belief about the truth of any suggestions Russert may have given Queen and/or whether Queen sent e-mails or other information to Phil Griffin pitching an "Ed Schultz show," and, Schultz therefore denies paragraph 37.

38. Schultz lacks the knowledge or information sufficient to form a belief about the truth of whether Queen ever spoke to Phil Griffin by telephone as alleged in paragraph 38; nor about the content or context of any such telephone conversation that may have occurred; and, Schultz therefore denies paragraph 38.

39. Schultz lacks the knowledge or information sufficient to form a belief about the content or context of any conversation Griffin may have had with Queen; and, therefore Schultz denies paragraph 39.

40. Schultz lacks the knowledge or information sufficient to form a belief about the truth of whether such telephone records exist as alleged; and/or whether such records are probative as to the contents or context of any conversations as alleged; and, Schultz therefore denies paragraph 40.

41. Schultz lacks the knowledge or information sufficient to form a belief about the truth of whether such March 20, 2008, e-mail was written to Russert stating plans to shoot a pilot in Studio A in Washington; and, because Queen advised Schultz by email at about 6:15 p.m. on May 30, 2008 that NBC confirmed availability of Studio A in Washington at approximately 5:15 p.m. on May 30, 2008, Schultz denies paragraph 41.

42. Schultz lacks the knowledge or information sufficient to form a belief about the truth of whether Queen had the alleged conversations with Michael Jack or Russert; and Schultz therefore denies paragraph 42.

43. Schultz admits paragraph 43. [See paragraph 42 which is incorporated by reference.]

44. Schultz has no independent recollection of such correspondence and therefore lacks the knowledge or information sufficient to form a belief about whether such an email occurred and/or the content or context of such email; and Schultz therefore denies paragraph 44.

45. Schultz has no independent recollection of Queen's concerns about trust on May 30, 2008 as alleged in Paragraph 45; and, Schultz admits only that Queen sent him an email on June 7, 2008 stating "I feel comfortable dealing with you and your wife, (who impresses me as a very special human being" and, therefore, Schultz denies.  Schultz also admits that Queen's June 7,

2008 email stated he "might draw up a tentative agreement and send it to [him] for a look see . . . just to get us successfully thru the pilot and we can decide where to go from there."

46. Schultz denies paragraph 46 as it pertains to *The Ed Show* and admits as it pertains to the failed projects to create a weekly show for CNN or later for a Sunday morning show on WUSA in Washington, D.C. which would be produced, owned and financed by Schultz et al.

47. Schultz denies paragraph 47 as it pertains to *The Ed Show* and admits only as it pertains to Queen's failed efforts to create a Sunday morning television show based on the Ed Shultz Radio Show.

48. Schultz admits paragraph 48.

49. Schultz denies the allegations of paragraph 49 and admits only that on March 5, 2009, Queen paid $11,000 (not $11,500 as alleged) to NBC on check number 111; and, on or immediately before May 12, 2009, Queen first advised Schultz there was an outstanding invoice due NBC; and, on May 12, 2009, Schultz reimbursed Queen $12,000 via check number 5225 indicating "Pilot Presentation" on the memo line.

50. Schultz denies paragraph 50 as it pertains to *The Ed Show*; and, admits as it pertains to Queen's failed efforts to create a Sunday morning television show based on the Ed Schultz Radio Show.

51. Schultz denies paragraph 51 as it pertains to *The Ed Show* and admits as it pertains to Queen's failed efforts to create a Sunday morning television show based on the Ed Schutz Radio Show.

52. Schultz denies paragraph 52 as it pertains to *The Ed Show*; and, Schultz lacks the knowledge or information sufficient to form a belief about the truth of whether Queen pitched any other show to Horlick, the General Manager of WUSA, the CBS affiliate station in Washington, D.C. on August 11, 2008; however Queen's email to Schultz dated April 25, 2008 refreshes Schultz' recollection that Queen represented he would contact Horlick at or about April 25, 2008.

53. Schultz denies the allegations in paragraph 53, particularly Queen had no agency agreement with Schultz at any time for any purpose; and, any representations by Queen that he

was an agent for Schultz was unauthorized and fraudulent in nature; and, Schultz further denies the allegations in paragraph 53 as they pertain to Susan O'Connell who similarly had no agency agreement with Schultz at any time for any purpose; and, any representations by O'Connell that she was acting as an agent for Schultz was unauthorized and fraudulent in nature.

54. Schultz denies the allegations in paragraph 54 and asserts that Schultz and Schultz' wife secured their apartment in Washington, D.C.; and, to Schultz knowledge and belief, Queen's only involvement was volunteering to call and subsequently calling the apartment manager to schedule an appointment for Schultz.

55. Schultz denies the allegations in paragraph 55 as it pertains to O'Connell securing the Schultz' apartment; and, Schultz admits only that Queen and O'Connell volunteered to pick up some grocery and other items for Schultz before he arrived in Washington, D.C.; and, Schultz further admits that he reimbursed Queen $361.21 on March 17, 2009 by his check number 5167 for those items picked up on Schultz' behalf.

56. Schultz denies the allegations in paragraph 56 as it pertains to O'Connell procuring items for Schultz; and, Schultz admits only that Queen and O'Connell volunteered to pick up some grocery and other items for Schultz before he arrived in Washington, D.C.; and, Schultz further admits that he reimbursed Queen $361.21 on March 17, 2009 by his check number 5167 for those items picked up on Schultz' behalf.

57. Schultz does not have any independent recollection of the January 17, 2009 e-mail and can neither admit or deny its content or the context of ". . . telling them they 'are moved in' to their new apartment. . ."; and, Schultz therefore, denies paragraph 57.

58. Schultz does not have any independent recollection of the e-mail including its content or context of "we owe you guys so much"; and, therefore, Schultz denies paragraph 58 and admits only that it is not uncommon for him to express gratification for persons that volunteer to assist him, e.g., picking him up at the airport, driving him to speaking engagements, shopping for items reflected in the $361.21 check by which he reimbursed Queen.

59. Schultz denies that he moved to Washington D.C. to "live" and admits only that he incurred costs and expenses in moving to Washington, D.C. on or about January 18, 2009

because of Queen's fraudulent assurance that Schultz would secure a contract with WUSA for a syndicated Sunday morning television show based on the *McLaughlin Group* concept.

60. Assuming "them" and "their" refer to Ed and Wendy Schultz, Schultz admits paragraph 60.

61. Assuming "them" refers to Ed and Wendy Schultz, Schultz admits that Queen drove them to an engagement as alleged in paragraph 61.

62. Schultz denies paragraph 62 that the car he used was O'Connell's "personal car;" and, Schultz admits only that O'Connell offered to let Schultz use an older car that she represented was sitting in a garage not being used.

63. Schultz denies paragraph 63; and admits only the following:  (1) that he offered compensation to O'Connell for temporary use of a vehicle for purposes of commuting to work; (2) that despite his repeated offers to compensate O'Connell, she has never invoiced Schultz nor was she willing to accept compensation for use of the vehicle; (3) that O'Connell may have worked at Queen's direction on some production work on the pilot, she has never invoiced Schultz for such work; and (4) Schultz reimbursed Queen $12,000 to repay all $11,000 production costs plus an additional $1,000 for additional costs, if any, were incurred.

64. Schultz denies paragraph 65 because Horlick never offered any television show to Schultz, and because Horlick was never in a position to select an executive producer or any other employee on any project Schultz was ever involved in; and, Schultz admits only that Horlick eventually offered Schultz the opportunity to rent studio space from WUSA wherein Schultz could produce the proposed Sunday morning television show at Schultz' expense.

65.   Schultz lacks the knowledge or information sufficient to form a belief about the truth of whether Horlick was concerned about ad time and/or what prompted Horlick's offer to rent studio space to Schultz; and Schultz further denies paragraph 65 as it pertains to (1) that he and Queen "would continue to own the show" as there was no show to own and no agreement executed regarding potential ownership and  (2) that Horlick was ever in a position to determine ownership of any television show in which Schultz was or would be involved; and, Schultz

admits only that (1) Horlick offered to rent studio space to Schultz for $5,000 per episode; (2) Schultz would pay for all other related production costs.

66. Schultz denies paragraph 66 because there was never a "deal" as referred to therein and because Queen was never an owner of any television show with Schultz, and because there was no television show.

67. Schultz lacks the knowledge or information sufficient to form a belief about the truth as to whether Queen pitched the show to Phil Griffin as alleged in paragraph 67; and, Schultz denies that Phil Griffin called Schultz directly and hired him for *The Ed Show* as alleged; and, Schultz admits only that he personally met with Phil Griffin on or shortly before April 6, 2009 to offer him "The Ed Show."

68. Schultz denies the allegation in paragraph 68; and, Schultz admits *The Ed Show* is live on MSNBC at 10:00 p.m. Eastern, Monday through Thursday.

69. Schultz does not have an independent recollection of a personal meeting with Queen on June 1, 2009 as alleged in paragraph 69; and, Schultz denies telling Queen "that he would pay the money he owed to Queen" as alleged because they had been paid months earlier; Schultz admits only the following:  (1) any and all moneys due Queen were reimbursed on May 12, 2009, via check number 5225 memo "Pilot Presentation" in the amount of $12,000 to reimburse Queen for NBC's $11,000 invoice plus all additional expenses, if any; (2) on October 27, 2009, Schultz' attorney emailed Queen stating that on May 12, 2009, Schultz' production company issued a check to Queen in the amount of $12,000 for payment in full of his $11,000 written invoice that Queen sent Schultz shortly before that date and that the additional moneys were to cover costs, if any, not included on the NBC invoice; (3) the email further went on to ask Queen to let him know if there is some other outstanding invoice related to production costs that Schultz is not aware of; (4) on October 27, 2009, Queen responded by email to Schultz' attorney that "The pilot is not the issue" and went on to rehash unrelated issues; (5) Schultz' attorney responded to Queen by e-mail on October 28, 2009 stating, "Mike, I don't think it's a good idea to have another conversation regarding the same issues we've already discussed.  My

correspondence was for the sole purpose of finding out if there was an issue regarding the pilot which apparently there isn't."

70. Schultz does not have an independent recollection of a personal meeting with Queen on June 1, 2009 as alleged in paragraph 70; and Schultz denies "agreeing to pay for other expenses incurred in the production of the pilot" as alleged for reasons stated in paragraph 69 which are incorporated by reference.

71. Schultz denies the allegations in paragraph 71; and, admits that communications with Queen stopped because of Queen's bizarre conduct, threatened litigation and because he was stalking Schultz and Schultz' wife; and, in that regard Schultz admits only the following:

- On July 8, 2009, Queen left voice messages for Schultz' wife indicating he was shopping around for financiers of litigation against Schultz and NBC; and Schultz' attorney e-mailed Queen requesting his attorneys contact him.

- On July 21, 2009, Schultz' attorney e-mailed Queen advising him that in response to Queen's threatened litigation, Schultz had been advised not to communicate with Queen.

- On July 27, 2009, Queen left a voice mail for Schultz threatening to bring the union and international union into the situation if Ed did not bow to Queen's demands to be paid 12% of Schultz' income for as long as Schultz was involved in television; and, Queen further threatened that several lawyers agreed to take on a case against Schultz at no cost. In response Schultz' attorney e-mailed Queen advising that Schultz would not submit to blackmail, that Queen's threatened litigation was baseless and that Schultz would offer nothing to settle. Yet another request was made for Queen to discontinue contact and/or further attempts to contact Schultz or his wife.

- On July 30, 2009, Schultz' attorney sent another *Cease & Desist* letter to Queen advising him to stop further attempts to contact Ed or Wendy Schultz, leaving threatening voice mails; and, Schultz' attorney further advised Queen that such acts violated New York stalking statutes.

- On November 17, 2009, Schultz' attorney responded by e-mail to Queen's request to meet with Schultz stating they would not meet with Queen and "the matter was closed."

-  On April 8, 2010, Schultz' attorney e-mailed Queen to cease and desist his "continual unwanted contacts [falling] under the purview of stalking statutes."

- On July 21, 2010, after Queen addressed an NBC employee "News Town Hall Meeting" at the NBC Facility in New York where he read a defamatory statement publically accusing Schultz of, among other things, stealing and causing him to finance his home to pay for the pilot.  Afterward, security discovered Queen on an unauthorized floor of the NBC building in search of Wendy Schultz and escorted him out of the building.

72. Schultz denies paragraph 72 because his attorney's statement that "he would advise his clients to seek 'judicial relief from [Queen's] harassment including a prayer for related fees and costs'" was not an attempt to intimidate Queen from seeking compensation as alleged in paragraph 72; and, Schultz admits that on April 7, 2007, Schultz' attorney e-mailed Queen advising him that Queen's proper course would be to pursue numerous legal remedies that were available to him rather than cause further harassment to the Schultz family.

73. Schultz lacks the knowledge or information sufficient to form a belief about the truth as to whether Queen wrote MSNBC or NBC Universal and/or the content or context of such communications, if any; and Schultz therefore denies paragraph 73.

74. Schultz lacks the knowledge or information sufficient to form a belief about the truth as to whether MSNBC or NBC Universal communicated with Queen and/or to the content or context of any such communications, if any; and Schultz therefore denies paragraph 74.

75. Schultz specifically denies all of the allegation in paragraph 75 because (1) Schultz never had a contract with Queen; (2) Queen is not an owner of *The Ed Show*; and, (3) Schultz is not an owner of *The Ed Show*; and Schultz admits only that Queen was paid in full for all monies owed him, i.e., $12,000 for payment in full of all pilot-related costs; and $361.21 for grocery shopping reimbursement.

76. Schultz denies the allegations in paragraph 76 and further denies that anyone other than MSNBC and/or its parent company is an owner or part owner in The Ed Show.

77. Schultz denies the allegations in paragraph 77 and further denies he was receiving a salary of $1,000,000 as alleged.

78. Schultz admits the allegations in paragraph 78.

79. Schultz repeats and realleges his denials and admissions to paragraphs 1-78.

80. Schultz denies the allegations in paragraph 80.

81. Schultz denies the allegations in paragraph 81.

82. Schultz denies the allegations in paragraph 82.

83. Schultz denies the allegations in paragraph 83.

84. Schultz repeats and realleges his denials and admissions to paragraphs 1-83.

85. Schultz denies the allegations in paragraph 85.

86. Schultz denies the allegations in paragraph 86.

87. Schultz denies the allegations in paragraph 87.

88. Schultz denies the allegations in paragraph 88.

89. Schultz denies the allegations in paragraph 89.

90. Schultz repeats and realleges his denials and admissions to paragraphs 1-89.

91. Schultz denies the allegations in paragraph 91.

92. Schultz denies the allegations in paragraph 92.

93. Schultz denies the allegations in paragraph 93.

94. Schultz repeats and realleges his denials and admissions to paragraphs 1-93.

95. Schultz denies the allegations in paragraph 95.

96. Schultz denies the allegations in paragraph 96.

97. Schultz denies the allegations in paragraph 97.

98. Schultz denies the allegations in paragraph 98.

99. Schultz repeats and realleges his denials and admissions to paragraphs 1-98.

100.    Schultz denies the allegations in paragraph 100.

101.    Schultz denies the allegations in paragraph 101.

102.    Schultz denies the allegations in paragraph 102.

103.    Schultz denies the allegations in paragraph 103.

## **AFFIRMATIVE DEFENSES**

A.    Plaintiff's claims are barred in whole or in part for failure to state a claim on which relief can be granted.

B.    Plaintiff's claims are barred in whole or in part because of illegality.

C.    Plaintiff's claims are barred in whole or in part because Plaintiffs have failed to name all necessary parties.

D.    Plaintiff is wholly or partially at fault, thereby reducing or eliminating his damages, if any, by way of the doctrine of comparative fault, and that his injuries, if any, were caused or contributed to by his own misconduct.

E.    Plaintiff's claims are barred in whole or in part by the doctrine of assumption of the risk, waiver and/or estoppel.

F.    Plaintiff's damages, if any, are barred in whole or in part because he failed to mitigate.

G.    Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

H.    Plaintiff's claims are barred in whole or in part because of intervening and/or superseding events.

I.    Plaintiff's claims are barred in whole or in part because of his own material breaches, thereby excusing Defendant's obligations and performance.

J.    Plaintiff's damages, if any, are subject to recoupment and set-off from Defendant's damages as alleged in the counterclaim.

K.    Plaintiff's claims are barred in whole or in part because of failure of consideration.

L.    Plaintiff's claims are barred in whole or in part because there was no meeting of the minds.

M.    Plaintiff's claims are barred in whole or in part because of fraud.

N.    Plaintiff's claims are barred in whole or in part because of payment.

O.    Plaintiff's claims are barred in whole or in part because of statute of frauds.

P.    Plaintiff's damages are barred in whole or in part because of contributory negligence.

**PRAYER FOR RELIEF**

WHEREFORE, having fully answered the claims, Defendants request that the Court enter judgment as follows:

A.  For Judgment against Plaintiff and in favor of Defendant, dismissing the complaint with prejudice so that Plaintiff takes nothing thereon;

B.  For Defendants' attorneys' fees;

C.  For Defendants' taxable costs; and,

D.  For any other relief the Court deems proper under the circumstances.

**COUNTERCLAIM**

As a Counterclaim, Ed Schultz states:

**PARTIES, JURISDICTION, VENUE**

1.  Counterdefendant Michael Queen ("Queen") is an adult resident of the State of Maryland.

2.  Counterclaimant Ed Schultz ("Schultz") is an adult resident of the State of Minnesota.

3.  This Court has jurisdiction based upon jurisdiction established in the underlying Complaint, Case no. 1:11-cv-00871 filed in United States District Court for the District of Columbia; and, because it is an action for money damages, and other appropriate relief, in excess of $100,000.

**COUNTERCLAIM COUNT I - FRAUD**

4.  Paragraphs 1-78 of Schultz' Answer to the Complaint, and Paragraphs 1-3 of the Counterclaim, supra, are incorporated by reference.

5.  On or about December, 2009, Queen assured and represented to Schultz that a Sunday morning television show was imminent on WUSA in Washington, D.C.; and, that a deal had been struck with Allan Horlick at WUSA wherein Schultz could finance or cause to be financed a nationally syndicated Sunday morning television show at a cost of $5,000 per week.

6.  At the time Queen made such representations, he knew or should have known that each of such representations were false; and, he made such representations with the intent to

induce Schultz' reliance on them and with the contemplated result being for Schultz to move to Washington, D.C.

7.   Schultz justifiably relied on Queen's representations which were material and significant to Schultz; and, substantially caused him to end his decades-long radio career in Fargo, ND and uproot his family to move to Washington, D.C.

8.   General and special damages were incurred by Schultz that were proximately caused by Queen's above-referenced misrepresentations; and, such costs included lost income; costs involved in moving to and residing in Schultz' Washington, D.C. apartment; costs related to the lease and maintenance of Schultz' Washington, D.C. apartment after Schultz moved to New York City, NY; legal costs related to the failed Washington, D.C. television project; and other costs, not limited to $12,000 for the production of the pilot.

## COUNTERCLAIM COUNT II – SLANDER PER SE

9.   Paragraphs 1-78 of Schultz' Answer to the Complaint, and Paragraphs 1-8 of the Counterclaim, supra, are incorporated by reference.

10. As alleged herein, Queen repeatedly and continually published false, unprivileged, oral statements concerning Schultz which resulted in injury to Schultz' business and professional reputation.

11. Such false, unprivileged oral statements included accusations that Schultz had a business contract with Queen and that Schultz reneged on or otherwise breached that contract; that Schultz defrauded Queen and that Schultz owed Queen money for, among other things, producing a pilot for a proposed television show; and, that Schultz caused Queen to mortgage his house to finance the pilot for a proposed television show project.

12. At the times Queen published these public and private statements to NBC, MSNBC, NBC/MSNBC News management and employees on July 21, 2010 and repeatedly thereafter, Queen knew them all to be false and slanderous in nature.

13. That such public and private statements to NBC, MSNBC, NBC/MSNBC News management and employees on July 21, 2010 were slanderous and malicious and made for the purpose, among other things, of injuring Schultz' business reputation.

14. That Queen repeatedly published such public and private statements which were republished throughout the United States at Queen's prompting.

15. That all such public and private statements published by Queen and republished by others proximately caused injury to Schultz' business reputation.

16. That all such public and private statements were slanderous in nature, malicious and intentional and knowingly false when made.

### COUNTERCLAIM COUNT III – LIBEL PER SE

17. Paragraphs 1-78 of Schultz' Answer to the Complaint, and Paragraphs 1-16 of the Counterclaim, supra, are incorporated by reference.

18. On July 21, 2010, Queen knowingly repeated the herein alleged false statements at a NBC/MSNBC News Town Hall Meeting, and when he published such false statements, he knew that his statements were being videotaped and that his comments would be made part of a permanent, indelible, fixed publication.

19. As acknowledged in paragraph 73 of the underlying complaint, Queen wrote to NBC Universal "to alert them to the fact that he, Queen, was entitled to compensation as he had a contract with Schultz; and, when he published such written false statements, he knew that his statements were false and that his comments would be made part of a permanent, indelible, fixed publication.

20. On or before May 10, 2010, Queen caused to be written a "press release" containing the false and slanderous statements alleged herein; and published such "press release" to, among others, Schultz' home town newspaper in Fargo, ND which is where Schultz attended college, was a well-known college athlete, started and continued his broadcasting career and was and remains a well-known public figure.

21. Fargo, ND is geographically removed from any of the allegations upon which Queen based jurisdiction on the complaint, and, therefore such publication was malicious and served no feasible judicial purpose.

22. The above-referenced publications contained false statements of fact.

23. All of the above-referenced publications were malicious, were intended to and did expose Schultz to hatred, contempt, ridicule, disgrace and/or tended to injure Schultz occupation and other business interests including, but not limited to, his construction company.

24. None of the above-referenced publications were privileged.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaimant respectfully requests judgment as follows:

1. On Counterclaim #1 for fraud, a judgment for general and special damages in the amount to be determined at trial and interest, costs and attorney's fees, as well as an award for punitive damages.

2. On Counterclaim #2 for slander per se, a judgment for compensatory, special, punitive damages in the amounts to be determined at trial and interest, costs and attorney's fees.

3. On Counterclaim #3 for libel per se, a judgment for compensatory, special, punitive damages in the amounts to be determined at trial and interest, costs and attorney's fees.

4. On all counterclaims, interest and costs and attorneys' fees, as well as such other and further relief as the Court deems just and equitable; and

5. Trial by jury is requested.

Dated: May 24, 2011                                    Respectfully submitted


_____          _____/s/_____
Jeffrey B. Landa (CA Bar No. 171217)        John C. Hayes, Jr. (DC Bar No.183582)
*Pro Hac Vice* Pending                      NIXON PEABODY, LLP
THE LAW OFFICES OF JEFFREY B. LANDA         401 9th Street, N.W.
1202 South 24th Avenue                      Suite 900
Fargo, ND 58103                             Washington, D.C. 20004
Telephone: (612) 306-8542                   Telephone: (202) 5858345
Facsimile: (701) 241-9309                   Facsimile: (202) 585-8080
E-mail: JBLLawyer@gmail.com                 E-mail: jhayes@nixonpeabody.com

Attorneys for defendant and counterclaimant

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of May 2011, I caused a true and correct copy of the

foregoing Answer of Defendant Ed Schultz to be filed by Electronic Case Filing System, which

will send copies to the following counsel of record to:

Frazer Walton, Jr.
920 Burns Street, S.E.
Washington, D.C. 20019


_____/s/_____
John C. Hayes, Jr.