**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MICHAEL QUEEN,<br><br>            Plaintiff,<br><br>      v.<br><br>EDWARD SCHULTZ,<br><br>            Defendant. | Civil Action No. 11-871  (BAH)<br><br>Judge Beryl A. Howell |
| EDWARD SCHULTZ,<br><br>            Counter-Claimant,<br><br>      v.<br><br>MICHAEL QUEEN,<br><br>            Counter-Defendant. |  |

**<u>MEMORANDUM OPINION</u>**

This case concerns the nature of the relationship between two parties involved in the formation of "The Ed Show"—a political news commentary television program hosted by the defendant, Ed Schultz, on MSNBC.  The plaintiff, Michael Queen,[1] claims that he was left out of the show when it was brought to air on MSNBC, and as a result he brings five causes of action against the defendant:  breach of contract, breach of implied-in-fact contract, fraud in the inducement, tortious interference with a business relationship, and intentional infliction of emotional distress.  The plaintiff claims, in essence, that he and the defendant were engaged in a

---

[1] In several of the record exhibits, Mr. Queen sent e-mails from an e-mail address associated with the name "Michael Anderson."  Although the defendant accuses the plaintiff of "conducting business under a false identify [sic]" as a result of using the name "Michael Anderson," Answer ¶ 15, ECF No. 5, the plaintiff has explained that "Anderson" is in fact his middle name.  *See* Pl.'s Mot. to Disqualify Jeffrey Landa, Esq., as Counsel for Def. Schultz ("Pl.'s Mot. to Disqualify") at 9, ECF No. 13.

joint enterprise to put the defendant on television and that, as a result, he is now entitled to twenty-five percent of the profits earned by the defendant as a result of the "The Ed Show."  The defendant, in turn, makes three counterclaims all sounding in tort:  fraud in the inducement, libel, and slander.  The defendant seeks damages for what he claims were false promises made to keep him involved in the project and retributory actions taken after it became clear that the plaintiff would not be involved in "The Ed Show."

Pending before the Court are two motions for summary judgment filed by the defendant and a cross-motion for partial summary judgment filed by the plaintiff, which in combination seek dismissal of all claims and counterclaims.  For the reasons stated below, the Court grants all three motions.

## I.    BACKGROUND

The plaintiff alleges that in 2007, while working for NBC in Washington, D.C., he developed an idea for a television show featuring the defendant, who at that time was a radio talk show host.  Compl. ¶¶ 5, 8, ECF No. 1.  Although the plaintiff and the defendant had yet to meet, *id.* ¶ 6, in January 2008 the plaintiff says he spoke to the late Timothy Russert, "who at that time was the Senior Vice President of NBC News and Washington Bureau Chief, pitching the idea for an NBC television show" featuring the defendant.  *Id.* ¶ 7.

In January 2008, according to the plaintiff, he and the defendant met for the first time, when the plaintiff gave the defendant a tour of the NBC Washington office building.  *Id.* ¶ 9.  It was during that tour that the plaintiff allegedly first pitched the idea for the show to the defendant, and in response the defendant allegedly expressed interest in moving forward with the show's development.  *Id.* ¶ 10–11.  Taking the defendant's interest as a green light, the plaintiff began developing and pitching the show in earnest.  The plaintiff claims that he continued to

meet with Russert to develop the show, he created a "demonstration reel" of the defendant's guest appearances on other programs, and he brought in a former NBC News co-worker, Max Schindler, to help develop the show. *Id.* ¶¶ 14, 16–18; *see also* Decl. of Max Schindler ("Schindler Decl.") ¶ 2, ECF No. 24-1.

Between March and June of 2008, the plaintiff claims that he, the defendant, the defendant's attorney Jeffrey Landa,[2] and Schindler engaged in a number of communications via telephone and e-mail, attempting to negotiate a contract that would govern the process of their joint development of the proposed show. Compl. ¶¶ 19–26, 28–29, 45–48; Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Pl.'s First Opp'n") Exs. 1, 3–4, 6, 9–11, 14, ECF No. 24-4. The first recorded communication in this regard took place on March 5, 2008, when the defendant sent the plaintiff an e-mail saying that he would "agree to a 50-25-25 percentage formula of profits after expenses of the show." Pl.'s First Opp'n Ex. 1. Although not specified in the e-mail, the implication was that 50% would go to the defendant, 25% would go to the plaintiff, and 25% would go to Schindler. On March 16, 2008, Landa sent the plaintiff an e-mail expressing agreement in principle to having the defendant sign a partnership agreement whereby the defendant, the plaintiff, and Schindler would form a "partnership or corporation . . . for any television broadcast opportunities that occur as a result of this agreement," with final terms to be executed within 30

---

[2] The fact that Landa was an integral participant in the events underlying the allegations in the Complaint, yet persisted in serving as the defendant's counsel in this lawsuit, raised clear conflict of interest issues. *See* Pl.'s Mot. to Disqualify at 4–5. The Court addressed this issue at the initial Scheduling Conference on July 8, 2011 and again at a Status Conference on October 21, 2011. At that time, Landa represented that he had discussed the potential conflict with his client and felt that he could continue to represent the defendant without adversely affecting his interests. *See* Tr. of Scheduling Conference at 3:11–4:23 (July 8, 2011) (unofficial rough transcript). The defendant also expressly waived any potential conflict. *See* Decl. of Edward Schultz in Opp'n Pl.'s Mot. to Disqualify ¶ 7, ECF No. 14-1 ("I have decided that no conflict of interest exists in this case; and that I desire Mr. Landa to continue as my attorney.").

days.  *Id.* Ex. 14.[3]  The written partnership agreement contemplated by Landa's e-mail, however, was never executed.

Landa also sent the plaintiff a second e-mail on the same day, March 16, 2008, entitled "Proposed Agency Agreement."  *Id.* Ex. 3.  The second e-mail purported to memorialize an exclusive representation or agency agreement, granting the plaintiff and Schindler exclusive authority to negotiate a television show on behalf of the defendant with CNN.  *Id.*  It further provided that if such a show were successful, "Ed Schultz will enter into an exclusive agreement with [Michael Queen and Max Schindler] for the production of that show at terms to be negotiated according to industry standards."  *Id.*[4]

Sometime after March 16, 2008, Schindler left the project and encouraged the plaintiff to do so as well, citing a lack of trust in the defendant as the reason for his departure.  Schindler Decl. ¶ 3 ("I did not trust Mr. Schultz.  I warned Mike that it was my belief he should abandon this project with Schultz or he would regret it.").  Apparently, the departure of Schindler, and the reason for his departure from the project, prompted the defendant to provide assurances to the

---

[3] Landa's first e-mail to the plaintiff on March 16, 2008 read in full as follows:

I would agree to having Ed sign the following.

This document serves as a letter of understanding in which ***Ed Schultz, Michael Queen and Max Schindler agree to form a partnership or corporation under the name "Ed Schultz Productions" for any television broadcast opportunities that occur as a result of this agreement***.  Articles of incorporation and/or final terms of the partnership agreement will be negotiated and executed within the next thirty (30) days.

Pl.'s First Opp'n Ex. 14 (emphasis added).

[4] Landa's second e-mail to the plaintiff on March 16, 2008 read in full as follows:

Will this work? Let me know.  JBL [Jeffrey B. Landa].

This document memorializes an exclusive representation or agency agreement wherein Michael Queen and Max Schindler will have exclusive authority to negotiate a television show with CNN to be based on the nationally syndicated Ed Schultz radio show.  It is further agreed that Ed Shultz will not utilize the services of others to promote or sell his show to CNN; and, in the event Michael Queen and Max Schindler successfully obtain an exceptable [sic] offer from CNN, Ed Shultz will enter into an exclusive agreement with them for the production of that show at terms to be negotiated according to industry standards.

*Id.* Ex. 3.

plaintiff.  Pl.'s Statement of Material Facts as to Which There Exists a Genuine Issue Necessary to Be Litigated ("Pl.'s Statement of Material Facts") ¶¶ 12–13, ECF No. 24.  Specifically, on April 5, 2008, the defendant personally e-mailed the plaintiff assuring him:  "I will not do a TV deal without your involvement and that includes financial involvement."  Pl.'s First Opp'n Ex. 4; *see also id.* Ex. 11 (June 8, 2008 e-mail from Schultz to Queen stating "I really want you to be a partner but you seem to have a hard time trusting me and understanding that").[5]

Assuaged by the defendant's assurances, the plaintiff says that he then began contacting television networks to "pitch" the idea of a show starring the defendant.  Compl. ¶¶ 30–42.  The plaintiff alleges that:  he met with Jeff Zucker, CEO of NBC Universal, in late March or early April 2008; he sent the demonstration reel of the defendant to Benjamin Silverman, chairman of NBC Entertainment, on April 17, 2008 and followed up to ensure that he saw the proposal; he wrote to Roger Ailes, Chairman of FOX Media Group, on April 22, 2008, to pitch the show; and he e-mailed Phil Griffin, President of MSNBC, on April 28, 2008, to pitch the show.[6]  *Id.* Despite these efforts, the plaintiff was unable to secure a show for the defendant through any of these communications.

---

[5] The defendant's April 5, 2008 e-mail to the defendant reads in full as follows:

> Michael . . .
>
> I understand your concern about a financial arrangement moving forward.  I can't give you specifics at this time.  We do not know what we are dealing with at this point and what kind of opportunity may present itself.  **However, any TV deal will obviously involve you.  I will not do a TV deal without your involvement and that includes a financial involvement.  Rest assured, we are together on this.**  I hope this works for you at this point.  Lets [sic] focus on the meeting and creating an opportunity.
>
> Thanks, Ed

*Id.* Ex. 4 (emphasis added).

[6] The record is unclear about the nature of these "pitches" and whether the plaintiff's proposal was for the networks to produce the show directly and retain ownership over it or whether the proposal was for the plaintiff and the defendant to produce and retain ownership of the show and have the networks syndicate it.

In parallel with his efforts to "pitch" the show idea to various networks, the plaintiff began making arrangements to produce and film a pilot episode of the proposed show, presumably to aid the plaintiff's ongoing marketing efforts.  *See id.* ¶¶ 41–43.  Although the defendant promised to "pay for [the pilot]," Pl.'s First Opp'n Ex. 11, the plaintiff claims that he initially paid the expenses for the pilot himself, which totaled $11,500.  *See* Compl. ¶¶ 48–49. While the preparations for the pilot were under way, the plaintiff sent an e-mail to Landa on May 29, 2008, outlining proposed contract terms relating to the show being developed in the pilot. *See* Pl.'s First Opp'n Ex. 6.  In that e-mail, the plaintiff proposed that he and the defendant would enjoy "[e]qual ownership" of the show, that the plaintiff "would receive an amount equal to 10% of Ed's television salary for the duration of any TV production formed from this agreement," and that the plaintiff "would be included in any television enterprise."  *Id.*

Landa responded three days later, on June 1, 2008, stating that he would discuss the proposal with the plaintiff, but that "30% ownership [*i.e.,* equal ownership] in my opinion is out of the question."  Decl. of Jeffrey Landa ("Landa Decl.") Ex. 7, ECF No. 25-1.  Landa sent yet another e-mail to the plaintiff on June 6, 2008 stating once again that "30% ownership by you is out of the question" and adding that "Ed is not interested in having your 'salary' based on his 'salary.'"  Pl.'s First Opp'n Ex. 9.  Also prior to the pilot being shot, the plaintiff and defendant discussed their intentions to draft an agreement memorializing their joint venture to produce the pilot and an "understanding about moving forward after the pilot."  *See id.* Exs. 10–11.[7]  It

---

[7] The defendant's June 7, 2008 e-mail to the plaintiff reads, in full, as follows:

> Michael . . .
>
> We have some work to do.  I'll will [sic] get right to it.  ***It was your idea.  What's that worth?***
>
> I don't have that number right now.  So we need to decide how do we do this pilot with no legal concerns that Jeff [Landa] talks about.  I'm back to my original position, let's draw up a short letter to join forces to produce the pilot with the intention of doing a structured deal down the road if the show has potential.

appears, however, that no such agreement was ever memorialized.  Nevertheless, the pilot was shot in Washington, D.C. on June 26, 2008, and the plaintiff claims that the defendant then shipped copies of the pilot "throughout the industry in an attempt to promote the show."  Compl. ¶¶ 50–51.  Despite his promises to "pay for [the pilot]" in June 2008, *see* Pl.'s First Opp'n Ex. 11, the defendant refused to pay NBC when payment was requested in February 2009, *see id.* Ex. 13 (responding to NBC's demand for payment:  "Tell em to sue us . . . ."), and waited until May 12, 2009, to reimburse the plaintiff $12,000 for the costs of producing the pilot, *see* Decl. of Jeffrey Landa in Supp. Def.'s Reply to Mot. for *Pro Hac Vice* Admission Ex. 8, ECF No. 23-1.

After the pilot was completed, on August 11, 2008, the plaintiff alleges that he "pitched" the show to Allan Horlick, President and General Manager of WUSA TV 9, the CBS affiliate station in Washington, D.C. Compl. ¶ 52.  The apparent intention of this "pitch" was for the plaintiff and defendant to raise capital to produce the show themselves and then syndicate the show on WUSA.  *See* Landa Decl. Ex. 19.  During this stage of the process in December 2008 to January 2009, the defendant was still living in North Dakota, and thus the plaintiff alleges that he and a friend of the plaintiff's (Susan O'Connell) acted as the defendant's "agent[s]" in Washington, D.C. by searching for, securing, and furnishing an apartment for the defendant and his wife in the Washington area.  *See* Compl. ¶¶ 53–57.

On January 18, 2009, the defendant and his wife moved from Fargo, North Dakota to Washington, D.C.  *Id.* ¶ 59.  According to the plaintiff, this move was for the Schultzes "to live and to foster their growing TV prospects."  *Id.*  After the Schultzes relocated to Washington, the plaintiff alleges that he and O'Connell continued to assist them by providing them with the use

---

Your thoughts?

Ed

Pl.'s First Opp'n Ex. 10.

of a car at no charge.  *Id.* ¶¶ 60–63.  The plaintiff also claims that in February 2009, Horlick

"offered Ed Schultz the show with Michael Queen as Executive Producer," and that the deal

struck between Horlick, the defendant, and the plaintiff in March 2009 was for the plaintiff and

the defendant to rent the WUSA studio for one year and work on a syndication deal, with the

defendant and the plaintiff being the "owners" of the show.  *Id.* ¶¶ 64–66.

The defendant, however, recalls the December 2008 to March 2009 time period quite

differently.  According to him, he never had any agency relationship with the plaintiff or

O'Connell with regard to securing an apartment or any other purpose.  Answer ¶ 53.  He also

says that he reimbursed the plaintiff and O'Connell for their assistance, including $361.21 for

groceries and other items and that he repeatedly offered to compensate O'Connell for the use of

her vehicle.  *Id.* ¶¶ 55–56, 62–63.  More fundamentally, the defendant alleges that he and his

wife relocated to Washington, D.C. at their own expense based upon the plaintiff's "fraudulent

assurance that Schultz would secure a contract with WUSA for a syndicated Sunday morning

television show," which never materialized.  *Id.* ¶ 59.  He also alleges that the only offer Horlick

ever gave him was "the opportunity to rent studio space from WUSA wherein Schultz could

produce the proposed Sunday morning television show at Schultz['s] expense."  *Id.* ¶ 64.

After the attempted deal with Horlick and WUSA fell through, an opportunity for a

television show began to develop with MSNBC.  On March 13, 2009, the plaintiff wrote the

defendant to discuss the "long over due business" of settling on a formal agreement that would

compensate the plaintiff for his work in developing the show.  Landa Decl. Ex. 11.  In that e-

mail, the plaintiff wrote:  "We have discussed and agreed to ownership, that is my renumeration

[sic] would be 12%.  Does that apply to the MSNBC opportunity as well?  In other words, would

my pay come from that percentage of your salary?"  *Id.*  As the Horlick deal faded and the

MSNBC opportunity began to come into focus, the plaintiff's communications displayed an increasing concern that he was being shut out of the process. In a March 29, 2009 e-mail to O'Connell, the plaintiff lamented that "[o]bviously it would have been better if all concerned had in advance, written contracts spelling out everything." *Id.* Ex. 13. On April 2, the plaintiff once again e-mailed O'Connell, expressing his concerns that the defendant's communications had become more sporadic and standoffish, and noting that the defendant had not given the plaintiff any public credit for his help in getting "The Ed Show" on the air. *Id.* Ex. 15. In that same April 2 e-mail, he told O'Connell that he was "a little nervous" about his financial compensation and that he "might get a small % of [the defendant's] salary ($300K)," but "[w]ith no written agreement . . . all bets are off." *Id.*

Some time at the end of March or beginning of April 2009, Phil Griffin, President of MSNBC, called the defendant directly, "almost a year" after turning down the plaintiff's pitch for a television show featuring the defendant. *See* Decl. of Michael Queen ("Queen Decl.") ¶ 24, ECF No. 24-3. Griffin offered the defendant a television show, the defendant accepted, and he began hosting "The Ed Show" on MSNBC, which aired for the first time on April 6, 2009. Compl. ¶ 67; Answer ¶ 67. "The Ed Show" is owned, operated and produced by MSNBC, and the defendant appears on the program as an independent contractor, pursuant to a contract between Ed Schultz Productions, LLC and MSNBC. Def.'s Statement of Material Facts as to Which There Is No Genuine Issue ("Def.'s Statement of Material Facts") ¶¶ 38–39, ECF No. 31-1. After the deal was complete, the plaintiff requested that the defendant mention his name on the air, in recognition of the efforts he had expended to develop and pitch the show, *see* Landa Decl. Ex. 14, but the defendant apparently refused to do so, opting instead to give thanks to a list of individuals from which the plaintiff was conspicuously absent, *see id.* Ex. 15.

From May 2009 on, the relations between the plaintiff and the defendant truly began to sour.  On May 10, 2009, the plaintiff wrote to the defendant once again in the hopes of finalizing his compensation, saying that "we are overdue for a written agreement."  *Id.* Ex. 17.  In this e-mail, the plaintiff stated that his "only claim is that which we have already agreed to verbally," which he said was a "12% stake in the partnership (i.e., 12% of gross income from TV Show considering aforementioned concessions above.)."  *Id.*  The defendant replied that same day, recounting his understanding of the events leading up to that point in an apparent attempt to set the record straight on what the plaintiff was owed (or, rather, *not* owed).  *See id.* Ex. 18.  The defendant's e-mail clarified that, in fact, there were two separate ventures being pursued.  One venture was a possible deal with a national TV network whereby the network would produce and own the rights to a show of unspecified format, and the defendant would be the on-air talent and would be compensated with an annual salary.  The other venture was a possible Sunday morning show that would be owned and produced by the plaintiff and the defendant.  *See also id.* Ex. 19. The defendant stated in his May 10, 2009, e-mail that (1) he would reimburse the plaintiff for the costs of producing the pilot; (2) the plaintiff was "not responsible for [the defendant] getting hired at MSNBC" and there was never any arrangement to compensate the plaintiff with a 12% commission for the MSNBC show; and (3) although the two had discussed a possible partnership to own and produce a Sunday morning show, the capital to produce the show "was NEVER raised" and, even though the defendant was still "willing to pursue that [show] with" the plaintiff, "that show never happened."  *Id.* Ex. 18.

According to the plaintiff, following the early May 2009 failed attempts to reach a deal on compensation, he contacted Landa and NBC Universal (MSNBC's parent company), seeking recognition of the money he believed he was owed.  Compl. ¶¶ 72–73.  On May 12, 2009, the

defendant—perhaps under pressure from MNBC management to do so, *see id.* ¶ 75—finally reimbursed the plaintiff $12,000 for the production of the pilot.  Compl. ¶ 76; Answer ¶ 69. Soon after the defendant reimbursed the plaintiff, the plaintiff alleges that the defendant "virtually ceased contact" with him and would not respond to "repeated inquiries about compensation as part owner of 'The Ed Show' and for his outstanding expense bills."  Compl. ¶ 71.

According to the defendant, however, communications between the two dropped off due to the plaintiff's "bizarre conduct," and the fact that he was "stalking Schultz and Schultz['s] wife."  Answer ¶ 71.  In particular, the defendant alleges that the plaintiff began to harass him and his wife with communications threatening litigation and blackmail if the defendant did not accede to his compensation demands, which resulted in a cease-and-desist letter being sent to the plaintiff on July 30, 2009.  *Id.*  The defendant further alleges that, on July 21, 2010, the plaintiff "read a defamatory statement publically accusing Schultz of, among other things, stealing and causing him to finance his home to pay for the pilot."  *Id.*  The defendant also claims that on or before May 20, 2010, the plaintiff "caused to be written a 'press release' containing the false and slanderous statements," i.e., "that Schultz had a business contract with Queen and that Schultz reneged on or otherwise breached that contract"; "that Schultz defrauded Queen and that Schultz owed Queen money for, among other things, producing a pilot for a proposed television show; and, that Schultz caused Queen to mortgage his house to finance the pilot for a proposed television show project."  Countercl. ¶¶ 11, 20–23, ECF No. 5.  For his part, the plaintiff admits that he made statements about the defendant at the July 21, 2010, NBC staff meeting and that he published the May 20, 2010, "press release," but he simply contends that none of his statements were ever false or defamatory.  Pl./Countercl. Def.'s Answer to Countercl. ("Pl.'s Answer to

Countercl.") ¶¶ 18–20, ECF No. 8.[8]

On May 5, 2011, the plaintiff filed the present action, seeking the compensation he believes he is owed under a number of legal theories.  In particular, in all five causes of action, the plaintiff seeks "(i) the outstanding principal of twenty-five percent of the income after expenses of 'The Ed Show' made to the defendant, plus (ii) accrued interest on the principal amount from the inception of 'The Ed Show' to date," which he claims "is in excess of $100,000."  Compl. ¶¶ 82, 88, 92, 97, 102.  In his Answer and Counterclaim, the defendant denies the gravamen of the plaintiff's claims and makes three counterclaims of his own, seeking an unspecified amount of damages.  Specifically, he alleges that the plaintiff fraudulently induced him and his wife to move to Washington, D.C. based on assurances that "a deal had been struck with Allan Horlick at WUSA wherein Schultz could finance or cause to be financed a nationally syndicated Sunday morning television show."  Countercl. ¶ 5.  He also alleges two counts of defamation (libel and slander *per se*) based upon the plaintiff's statements at the July 21, 2010, NBC staff meeting and in the May 20, 2010, press release.  *Id.* ¶¶ 9–24.

The defendant has filed two motions for summary judgment on all of the plaintiff's claims.  *See* Rule 56 Mot. for Summ. J. or Alternatively Rule 12(c) Mot. J. on Pleadings ("Def.'s First Mem."), ECF No. 20; Def.'s Second Mot. for Summ. J. or Alternatively for J. on Pleadings ("Def.'s Second. Mem."), ECF No. 31.  The plaintiff has also filed a cross-motion for summary judgment on all of the defendant's counterclaims as well as the plaintiff's contract claims.  *See* Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mem."), ECF No. 30. These three motions are now pending before the Court.

---

[8] The defendant has not submitted any direct evidence of the content of the July 21, 2010, statements or the May 20, 2010, press release.

In his first summary judgment motion, the defendant rested his entire argument on the premise that, throughout the relevant time period, the plaintiff was acting as an unlicensed talent agent for the defendant and, therefore, that any contract for compensation arising out of their relationship was illegal under both New York and District of Columbia law.  *See* Def.'s First Mem. at 1–3.  In his second motion for summary judgment, the defendant additionally argued that (a) the alleged contract violates the Statute of Frauds and (b) the alleged contract is unenforceable because there was no meeting of the minds regarding any material provision of the alleged contract; (c) the breach of implied contract and intentional infliction of emotion distress claims are duplicative of the breach of contract claim; and (d) the fraud in the inducement and tortious interference with business relations claims fail because they are directly contradicted by the plaintiff's deposition testimony.  *See* Def.'s Second Mem. at 1–3

The plaintiff argues in his cross-motion for summary judgment that he is entitled to judgment as a matter of law on his contract claims because he and the defendant "agreed to form a partnership in order to develop and pitch the concept of a TV show featuring Schultz as host to various television networks."  Pl.'s Mem. at 10.  He also argues that he is entitled to summary judgment on the defendant's counterclaims because, essentially, there is no evidence that he said anything false and, therefore, he committed no fraud or defamation.  *See id.* at 19–23.

The record after nearly five months of discovery makes clear that both parties were willing to pursue efforts to transfer the defendant's radio show to a television format and that the defendant, along with his counsel Landa, encouraged—and exploited—the plaintiff to expend time, energy and resources for this goal.  What is far from clear, however, is what the nature of the parties' relationship was, what damages either or both parties may have suffered, and what might have constituted the final terms of any deal struck between the parties.  While the record is

replete with activities undertaken by both parties towards their shared goal of putting the

defendant on television, these open questions are not the result of any genuine disputes of

material fact.  Rather, the record is largely devoid of evidence required to establish legally

cognizable claims.  Even accepting the plaintiff's view that in his dealings with the defendant, he

"trusted a liar and a thief," and was "lied to, lied to, lied to," *see* Queen Dep. at 339:9–10,

341:15–16, establishing that the defendant did not "remain true to his word," Pl.'s Statement of

Material Facts ¶ 13, is not sufficient to support the pending claims.  Therefore, though questions

remain unanswered, the Court ultimately concludes that all of these claims and counterclaims

must be dismissed as a matter of law.

## II.    STANDARDS OF REVIEW

The defendant has moved for dismissal of the plaintiff's claims under Federal Rule of

Civil Procedure 12(c) (Judgment on the Pleadings) and Federal Rule of Civil Procedure 56

(Summary Judgment).  The plaintiff has moved for dismissal of the defendant's counterclaims

only under Rule 56.

### A.    Judgment on the Pleadings

"In evaluating a motion for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c), courts employ the same standard that governs a Rule 12(b)(6) motion to

dismiss."  *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 265 (D.D.C.

2011).  In other words, "the Court may not rely on facts outside the pleadings and must construe

the complaint in the light most favorable to the non-moving party."  *Id.* (internal quotation marks

omitted).  If, however, on a motion under Rule 12(c), "matters outside the pleadings are

presented to and not excluded by the court, the motion must be treated as one for summary

judgment."  FED. R. CIV. P. 12(d).  Because the Court will consider matters beyond the pleadings

in deciding the instant motions, the defendant's motions will be treated as motions for summary judgment.

### B.   Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Id.* at 323.

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party and shall accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3). For a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position, *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See, e.g.*, FED. R. CIV. P. 56(c)(1). If the evidence "is merely

colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that situation, "[t]he moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.*  "Self-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007).

## III.   DISCUSSION

Because the Court is exercising diversity jurisdiction over this action, and all of the claims are common-law contract and tort causes of action, the Court must first discuss what choice-of-law principles need to be applied.  The defendant contends that New York law should apply, *see* Def.'s Second Mem. at 3, while the plaintiff argues that District of Columbia law should apply, *see* Mem. P&A in Supp. Pl.'s Second Opp'n Def.'s Second Mot. Summ. J. ("Pl.'s Second Opp'n") at 15–17, ECF No. 32.

### A.   <u>Choice of Law</u>

When claims are brought pursuant to diversity jurisdiction, a federal court must apply the choice-of-law rules of the forum state.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1107 (D.C. Cir. 2008).  Under District of Columbia choice-of-law rules, "the court must first determine whether a conflict exists between the law of the forum and the law of the alternative jurisdiction" because "[i]f there is no true conflict, the court should apply the law of the forum." *Owens v. Republic of*

*Sudan*, 826 F. Supp. 2d 128, 154 (D.D.C. 2011) (citing *USA Waste of Md., Inc. v. Love*, 954 A.2d 1027, 1032 (D.C. 2008)).  "A conflict of laws does not exist when the laws of the different jurisdictions are identical or would produce the identical result on the facts presented."  *USA Waste*, 954 A.2d at 1032.  If a conflict does exist, District of Columbia courts employ a "modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute."  *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006) (internal quotation marks omitted); *accord Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009) ("District of Columbia courts blend a 'governmental interests analysis' with a 'most significant relationship' test." (quoting *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 40–41 & n.18 (D.C. 1989))).

The Court will apply this test to each of the claims in the discussion below.

### B.   <u>Contract Claims</u>[9]

The defendant concedes that he entered into an agreement with the plaintiff jointly to produce a pilot episode of a proposed syndicated television show.  *See* Decl. of Edward Schultz in Opp'n Pl.'s Mot. Summ. J. ("Second Schultz Decl.") ¶ 5, ECF No. 33-3.  He also admits that he authorized or requested the plaintiff to act on his behalf in trying to find a television show on CNN and CBS.  *See* Schultz Dep. at 28:12–20.  What the parties dispute is whether an agreement ever existed wherein the defendant actually promised to compensate the plaintiff for his efforts— either through a percentage of profits or income, or otherwise.  The plaintiff argues that he and the defendant formed "an oral, written, and implied contract" that was subsequently breached by

---

[9] This discussion applies to the plaintiff's first and second causes of action because, although the second cause of action alleges a "Breach of Implied-In-Fact Contract," an "implied-in-fact contract is a true contract that contains all the required elements of a binding agreement," and thus all of the requirements of a contract apply to both claims. *See Fred Ezra Co. v. Pedas*, 682 A.2d 173, 176 (D.C. 1996)

the defendant, *see* Pl.'s Mem. at 10, which now entitles him to "twenty-five percent of the income after expenses of 'The Ed Show' made to defendant," Compl. ¶¶ 82, 88, 92, 97, 102.

The Court notes at the outset that the nature of this alleged contract has eluded precise definition and has been characterized by the plaintiff in a variety of ways. The plaintiff refers to the agreement in the Complaint broadly as a "valid and enforceable verbal and written agreement through telephone calls and e-mail exchanges . . . which entitled plaintiff to twenty-five percent of the income after expenses of 'The Ed Show.'" Compl. ¶ 80. In his opposition to the defendant's first motion for summary judgment, he described it both as an "oral, written, and implied in fact contract to form a partnership for the sole purpose of pitching the concept of a TV show featuring the defendant as host," and as a "partnership venture." Pl.'s First Opp'n at 24.[10] Finally, in his own motion for partial summary judgment, the plaintiff characterizes it as both "an agreement to create, produce and pitch the show" and an "agreement to have [the plaintiff] develop and pitch the concept of a TV show with [the defendant] as host." Pl.'s Mem. at 17–18. From this, the Court discerns two distinct, potential agreements: (1) an agreement whereby the

---

[10] The Court notes that the plaintiff also refers to the alleged agreement as a "joint venture." *See* Pl.'s Mem. at 19 ("During the course of the TV project, the parties agreed to basic compensation terms for the joint venture, which was a 50-25-25 split."); Pl.'s Second Opp'n at 33 (same). The Court declines to address separately the joint venture characterization for two primary reasons.

First, the definition of a joint venture under D.C. law is nearly identical to that of a partnership: "Two or more persons who join in a particular business enterprise for profit . . . ." *Jonathan Woodner Co. v. Laufer*, 531 A.2d 280, 286 n.8 (D.C. 1987) (quoting *Libby v. L.J. Corp.*, 247 F.2d 78, 81 (D.C. Cir. 1957)). The District of Columbia Court of Appeals has recognized that joint ventures and partnerships are so similar that "there is very little law . . . applicable to one that does not apply to the other," and that "[p]rinciples of partnership law, in particular the Uniform Partnership Act, apply in most instances to joint ventures." *Id.* at 285 n.7. The "only noteworthy distinction . . . between a joint venture and a partnership is that a partnership is ongoing, whereas a joint venture is usually limited to a single transaction." *Id.* Since the plaintiff has clearly alleged an agreement that would apply to "*any* TV show featuring Schultz," Pl.'s Statement of Material Facts ¶ 25 (emphasis added); Queen Dep. at 149:22–150:1, 227:11–15, the agreement would be more akin to a general partnership than a joint venture in any event.

Second, the plaintiff appears to use the "joint venture" label interchangeably with the "partnership" label, *see* Pl.'s Second Opp'n at 29–33 (using the phrase "joint venture" under the heading "Contract Compensation for Participants and or Partners"); *id.* at 12, 33 (asserting first that "[t]he *partners* agreed that the *partners* would share the profits from such a venture based upon a 50-25-25 split," and later that the "basic compensation terms for the *joint venture* was a 50-25-25 split" (emphasis added)), and he does not make any arguments with respect to a joint venture that are distinct or independent from his arguments regarding a partnership.

18

plaintiff developed and pitched a show *on behalf of* the defendant; and (2) an agreement whereby the plaintiff produced and pitched a show *in partnership with* the defendant.

The Court also notes, as briefly discussed above, that the nature of the show being "pitched" also changed over time. *See* discussion *supra* page 10. As the record evidence indicates, the original concept was for the plaintiff to propose the concept of a show with the defendant as host in the hope that a television network would sign the defendant to a contract and produce the show. *See* Landa Decl. Exs. 18–19. In this "agency scenario," the network would own the rights to the show, and any compensation to the plaintiff would come either from a share of the defendant's salary or from being employed by the network as a producer of the show. *See id.* Ex. 19 (describing to the plaintiff how "you would have gotten credit for getting Ed on TV and your team would make some sort of commission"). The alternative concept was for the plaintiff, the defendant, and possibly a third party (*e.g.,* Schindler or Landa) to form a partnership that would produce a show with its own capital and then try to syndicate the show. *See id.* Exs. 18–19. Under this "ownership scenario," the partnership (including the plaintiff and the defendant) would own the show and would presumably sell the rights to broadcast the show to a network or networks in return for cash, air time, or other consideration. The first potential agreement discussed above would necessarily be an agency scenario agreement, while the second potential agreement would almost certainly be an ownership scenario agreement. The Court will consider both possible scenarios in determining whether summary judgment should be granted to either party.

### 1.   *Enforceability of the "Agency" Contract*

Under the agency scenario, the plaintiff claims that there was an agreement whereby the plaintiff would be compensated for developing and pitching a television show, either on behalf

of or in conjunction with the defendant.  The plaintiff admits there was no final written contract signed between himself and the defendant.  Compl. ¶ 80 (conceding that "the final agreement was not signed by defendant").  Nor does the plaintiff assert that there were multiple agreements, such that an oral agreement modified a prior written agreement or that a written agreement memorialized a prior oral agreement.  Instead, the plaintiff attempts to piece together e-mails and undocumented oral communications that evince a single, enforceable contract.  *Id.*; Pl.'s Second Opp'n at 28 ("Queen asserts he entered into an oral and written agreement [through a series of telephone calls, in-person conversations, and e-mails] with Schultz to exclusively develop and pitch the concept for a TV show with Schultz as host to various TV and cable television networks . . . .").

Under District of Columbia law, a "valid and enforceable contract requires 'both (1) agreement as to all material terms, and (2) intention of the parties to be bound." *Simon v. Circle Assocs., Inc.*, 753 A.2d 1006, 1012 (D.C. 2000) (quoting *Sims v. Westminster Investing Corp.*, 648 A.2d 940, 942 (D.C. 1994)); *see also Duffy v. Duffy*, 881 A.2d 630, 633 (D.C. 2005) ("'For there to be an enforceable contract, there must be mutual assent of the parties to all the essential terms of the contract.'" (quoting *Malone v. Saxony Coop. Apartments*, 763 A.2d 725, 729 (D.C. 2000))).  This is regardless of whether the contract is written or oral in nature.  *See Jack Baker Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995).[11]  The requirements for proving the enforceability of an alleged contract are essentially the same in New York.  *See, e.g., Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y.

---

[11] "To create an enforceable oral contract, both parties must intend to be bound by their oral representations alone." *Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007) (citing *New Econ. Capital, LLC v. New Mkts. Capital Grp.*, 881 A.2d 1087, 1094 (D.C. 2005)).  "The fact that parties contemplate a writing is evidence, therefore, that they do not intend to bind themselves by an oral agreement." *Id.* (citing *Jack Baker*, 664 A.2d at 1240).  In considering whether an oral agreement in contemplation of a written contract is enforceable, the D.C. Court of Appeals has endorsed a multi-factor test that considers, *inter alia*, "whether the contract is one usually put in writing," "whether there are few or many details," and "whether the amount involved is large or small." *Jack Baker*, 664 A.2d at 1240.

1999) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently

definite to assure that the parties are truly in agreement with respect to all material terms.");

*Gui's Lumber & Home Ctr., Inc. v. Mader Constr. Co., Inc.*, 787 N.Y.S.2d 555, 556 (App. Div.

2004) ("In order to create a binding contract there must be a meeting of the minds as to the

essential terms of the agreement."); *Maffea v. Ippolito*, 668 N.Y.S.2d 653, 654 (App. Div. 1998)

("The manifestation or expression of assent necessary to form a contract may be by word, act, or

conduct which evinces the intention of the parties to contract.").  Because the laws of New York

and the District of Columbia regarding the requirements for enforcing a contract are either

identical or would lead to the same result in this case, no conflict exists and, therefore, the Court

will apply District of Columbia law to the breach-of-contract claims.  *See USA Waste*, 954 A.2d

at 1032.

a)     *Agreement on Material Terms*

Regardless of whether the contract was oral, written, or implied in fact, the plaintiff has

failed to create a genuine issue of material fact regarding the existence of a contract because he

has presented no evidence that the parties agreed on all of the material terms of the alleged

agreement.  "A contract must be sufficiently definite as to its material terms (which include, *e.g.,*

subject matter, price, payment terms, quantity, quality, and duration) that the promises and

performance to be rendered by each party are reasonably certain."  *Rosenthal v. Nat'l Produce

Co.*, 573 A.2d 365, 370 (D.C. 1990).  For that standard to be met, "parties need to express their

intentions so that a court can understand them, determine whether a breach has occurred, and

identify the obligations it should enforce."  *Dyer v. Bilaal*, 983 A.2d 349, 356 (D.C. 2009).  "To

be final, contract negotiations must include all of the terms which the parties intended to resolve;

21

material terms cannot be left to future settlement." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C. 1981).

Here, the parties never agreed with reasonable certainty on several material terms of the alleged agreement, most notably the amount of compensation that would be paid to the plaintiff. It is clear from the record that the defendant made what could reasonably be read as assurances to the plaintiff about compensation for his help in developing a television show with the defendant as host.  For example, the defendant wrote to the plaintiff on March 5, 2008, that "I will agree to a 50-25-25 percentage formula of profits after expenses of the show."  Pl.'s First Opp'n Ex. 1.  One month later, on April 5, 2008, the defendant told the plaintiff "any TV deal will obviously involve you.  I will not do a TV deal without your involvement and that includes financial involvement.  Rest assured, we are together on this."  *Id.* Ex. 4.  Yet again, on June 7, 2008, the defendant told the plaintiff, "We have some work to do.  I'll will [sic] get right to it.  It was your idea.  What's that worth?"  *Id.* Ex. 10.

The only one of these communications that even *mentioned* a specific term for compensation, however, was the March 5, 2008, e-mail, in which the defendant indicated a willingness to agree to a 50/25/25 split of "profits after expenses of the show," *id.* Ex. 1, but the Court concludes for a number of reasons that the parties never agreed to that figure (or any alternative figure) for the purpose of compensating the plaintiff.  First and foremost, the statement by the defendant that he "will agree" displays an initial desire to agree, but it does not display an agreement itself.  The clear thrust of the statement is that the defendant would be comfortable agreeing to a 50/25/25 split in the future, and no evidence suggests that the defendant intended to be bound by that figure at that time.  Thus, the defendant's statement about a 50/25/25 split was no more than an "agreement to agree," which is unenforceable as a contract

22

in the District of Columbia.  *See, e.g.*, *Overseas Partners, Inc. v. PROGEN Musavirlik ve Yonetim Hizmetleri, Ltd. Sikerti*, 15 F. Supp. 2d 47, 53 (D.D.C. 1998) (agreements to agree are unenforceable under D.C. law).

Second, the record demonstrates that the 50/25/25 figure was never finalized as a term of any agreement and was in fact superseded by other proposals and counter-proposals regarding compensation structures.  In a May 29, 2008, e-mail, the plaintiff sent Landa proposed terms for an agreement and requested "[e]qual ownership . . . should you, Ed, and I enter into an agreement," and "an amount equal to 10% of Ed's television salary for the duration of any TV production formed from this agreement."[12]  Pl.'s First Opp'n Ex. 6.  Landa replied on June 6, 2008, that "30% ownership by you is out of the question" and "Ed is not interested in having your 'salary' based on his 'salary.'"[13]  *Id.* Ex. 9.  On March 13, 2009, the plaintiff once again changed positions, stating in an e-mail to the defendant:  "We have discussed and agreed to ownership, that is my renumeration [sic] would be 12%."  Landa Decl. Ex. 11.  Finally, on May 10, 2009, the plaintiff wrote to the defendant claiming he was owed "12% of gross income from [The Ed Show]."  *Id.* Ex. 17.  Thus, over time the plaintiff's proposed compensation has vacillated from (a) 25% of "profits," to (b) 33% of profits plus 10% of the defendant's salary, to (c) 12% of some unspecified amount (profits or salary), to (d) 12% of "gross income," and now the plaintiff has returned to the original figure of 25% but now seeks (e) 25% of the defendant's *salary* rather than 25% of "profits."

Indeed, the plaintiff's own deposition testimony demonstrates that there was never any final agreement regarding the terms of his compensation.  *See, e.g.*, Queen Dep. at 146:8–9

---

[12] The plaintiff's statement in this e-mail that he was seeking equal ownership "*should you, Ed, and I enter into an agreement*" demonstrates that the earlier March 5, 2008, e-mail did not constitute an agreement on the defendant's part.

[13] This June 6, 2008, e-mail strongly suggests that the defendant's statement in his March 5, 2008, e-mail about splitting "profits" did not apply to the defendant's future salary.

(admitting that he and the defendant "were discussing all kinds of different things" with regard to compensation); *id.* at 339:13–19 ("I didn't have these [compensation] numbers . . . in a written agreement . . . .  I was grabbing at straws [in May 2009], hoping against hope that this man would do something decent to . . . pay me for all the work I did, be it 25 or whatever."); *id.* at 441:20–22 (stating that the terms of the putative partnership "evolved over many conversations").  The plaintiff's March 13, 2009, e-mail further indicates clear confusion (rather than agreement) about the compensation owed to the plaintiff.  In that e-mail, the plaintiff wonders aloud whether their proposed agreement would even apply to "the MSNBC opportunity" and whether the plaintiff would be paid a portion of the defendant's salary from that show—in other words, the very questions at the heart of the plaintiff's breach-of-contract claims.  *See* Landa Decl. Ex. 11.

Finally, as referenced above, the record reveals that, aside from the numerical figures, there was also no agreement regarding the *type* of compensation to be paid to the plaintiff.  Although initial discussions mentioned splitting "profits" from a potential show, later communications discussed the plaintiff being paid a percentage of the defendant's salary, and some communications referenced both types.  *Compare* Pl.'s First Opp'n Ex. 1, *and* Landa Decl. Ex. 17, *with* Pl.'s First Opp'n Ex. 6, *and* Landa Decl. Ex. 15.  There is no evidence in the record suggesting that the parties ever settled on a type of compensation for the plaintiff, and Landa's June 6, 2008, e-mail to the plaintiff explicitly rejected (on the defendant's behalf) any proposed compensation that would be based upon the defendant's salary.  *See* Pl.'s First Opp'n Ex. 9.

As a result, the Court holds that the plaintiff has failed to create a genuine issue of material fact regarding the absence of agreement on the material terms of the alleged contract.  Although the defendant encouraged the plaintiff to expend time and resources on behalf of their

shared goal of getting the defendant on television and, to this end, provided the plaintiff with

ongoing assurances that he would be rewarded with *some* compensation for his efforts, the

amount and nature of that compensation was never agreed upon.  As a result, the Court is unable

to discern all of the material terms of the alleged agreement, and thus the defendant is entitled to

judgment as a matter of the law on the plaintiff's breach-of-contract claims.  *See Duffy*, 881 A.2d

at 634 ("[A]n agreement is unenforceable if it fails to address material terms."); *Jack Baker*, 664

A.2d at 1239 ("Where the parties fail to agree to all material terms no contract is formed, even if

the parties intended to be bound by their oral agreement prior to the execution of the written

contract." (citation omitted)); *Rosenthal*, 573 A.2d at 369–70 ("Vagueness of expression,

indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been

held to prevent the creation of an enforceable contract." (quoting 1 A. CORBIN, CORBIN ON

CONTRACTS § 95, at 394 (2d ed. 1963))).

b)   <em>Intent to Be Bound</em>

Even assuming *arguendo* that the plaintiff had created a genuine issue of fact regarding

agreement on material terms, his breach-of-contract claims would still not survive summary

judgment because the plaintiff has not created any genuine issue of fact regarding the

defendant's intent to be bound.  "For an enforceable contract to exist, the court must not only

determine that there was an agreement to all material terms, but also that the parties intended to

be bound."  *Duffy*, 881 A.2d at 636–37 (citing *Jack Baker*, 664 A.2d at 1238).  To determine

whether the parties intended to be bound, the Court must determine whether the parties

objectively manifested a mutual intent to be bound.  "'[R]egardless of the parties' actual,

subjective intentions, the ultimate issue is whether, by their choice of language . . . , they

*objectively* manifested a mutual intent to be bound contractually.'"  *Dyer*, 983 A.2d at 357

25

(alteration in original) (quoting *1836 S St. Tenants Ass'n, Inc. v. Estate of B. Battle*, 965 A.2d 832, 837 (D.C. 2009)).  "The intentions of parties to a contract can be found from written materials, oral expressions, and the actions of the parties."  *Duffy*, 881 A.2d at 637.

To create a genuine issue of fact regarding the defendant's intent to be bound, the plaintiff points to the same e-mail communications between March and June 2008 that he puts forth as evidence of agreement on compensation.  *See* Pl.'s Second Opp'n at 31–33.  Before discussing those e-mails, the Court notes that the plaintiff's argument that the defendant intended to be bound because he "intend[ed] for Queen to develop and pitch the concept of a TV show to MSNBC," *id.* at 32, misunderstands the requirement of demonstrating an intent to be bound.  For the defendant to intend *to be bound* under contract law principles he must have manifested an intent not only to have the plaintiff perform some act; he must also display an intent to be bound to provide consideration *in return* for that act.  This is why courts, including the District of Columbia Court of Appeals, describe an intent to be bound as "a *mutual* intent to be bound contractually."  *Dyer*, 983 A.2d at 357 (emphasis added).  The required intent is, in other words, an intent to be held to a *mutual* and *reciprocal* bargain, not just an intent to have one side of that bargain performed.  *See, e.g.*, E. ALLAN FARNSWORTH, CONTRACTS § 3.1, at 108 (4th ed. 2004) ("The requirement of a bargain imposed by the doctrine of consideration means that the parties' manifestations must have reference to each other, i.e., that they be reciprocal.")

The plaintiff relies heavily on two e-mail communications to create a genuine issue of fact regarding the defendant's intent to be bound.  *See* Pl.'s Second Opp'n at 31–33.  The first is the March 16, 2008, e-mail in which the defendant's attorney, Landa, stated that he "would agree" to a "letter of understanding" wherein the plaintiff, the defendant, and Mr. Schindler "agree to form a partnership or corporation . . . for any television broadcast opportunities that

26

occurs as a result of this agreement." Pl.'s First Opp'n Ex. 14. The second is an April 22, 2008,

e-mail in which the defendant stated: "The networks is [sic] our only chance. Hopefully Fox or

MSNBC will come through." *Id.* Ex. 5. The plaintiff also points to actions taken by both parties

after the alleged agreement that, he argues, illustrate the intent of the parties to be bound because

they demonstrate that both parties "proceeded to perform the terms of the agreement." *See* Pl.'s

Second Opp'n at 32 (citing *Duffy*, 881 A.2d at 637). Specifically, the plaintiff points to the

defendant's admission that he entered into a joint venture to shoot a pilot regarding a TV show

with the defendant as host. *Id.* (citing Schultz Dep. at 30:14-22). The plaintiff also notes that he

pitched the show to numerous television executives. *Id.* at 33 (citing Queen Dep. at 39:3–21).

      The fundamental question that must be asked is: Could a reasonable factfinder view this

evidence and conclude that the defendant ever objectively manifested an intent to be bound?

The Court believes the answer must be no. The two e-mail communications marshaled in

support of an intent to be bound are insufficient to create a genuine issue of fact. The March 16,

2008, e-mail is clearly a preliminary proposal that, like the defendant's March 5, 2008, e-mail, is

an unenforceable "agreement to agree" at best, and the April 22, 2008, e-mail is even less—a

mere statement of optimism untethered to any particular agreement or understanding. The

parties' alleged post-agreement conduct is equally unavailing. The fact that the defendant agreed

to produce the pilot in a joint venture with the plaintiff cannot create a genuine issue of fact

regarding whether the defendant intended to be bound to a *different* agreement, *i.e.*, a much

broader agreement to give the plaintiff 25% of his salary. Even less helpful is the evidence that

the plaintiff subsequently "pitched" the show to several networks because, even assuming the

plaintiff intended to be bound, the crux of this dispute is whether the *defendant* intended to be

bound, which the plaintiff's actions cannot illuminate.

Additionally, the fact that negotiations continued after the alleged time of contract formation militate strongly against any finding that either party intended to be bound to the alleged contract.  As discussed above, the e-mail negotiations concerning compensation continued well after March 2008, when the 50/25/25 division of profits proposal and the partnership proposal were exchanged.  *See* discussion *supra* Part III.B.1.a.  These subsequent negotiations reflect both parties' intention *not* to be bound.  *See Edmund J. Flynn*, 431 A.2d at 547 ("[S]ubsequent negotiations about drafts of a written sales commission agreement reflect the parties' intention not to be bound until a formal writing was executed."); *Jack Baker*, 664 A.2d at 1239 ("[P]arties will not be bound to a preliminary agreement unless the evidence presented clearly indicates that they intended to be bound at that point.").  What is more, the plaintiff admitted in a July 28, 2008, e-mail to a third party that he "d[id] not have a formal agreement with Ed as of yet," Landa Decl. Ex. 11, which is strong evidence further weighing against any genuine issue of fact regarding an intent to be bound by either party.

Because the plaintiff has failed to create a genuine issue of fact regarding both essential elements of his two breach-of-contract claims—agreement on material terms and intent to be bound—the record evidence demonstrates that the defendant is entitled to judgment as a matter of law on those claims.[14]

## 2.     *Enforceability of Partnership Agreement*

Because the plaintiff also characterizes his agreement with the defendant as a "partnership," *see, e.g.*, Queen Decl. ¶¶ 28, 31, the Court will also analyze the plaintiff's breach-

---

[14] The defendant also argues that he is entitled to summary judgment on the breach-of-contract claims because (1) the alleged contract is barred by the statute of frauds; and (2) the alleged contract is illegal under both New York and D.C. statutes pertaining to employment agencies.  *See* Def.'s First Mem. at 4–13; Def.'s Second Mem. at 14–17. Because the Court grants summary judgment to the defendant on the breach-of-contract claims upon other grounds discussed above, the Court need not reach the merits of the defendant's alternative arguments in support of summary judgment.

of-contract claims under a partnership theory.[15]   Under District of Columbia law, a partnership is formed "'when two or more competent persons [contract] to place their money, effects, labor, and skill or some or all of them, in lawful commerce or business, and to divide profit and bear the loss in certain proportions.'"  *Beckman v. Farmer*, 579 A.2d 618, 627 (D.C. 1990) (alteration in original) (quoting *Ga. Cas. Co. v. Hoage*, 59 F.2d 870, 872 (D.C. Cir. 1932)); *see also* D.C. CODE § 29-602.02(a) (2012) ("[T]he association of 2 or more persons to carry on as co-owners of a business for profit shall form a partnership, whether or not the persons intend to form a partnership.").  While the parties' characterizations of their relationship is probative, "the question ultimately is objective:  did the parties intend to do the acts that in law constitute partnership?"  *Beckman*, 579 A.2d at 627 (internal quotation marks omitted).  "In general, the courts, in determining objective partnership intent, look for the presence or absence of the attributes of co-ownership, including profit and loss sharing, control, and capital contributions."  *Id.* (internal quotation marks omitted).

New York law on the formation of a partnership mirrors that of the District of Columbia. *See, e.g.*, *In re Nassau Cnty. Grand Jury Subpoena Duces Tecum Dated June 24, 2003*, 830 N.E.2d 1118, 1125 (N.Y. 2003) ("[T]he term 'partnership' is defined as 'an association of two or more persons to carry on as co-owners a business for profit' (citing N.Y. P'ship Law §10(1)));  *Griffith Energy, Inc. v. Evans*, 925 N.Y.S.2d 282, 283 (App. Div. 2011) (holding that existence of partnership depends upon "the conduct, intention[], and relationship between" the parties, though "[n]o one factor is determinative; it is necessary to examine the . . . relationship as a

---

[15] Although the defendant maintains that "none of [the plaintiff's] causes of action pertain to Partnership issues, e.g., breach of fiduciary duty, accounting," Def.'s Reply to Opp'n to Mot. for Rule 56 Summ. J.; or Alternatively Rule 12(c) Mot. J. Pleadings ("Def.'s First Reply") at 4, ECF No. 25, a breach-of-contract claim is capable of being premised upon an underlying partnership agreement, even if such a claim does not address issues that are more peculiar to the partnership context.  *See, e.g.*, *Rosenthal v. Sonnenschein Nath & Rosenthal, LLP*, 985 A.2d 443, 452 (D.C. 2009) (applying contract principles to claim that partner breached compensation terms of partnership agreement).

whole"). Because the laws of New York and the District of Columbia regarding the formation of a partnership are either identical or would lead to the same result in this case, no conflict exists, and the Court will apply District of Columbia law to the plaintiff's partnership theory. *See USA Waste*, 954 A.2d at 1032.

The Court first repeats its previous observation that, under a partnership theory, the only arrangement between the parties that makes sense based on the evidentiary record is that the proposed "partnership" would have been formed for the purpose of producing a television show that would be *owned by* the partnership and then syndicated. *See* discussion *supra* pages 17–19. This appears to be what the plaintiff means when he alleges that a partnership was formed "for the development and production of any TV show featuring Schultz." Queen Decl. ¶ 28.

This observation is based upon the well-settled distinction between a partnership relationship and an employment relationship. The critical element of a partnership not present in an employment relationship is co-ownership. *See, e.g.*, *In re KeyTronics*, 744 N.W.2d 425, 441 (Neb. 2008) ("It is co-ownership that distinguishes partnerships from other commercial relationships . . . ." (citing J. WILLIAM CALLISON & MAUREEN A. SULLIVAN, PARTNERSHIP LAW AND PRACTICE, GENERAL AND LIMITED PARTNERSHIPS, § 5:11 (2006))). Thus, where one person merely performs the service of procuring employment for another person, it stands to reason that such a relationship cannot be a partnership because it is not a co-owned business—it is an employment relationship. This would be true even if the agent's compensation were based on the profit of a resulting employment opportunity. As another federal court has said:

> A person who has no proprietary interest in the business save to share profits as a compensation for services is not a partner or joint venturer. An agreement made in exchange for a business finder's or a broker's services performed at plaintiff's pleasure, to compensate plaintiff in an amount measured by the net profits realized on a deal found by the plaintiff does not create a joint venture.

*Allen Chase & Co. v. White, Weld & Co.*, 311 F. Supp. 1253, 1259 (S.D.N.Y. 1970); *see also* D.C. CODE § 29-602.02(c)(3) ("A person that receives a share of the profits of a business shall be presumed to be a partner in the business, unless the profits were received in payment . . . [f]or services as an independent contractor or of wages or other compensation to an employee.")

As applied to the instant case this means that, insofar as the plaintiff claims that he is entitled to a portion of the defendant's *salary* as a result of a partnership, his partnership theory is a non-starter.  Any such claim would necessarily have to be based on some kind of agency services contract because the plaintiff has presented no evidence or legal authority to support the notion that he has (or could have) a proprietary interest in or co-ownership of the defendant's *employment*.  To hold otherwise would be potentially to entitle any talent or employment agent to the perpetual co-ownership of the salaries of his clients.  Likewise, insofar as the plaintiff claims that, as a result of a partnership with the defendant, he is entitled to a percentage of *profits* from any given television program involving the defendant as host, that claim, although potentially colorable, is foreclosed by the undisputed facts in this case:  The defendant has no ownership interest in "The Ed Show" nor any entitlement to receive a share of its profits.  *See* Decl. of Edward Schultz in Supp. Def.'s Second Mot. Summ. J. ("First Schultz Decl.") ¶¶ 8–9, ECF No. 31-2.  Therefore, the Court holds that the plaintiff's claim to a percentage of the defendant's salary under a partnership theory fails as a matter of law.[16]

Even if a partnership theory were applicable to the facts of this case, the plaintiff has nevertheless failed to create a genuine issue of fact regarding whether the parties intended to

---

[16] To the extent that the plaintiff alternatively relies upon a "joint venture" theory, based upon the defendant's admission that he and the plaintiff formed a "joint venture" to produce the pilot, *see* Schultz Dep. at 30:14–19, he has failed to create any genuine issue of fact about the scope of that venture.  The "joint venture" that the defendant admits to was clearly for the limited purpose of creating the pilot episode, and there is no evidence in the record to suggest that this venture was ever intended to extend beyond the pilot or entitle the plaintiff to any portion of the defendant's subsequent salary.

form a partnership.  The communications between the parties consistently display a relationship that was devoid of any indicia of a partnership, most notably the sharing of profits and losses, control, and capital contributions.  The plaintiff never made any capital contributions to the putative business, but rather relied upon the defendant to cover the capital investments that were necessary to launching a television show—in particular, the $11,500 for the production and dissemination of the pilot.  In fact, the plaintiff only agreed initially to pay for the pilot on the condition that the defendant would reimburse all of the costs of production.  *See* Pl.'s First Opp'n Ex. 8.  This cost was by far the largest tangible investment from which the parties would have stood to gain or lose in an alleged partnership, yet both parties agreed that the defendant would bear that risk himself.

What is more, the communications between the parties illustrate a relationship in which the defendant retained all meaningful control over how the "business" was run.  In one particularly poignant example, one iteration of the plaintiff's business proposal conceded in relevant part that "Ed would have total control of content, hiring, [and] production decisions." *Id.* Ex. 6.  These facts alone, standing uncontradicted and undiluted by any countervailing evidence from the plaintiff, demonstrate no genuine issue of material fact regarding the parties' absence of intent to form a partnership.[17]  As a result, the Court repeats its conclusion that the defendant is entitled to judgment as a matter of law on the plaintiff's breach-of-contract claims.

### 3.     *Unjust Enrichment*

In his opposition to the defendant's second Motion for Summary Judgment, the plaintiff raised, for the first time, the argument that he is entitled to damages under a theory of unjust

---

[17] There is also no evidence in the record that the parties ever held themselves out as partners in their interactions with third parties or otherwise.  The District of Columbia Court of Appeals has consistently looked to this factor in determining whether parties intended to form a partnership.  *See, e.g., Brown v. 1401 N.Y. Ave., Inc.*, 25 A.3d 912, 915–16 (D.C. 2011); *Beckman*, 579 A.2d at 628.

enrichment.  *See* Pl.'s Second Opp'n at 22–24.  The plaintiff purports to raise an unjust

enrichment theory under his second cause of action for "Breach of Implied-in-Fact Contract."

*See id.*  A claim for unjust enrichment, however, is distinct from a claim for an implied-in-fact

contract.  As the District of Columbia Court of Appeals has explained, unjust enrichment is

"quasi-contractual in nature," or a contract "implied in law," rather than one implied in fact.  *See*

*Peart v. Dist. of Columbia Hous. Auth.*, 972 A.2d 810, 813–814 (D.C. 2009).  "A quasi-

contract . . . is not a contract at all, but a duty thrust . . . upon one party to requite another in

order to avoid the former's unjust enrichment."  *Vereen v. Clayborne*, 623 A.2d 1190, 1194

(D.C. 1993) (internal quotation marks omitted); *see also Jordan Keys & Jessamy, LLP v. St. Paul*

*Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C. 2005) ("From the beginning a quasi-contract has

been openly acknowledged to be a [l]egal fiction invented by common law courts to permit

recovery by contractual remedy in cases where, in fact, there is no contract . . . ." (alteration in

original) (internal quotation marks omitted)); *Vila v. Inter-American Inv. Corp.*, 570 F.3d 274,

280 (D.C. Cir. 2009) ("[U]njust enrichment provides a party with a remedy to unwind

entanglements that may have arisen from a failed agreement, for instance, . . .  where the

agreement is too indefinite to be enforced." (internal quotation marks omitted)).  "Unlike an

implied-in-law 'quasi-contract,' an implied-in-fact contract is a true contract that contains all the

required elements of a binding agreement.  *Fred Ezra Co.*, 682 A.2d at 176.

Because unjust enrichment does not fall within the claim pled by the plaintiff, the Court

must consider whether it may consider this claim on summary judgment.  Normally, a plaintiff

may not raise new claims at the summary judgment stage that were not pled in his complaint.

*See Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011) ("[P]laintiffs cannot use their

summary judgment briefing to press claims not raised in their amended complaint."); *Sharp v.*

*Rosa Mexicano, D.C. LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) ("[P]laintiff may not,

through summary judgment briefs, raise the new claims . . . because plaintiff did not raise them

in his complaint, and did not file an amended complaint."). It is possible, however, to

"constructively amend" the plaintiff's complaint at the summary judgment stage "when the

parties ha[ve] fully briefed an issue that was not necessarily raised in the complaint." *See Turner*

*v. Shinseki*, 824 F. Supp. 2d 99, 122 n.23 (D.D.C. 2011) (citing FED. R. CIV. P. 15(b)(2)).

The Court holds that the plaintiff may not raise his unjust enrichment claim at the

summary judgment stage because he failed to raise such a claim in his Complaint. He also may

not "constructively amend" his Complaint by raising the claim on summary judgment because

the claim has not been fully briefed. Indeed, the defendant never addressed the plaintiff's unjust

enrichment theory in his reply brief, *see generally* Def.'s Reply in Supp. Second Mot. Summ. J.

("Def.'s Second Reply"), ECF No. 35, and therefore this claim has not been "tried by the express

or implied consent of the parties" and cannot be considered.[18] *See Turner*, 824 F. Supp. 2d at

122 n.23 (quoting FED. R. CIV. P. 15(b)(2)).

---

[18] The Court is skeptical that the plaintiff could prevail on a claim of unjust enrichment even if he had asserted this claim in the Complaint. To recover restitution for unjust enrichment, the plaintiff must prove that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005); *see also Bloomgarden v. Coyer*, 479 F.2d 201, 211 (D.C. Cir. 1973) ("[I]n order to recover on a quasi-contractual claim, the plaintiff must show that the defendant was unjustly enriched at the plaintiff's expense, and that the circumstances were such that in good conscience the defendant should make restitution.").

The record is bare of evidence to establish even the first element, namely, that the plaintiff was the source of the "benefit" conferred on the defendant in the form of the offer from MSNBC's President directly to the defendant to host "The Ed Show." While the plaintiff plainly expended much effort to bring to fruition his shared goal with the defendant of launching a television show hosted by the defendant, the evidence is slim and only speculative that "The Ed Show" was the product of this effort. *See Novecon Ltd. v. Bulgarian-American Enter. Fund*, 190 F.3d 556, 566 (D.C. Cir. 1999) ("[A] party's expenditures in preparation for performance that do not confer a benefit on the other party do not give rise to a restitution interest." (internal quotation marks omitted)). On the contrary, the plaintiff's alleged communications in April 2008 with the management of NBC and MSNBC, *see* Compl. ¶¶ 30–40, were concededly unsuccessful, as were his efforts to circulate the June 2008 pilot. As the plaintiff further concedes, almost a year passed between his last communication with Griffin and Griffin's subsequent offer to the defendant. *See* Pl.'s Statement of Material Facts ¶¶ 14, 22. Indeed, these facts could suggest that the plaintiff's involvement was a *disincentive* for a network to "pick up" a show with the defendant—a far cry from conferring a benefit on the defendant. The plaintiff has presented no evidence from any person at MSNBC about what prompted MSNBC to make the offer to the defendant, to what extent, if any, MSNBC got the idea for "The Ed Show" from the plaintiff,

C.      **Tort Claims**

1.      **Fraud in the Inducement**

The plaintiff's third cause of action is for fraud in the inducement.  He claims that the

defendant "misled [him] as to facts upon which he relied in basing his decision to produce a pilot

for 'The Ed Show.'"  Compl. ¶ 91.  He claims that he "entered into an agreement with [the

defendant]" to produce the pilot, and he "would not have entered into this agreement and

produced a pilot for the show and provided all of the other services for [the defendant] . . . unless

[the defendant] had promised him ownership in the show."  *Id.*  He further claims that, as a result

of this fraud, he is entitled to the same damages that he claimed in his breach-of-contract claims:

"twenty-five percent of the profits of 'The Ed Show' made to the defendant," plus interest.  *Id.*

¶ 92.

Under District of Columbia law, the elements of fraud in the inducement are the same as

the elements of fraud.  *See In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 100

(D.D.C. 2003).  To prove fraud in the inducement, a plaintiff must show the following:  "(1) a

false representation; (2) made in reference to a material fact; (3) with knowledge of its falsity;

(4) with the intent to deceive; and (5) an action that is taken in reliance upon the representation."

*Hercules*, 613 A.2d at 923.  "A promise or contractual commitment may be actionable as fraud

(misrepresentation) if at the time of its making, the promisor had no present intention of carrying

---

or how the terms of MSNBC's offer related to any communication or "pitch" made by the plaintiff.  In short, the
plaintiff has failed to put forth any proof about whether his efforts conferred the benefit of "The Ed Show" on the
defendant and, consequently, whether an injustice has been visited on the plaintiff by the defendant's failure to
involve him in payments from the show that would now entitle him to restitution for his efforts on the defendant's
behalf.

it out." *Va. Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1234 (D.C. 2005).[19]

The plaintiff is attempting to use fraud in the inducement as a way to enforce the agreement that he claims was fraudulently induced.  In other words, he says that he entered into an agreement by way of the defendant's fraud and now wants to enforce the defendant's false promises. *See* Compl. ¶¶ 91–92.  The primary problem with this theory, however, is that it relies upon the existence of an enforceable agreement, which the Court has already found did not exist. *See* 2 Harper, James and Gray on Torts § 7.15, at 567 (3d ed. 2006) (noting that an action for damages based on a fraudulent transaction is for "the loss caused by the fraud" and "proceeds on the assumption that the transaction stands").  Because the Court has already held that the alleged contract that forms the basis of the fraud-in-the-inducement claim was never formed, the plaintiff cannot seek to enforce the promise that he claims the defendant made to him as part of that agreement (*i.e.*, 25% of "profits of 'The Ed Show' made to the defendant").

Other than the 25% profit measure, which is unavailable in the absence of an agreement, the plaintiff has not put forth any evidence of (or even alleged) any actual damages resulting from the claimed false representations of the defendant.  It thus appears that the plaintiff has merely pled this cause of action as an alternative attempt to enforce the agreement he alleges in his first two causes of action.  The plaintiff did initially cover the costs of producing the pilot, which he alleges were approximately $11,500, *see* Compl. ¶ 49, but it is undisputed that the defendant reimbursed him for those costs, and then some. *See* Pl.'s Statement of Material Facts ¶ 23.  The plaintiff's lack of evidence regarding non-contractual damages in this case is fatal to

---

[19] The requirements for proving fraudulent inducement in New York are substantially the same. *See, e.g.*, *Bain v. Jackson*, 783 F. Supp. 2d 13, 17–18 (D.D.C. 2010) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996)).  Because the laws of New York and the District of Columbia regarding fraud in the inducement are either identical or would lead to the same result in this case, no conflict exists, and the Court will apply District of Columbia law to the fraud-in-the-inducement claim. *See USA Waste*, 954 A.2d at 1032.

his fraud-in-the-inducement claim because "a *sine qua non* of any recovery for misrepresentation

is a showing of pecuniary loss proximately caused by reliance on the misrepresentation." *Day v.*

*Avery*, 548 F.2d 1018, 1029 (D.C. Cir. 1976); *accord Kitt v. Capital Concerts, Inc.*, 742 A.2d

856, 861 (D.C. 1999) ("To recover in the District, appellant's proof of damages [is] crucial."

(alteration in original) (internal quotation marks omitted)).  As a result, the defendant is entitled

to judgment as a matter of law, and the Court will grant summary judgment to the defendant on

the plaintiff's fraud-in-the-inducement claim.[20]

### 2.   Tortious Interference with a Business Relationship and Intentional Infliction of Emotional Distress

Plaintiff's fourth and fifth causes of action are for tortious interference with business

relationships and intentional infliction of emotional distress ("IIED").  It appears that the plaintiff

is claiming either that (1) the defendant's execution of a contract with MSNBC without the

plaintiff's participation constituted tortious interference and IIED or (2) the defendant has

engaged in behavior *independent of* the signing of the MSNBC contract that constitutes tortious

interference and IIED.  *See* Compl. ¶¶ 94-103.  Neither interpretation, however, is sufficient to

survive summary judgment.

Assuming that the plaintiff is claiming that the act of entering into a contract with

MSNBC without the plaintiff's involvement is the root of the defendant's tortious interference

and IIED, those claims fail for being duplicative of his contract claims.  The D.C. Court of

Appeals has clearly held that, for a tort to be actionable when claimed in addition to a breach of

---

[20] Alternatively, the plaintiff's fraud claim also fails because he has not created a genuine issue of fact regarding his reliance.  He claims that he relied upon the defendant's promises of 25% of profits in deciding to produce the pilot, but he presents no evidence to support that claim, and the record evidence directly contradicts that claim.  In his May 31, 2008, e-mail to the defendant, the plaintiff said "I am willing to move forward [with production of the pilot] without a signed contract *on the condition that Ed will cover all costs of production*."  Pl.'s Second Opp'n Ex. 8 (emphasis added).  Hence, the evidence demonstrates that the plaintiff relied upon the defendant's promise to pay the costs of the pilot, not on his alleged promise to give 25% of his salary to the plaintiff.

contract, "the tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship. The tort must stand as a tort even if the contractual relationship did not exist." *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008).[21]  In *Choharis*, the court held, *inter alia*, that an insurance company's duty to be accurate in its assessment of housing conditions when it issued a homeowner's policy flowed from the parties' contractual relationship and did not support a tort claim independent of a breach-of-contract claim.  *Id.* at 1090.  This Court has followed similar principles.  *See, e.g.*, *Nugent v. Unum Life Ins. Co. of Am.*, 752 F. Supp. 2d 46, 55 (D.D.C. 2010) (dismissing IIED claim that was not independent of contract claim).

Thus, in the instant case, to the extent the plaintiff merely claims that the defendant's actions in breaching the alleged contract (*i.e.*, not involving him in the MSNBC deal, not paying him 25% of his salary from the MSNBC deal, etc.) form the basis of his tortious interference and IIED claims, those claims must fail.  The plaintiff's allegations suggest that this may be the case. *See, e.g.*, Compl. ¶ 96 (alleging, in support of tortious interference claim, that the defendant "improperly directly entered into a contract with MSNBC and Griffin, excluding Plaintiff from any participation in the show even though Plaintiff was a part owner of said show"); *id.* ¶¶ 97, 102 (claiming damages for tortious interference and IIED "[a]s a result of Defendant's defaults under and breaches of the contract"); *id.* ¶ 101 (alleging, in support of IIED claim, that the defendant "has refused to honor this contract and has acted intentionally and recklessly to deny compensation to Plaintiff").

---

[21] New York law is substantially the same.  *See, e.g.*, *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.").  Because the laws of New York and the District of Columbia in this regard are either identical or would lead to the same result in this case, no conflict exists, and the Court will apply District of Columbia law.  *See USA Waste*, 954 A.2d at 1032.

Giving the plaintiff the benefit of the doubt, however, and assuming that his tortious interference and IIED claims are based on actions and duties independent of the alleged contract, *i.e.,* "inducing a third party, MSNBC/Griffin, not to enter into or continue a business relationship with the Plaintiff," *id.* ¶ 101, the court still holds that those claims fail to survive summary judgment for failure of proof.  To establish IIED, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2010) (internal quotation mark omitted).[22]  Importantly, to be actionable under an IIED theory, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (quoting *Carter v. Hahn*, 821 A.2d 890, 893 (D.C. 2003)).  The District of Columbia Court of Appeals has only recognized a limited set of actions as "outrageous" enough to state a claim for IIED.  *See Carter*, 821 A.2d 890 (intentionally lying to police in saying that plaintiff committed a crime); *Herbin v. Hoeffel*, 806 A.2d 186 (D.C. 2002) (attorney intentionally disclosing confidential information about his client to law enforcement).

In this case, the plaintiff has failed to offer any evidence to indicate why the defendant's conduct in "inducing a third party, MSNBC/Griffin, not to enter into or continue a business relationship with the Plaintiff," could be extreme and outrageous enough to support an IIED claim.  More fundamentally, however, the plaintiff has also failed to produce any evidence that the defendant *in fact* induced MSNBC or Griffin not to do business with the plaintiff.  The only evidence outside the conclusory allegations in the Complaint cited by the plaintiff for the

---

[22] New York requires the same elements to prove IIED.  *See, e.g.*, *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).  Because the laws of New York and the District of Columbia in this regard are either identical or would lead to the same result in this case, no conflict exists, and the Court will apply District of Columbia law to the plaintiff's IIED claim.  *See USA Waste*, 954 A.2d at 1032.

existence of this conduct are radio transcripts of the defendant discussing the plaintiff's allegations. *See* Pl.'s Second Opp'n at 19–22 (citing Exs. 18–20 attached thereto). Yet, these transcripts contain no evidence whatsoever that the defendant induced MSNBC or Griffin not to do business with the plaintiff. In the absence of evidence of the underlying conduct alleged to be extreme and outrageous, the plaintiff's IIED claim cannot survive summary judgment.

The same fatal absence of evidence plagues the plaintiff's tortious interference claim. The cause of action for intentional interference with business relations in the District of Columbia requires a plaintiff to prove: "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008).[23]

The plaintiff relies on the exact same conduct for his tortious interference claim as he did for his IIED claim, *i.e.*, "induc[ing] a third party, MSNBC/Griffin not to enter into or continue a business relationship with the Plaintiff." Compl. ¶ 96. In his second opposition brief, the plaintiff cites absolutely no evidence, other than repeating the conclusory allegations of his Complaint, in support of his tortious interference claim. There is no evidence that the plaintiff ever had a "valid contractual or other business relationship" with either MSNBC or Griffin, nor is there any evidence that the defendant interfered with such a relationship. On the contrary, the plaintiff admitted in deposition testimony that the extent of his relationship with MSNBC and Griffin was to "keep [them] informed" about how the potential project with the defendant was developing and that the defendant never interfered with the plaintiff doing so. *See* Queen Dep. at

---

[23] New York law is substantially the same. *See, e.g.*, *Amaranth LLC v. J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 494 (App. Div. 2009) (citing *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1102–03 (N.Y. 2004)). Because the laws of New York and the District of Columbia in this regard are either identical or would lead to the same result in this case, no conflict exists, and the Court will apply District of Columbia law to the plaintiff's tortious interference claim. *See USA Waste*, 954 A.2d at 1032.

40:17–41:3, 42:2–13, 44:19–22, 51:9–52:10, 202:1–21, 248:22–249:10.  Additionally, the

plaintiff's sworn declaration establishes that it was Griffin, not the defendant, who initiated the

deal for "The Ed Show," *see* Queen Decl. ¶ 24 ("Griffin called Schultz directly and hired him for

*The Ed Show* . . . ."), further supporting the conclusion that no third-party interference ever took

place vis-à-vis any claimed business relationship between the plaintiff and MSNBC/Griffin.

        In sum, because the plaintiff has failed to support his tortious interference and IIED

allegations with *any* factual evidence, the defendant is entitled to judgment as a matter of law,

and the Court must grant summary judgment on both causes of action.

####        D.        Counterclaims (Fraud and Defamation)

        In his Answer, the defendant asserts three counterclaims against the plaintiff.

#####                1.        *Fraud*

        The defendant first alleges that the plaintiff defrauded him.  Specifically, the defendant

claims that the plaintiff falsely assured him that a deal was in place for a nationally syndicated

Sunday morning television show on WUSA (the local CBS affiliate in Washington, D.C.), which

the defendant could finance at a cost of $5,000 per week.  Countercl. ¶ 5.  He claims that the

plaintiff's knowing misrepresentations about the WUSA opportunity "substantially caused him

to end his decades-long radio career in Fargo, ND and uproot his family to move to Washington,

D.C." *Id.* ¶ 7.  The defendant argues, alternatively, that either "there simply was not a deal with

WUSA regarding a television show in Washington, D.C. for Schultz," or "the deal allegedly

struck would cost Schultz, not $5,000 per week . . . but well over $1,000,000."  Def.'s Opp'n to

Pl.'s Mot. Partial Summ. J. ("Def.'s Opp'n") at 14, ECF No. 33.

        The record is clear that both parties agree that there was an offer made by Allan Horlick

of WUSA to the defendant "to rent studio space from WUSA wherein Schultz could produce the

proposed Sunday morning television show at Schultz['s] expense."  Answer ¶ 64; *see also* Queen Dep. at 280:9–11 ("[Horlick] okayed a television show starting [sic] Ed Schultz on WUSA on the condition that we could come up with the funding for that."); Second Schultz Decl. ¶ 10 ("Alan Horlick and WUSA guaranteed that I could do a Sunday morning local television show in Washington, D.C. but it would only be done at my expense.").  Thus, the defendant's assertion that there "simply was not a deal with WUSA regarding a television show in Washington, D.C. for Schultz" cannot literally be true because he concedes that some sort of "deal" existed.  The true point of contention on the defendant's fraud counterclaim is what the nature of the WUSA deal was.  The defendant alleges that the plaintiff "assured and represented" that the deal would allow the defendant to finance the WUSA show "at a cost of $5,000 per week."  Countercl. ¶ 5. Queen denies this allegation in its entirety.  *See* Pl.'s Answer to Countercl. ¶ 5.

As stated above, to prove fraud in the inducement in the District of Columbia, a plaintiff must show the following:  "(1) a false representation; (2) made in reference to a material fact; (3) with knowledge of its falsity; (4) with the intent to deceive; and (5) an action that is taken in reliance upon the representation."  *Hercules*, 613 A.2d at 923.  "Facts which will enable the court to draw an inference of fraud must be alleged, and allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient."  *Bennett v. Kiggins*, 377 A.2d 57, 60 (D.C. 1977).[24]

The Court finds that the defendant has failed to present any evidence on the first element of his fraud counterclaim (*i.e.*, the existence of a false representation).  First, there is no evidence, beyond the defendant's naked allegation, that the plaintiff told the defendant that he

---

[24] New York law requires the same elements be proven.  *See, e.g.*, *Klembczyk v. DiNardo*, 705 N.Y.S.2d 743, 744 (App. Div. 1999).  Because the laws of New York and the District of Columbia in this regard are either identical or would lead to the same result in this case, no conflict exists, and the Court will apply District of Columbia law to the defendant's fraud counterclaim.  *See USA Waste*, 954 A.2d at 1032.

could produce a show for $5,000 per week.  Without more proof (indeed, *any* proof) that the alleged statement was ever made, it is impossible for the defendant's counterclaim to survive summary judgment.

More importantly, however, the defendant has offered no evidence to allow the Court to infer that such a statement would have been materially false.  On the contrary, the defendant admitted in his Answer that "Horlick offered to rent studio space to Schultz for $5,000 per episode."  Answer ¶ 65.  Without any evidence regarding what the plaintiff's statement actually was (*i.e.,* whether it referred to the cost of renting studio space, total costs of production, or some other figure), it would be pure speculation for a reasonable factfinder to conclude, on this record, that the plaintiff's alleged statement was clearly and convincingly false.  Therefore, the Court will grant summary judgment to the plaintiff on the defendant's fraud counterclaim.  *See, e.g.*, *Va. Acad. of Clinical Psychologists*, 878 A.2d at 1235–36 (affirming summary judgment on appellants' fraud claim where appellant failed to present sufficient evidence to demonstrate *prima facie* case of fraud by clear and convincing evidence).

### 2.   *Defamation Claims*

The defendant also claims that the plaintiff libeled and slandered him after it had become clear that the plaintiff would not be involved in "The Ed Show."  The defendant claims that the plaintiff committed both libel and slander *per se* by making false statements on July 21, 2010, to a group of NBC, MSNBC, and NBC/MSNBC News management and employees.  Countercl. ¶¶ 11–13, 18.  The statements allegedly "included accusations that Schultz had a business contract with Queen and that Schultz reneged or otherwise breached that contract," that "Schultz defrauded Queen and that Schultz owed Queen money for, among other things, producing a pilot for a proposed television show," and that "Schultz caused Queen to mortgage his house to

finance the pilot for the proposed television show project." *Id.* ¶ 11.  The defendant also alleges

that the plaintiff committed libel *per se* by (1) writing to NBC on an unspecified date to "alert"

them that "he was entitled to compensation as he had a contract with Schultz"; and (2) "caus[ing]

to be written a 'press release'" on May 10, 2010, containing essentially the same types of

statements alleged in his slander claim (*i.e.*, he had a contract with Schultz that was breached,

entitling him to compensation).  *See id.* ¶¶ 19–20.

     For his part, the plaintiff admits that he made statements at the meeting on July 21, 2010,

that he wrote to NBC, and that he caused the "press release" to be published on May 10, 2010.

Pl.'s Answer to Countercl. ¶¶ 18–20.  The plaintiff flatly denies, however, that any of these

statements were false, and he further argues that he did not make the statements with actual

malice, citing the defendant's status as a public figure.  *See* Pl.'s Mem. at 21–22.

     Under District of Columbia law, defamation has four essential elements:  (1) the

defendant made a false or defamatory statement concerning the plaintiff; (2) the defendant

published the statement without privilege to a third party; (3) the defendant's fault in publishing

the statement amounted to at least negligence; and (4) either the statement was actionable as a

matter of law irrespective of special harm or its publication caused the plaintiff special harm.

*Payne v. Clark*, 25 A.3d 918, 924 (D.C. 2011).  "A statement is 'defamatory' if it tends to injure

the plaintiff in his trade, profession or community standing, or lower him in the estimation of the

community." *Id.*[25]  Additionally, when a "public figure" alleges defamation, he carries an even

higher burden.  In such cases, the "public figure" must prove that the statements were made with

"actual malice," which means that the defendant must have "'entertained serious doubts as to the

---

[25] New York law is essentially the same.  *See, e.g.*, *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (App. Div. 1999)
(reciting elements of defamation cause of action).  Because the laws of New York and the District of Columbia in
this regard are either identical or would lead to the same result in this case, no conflict exists, and the Court will
apply District of Columbia law to the defendant's defamation counterclaims.  *See USA Waste*, 954 A.2d at 1032.

truth of [its] publication' or acted with a 'high degree of awareness of . . . [its] probable falsity.'"

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).  A general "public figure" is one who has "assumed a role of especial prominence in the affairs of society," or has attained "general fame or notoriety in the community" because "[t]he public recognizes him and follows his words and deeds."  *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980).

"As a threshold matter, the court must determine whether a statement can be construed as defamatory."  *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990).  "[A]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiffs appear odious, infamous or ridiculous."  *Klayman v. Segal*, 783 A.2d 607, 613 (D.C. 2001) (alteration in original) (internal quotation marks omitted).  "The plaintiff has the burden of proving the defamatory nature of the publication, and the publication must be considered as a whole, in the sense in which it would be understood by readers to whom it was addressed."  *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (citation omitted).  The Court must "determine whether the statements in question are capable of carrying a defamatory meaning," and "only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in a defamatory sense, can it rule as a matter of law that it was not libelous."  *Id.*  "If it appears that the statements are at least capable of a defamatory meaning, whether they were defamatory and false are questions of fact to be resolved by the jury."  *Moss*, 580 A.2d at 1023.

Although the Court takes seriously its obligation to determine whether the alleged statements in this action are "reasonably capable of defamatory meaning," the defendant has made that task impossible by failing to submit any evidence whatsoever regarding the contents of

the statements at issue.  The defendant is perhaps correct that he "allege[d] each of the requisite *allegations* in his counterclaim," Def.'s Opp'n at 14 (emphasis added), but mere allegations are wholly insufficient to defeat a motion for summary judgment.  *See Veitch*, 471 F.3d at 134 (non-moving party "cannot rely in opposing summary judgment on mere allegations").  In light of the defendant's complete failure of proof, the plaintiff is entitled to summary judgment on the defendant's defamation counterclaims.  *See Celotex*, 477 U.S. at 323; *Kent v. Iowa*, 651 F. Supp. 2d 910, 958 (S.D. Iowa 2009) (granting summary judgment to defamation defendant where plaintiffs "offered absolutely no information regarding the actual words of [defendant's] alleged statement"); *Marshall v. Circle K Corp.*, 715 F. Supp. 1341, 1343–44 (M.D. La. 1989) (granting summary judgment to defamation defendant where plaintiff "ha[d] come forth with no evidence of defamatory words").

## IV.     CONCLUSION

For the reasons discussed above, the Court holds that, because both the plaintiff and defendant have failed to create a genuine issue of material fact with respect to any of the claims or counterclaims at issue here, each party is entitled to judgment as a matter of law on each claim against him, and therefore the Court **GRANTS** both of the defendant's motions for summary judgment as well as the plaintiff's cross-motion for partial summary judgment.


Date:  August 30, 2012


                                        /s/ *Beryl A. Howell*
                                        BERYL A. HOWELL
                                        United States District Judge