# EXHIBIT A

**(PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS)**

SCHULTZ  - CONFIDENTIAL, ED

1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3

4     ------------------------x

5     MICHAEL QUEEN

6          Plaintiff,

7     -vs-                    Case No.

8     ED SCHULTZ               1:11-cv-00871 BAH

9          Defendant.

10    ------------------------x

11    ED SCHULTZ

12          Counterclaimant,

13    -vs-

14    MICHAEL QUEEN

15    aka MICHAEL ANDERSON

16          Counterdefendant.

17    ------------------------x

18                    Thursday, November 10, 2011

19                    Washington, DC

20

21          C-O-N-F-I-D-E-N-T-I-A-L

22    VIDEO DEPOSITION OF ED SCHULTZ

2

1          VIDEO DEPOSITION OF ED SCHULTZ

2

3          The deposition of ED SCHULTZ was taken

4     on Thursday, November 10, 2011, commencing at

SCHULTZ – CONFIDENTIAL, ED

5   10:13 a.m., at the law offices of Nixon Peabody,

6   LLP, 401 9th Street, N.W., Washington, DC,

7   before CHERYL NICHOLSON, CLR, Stenotype Reporter

8   and Notary Public in and for the District of

9   Columbia.

10

11

12

13

14

15

16

17

18

19

20

21

22

♀

3

1   APPEARANCES:

2

3   On behalf of the Plaintiff/Counterdefendant:

4           MARK LANE, ESQ.

5           The Lane Law Firm

6           4 Old Farm Road

7           Charlottesville, VA 22903

8           434.293.2349

9           Mlane777@cs.com

10

SCHULTZ  - CONFIDENTIAL, ED

11      FRAZER WALTON, ESQ.

12          920 Burns Street, S.E.

13          Washington, DC 20019

14          202.584.7572

15          Frawalton@verizon.net

16

17

18

19

20

21

22

♀

4

1   APPEARANCES: (Continued)

2

3       On behalf of the Defendant/Counterclaimant:

4           JEFFREY B. LANDA, ESQ.

5           One Bunker Hill

6           8th Floor

7           601 West Fifth Street

8           Los Angeles, CA 90071

9           612.306.8542

10          Jblawyer@gmail.com

11

12          JOHN C. HAYES, JR., ESQ.

13          Nixon Peabody, LLP

14          401 9th Street, N.W.

15          Suite 900

16          Washington, DC 20004

Page 3

SCHULTZ  - CONFIDENTIAL, ED

17          202.585.8345

18          Jhayes@nixonpeabody.com

19  ALSO PRESENT:

20          Amy Wooden, paralegal

21          Sue Herndon, paralegal

22          Michael Queen

♀

5

1            C O N T E N T S

2          EXAMINATION OF ED SCHULTZ

3  BY MR. LANE   ........ 9

4  BY MR. WALTON ........132

5

6  Afternoon Session ....111

7

8  Ed Schultz deposition (pages 134 through 159)

9  were marked CONFIDENTIAL -- ATTORNEYS' EYES ONLY

10  and placed under separate cover.

11

12            E X H I B I T S

13          (Attached to original transcript)

14  SCHULTZ DEPOSITION EXHIBIT                 PAGE

15  No. 1..Email March 16, 2008...................42

16  No. 2..Straight Talk..........................49

17  No. 3..Email Feb 20, 2008.....................53

18  No. 4..Email March 5, 2008, 10:21:27..........55

19  No. 5..Email March 5, 2008, 10:34:47..........56

20  No. 6..Email March 15, 2008...................58

21  No. 7..Email March 16, 2008...................63

22  No. 8..Email April 5, 2008....................68

SCHULTZ  – CONFIDENTIAL, ED

♀

6

1   EXHIBITS (Continued)

2   SCHULTZ DEPOSITION EXHIBIT                    PAGE

3   No. 9..Email April 15, 2008...................69

4   No. 10..Email May 28, 2008....................72

5   No. 11..Email May 31, 2008....................74

6   No. 12..Email June 1, 2008....................76

7   No. 13..Email June 6, 2008....................77

8   No. 14..Email June 7, 2008....................81

9   No. 15..Email June 7, 2008....................84

10   No. 16..Email June 8, 2008....................85

11   No. 17..Email June 11, 2009...................89

12   No. 18..Email February 22, 2009...............92

13   No. 19..Email March 13, 2009..................95

14   No. 20..Email March 21, 2009..................97

15   No. 21..Email April 5, 2009...................97

16   No. 22..Email May 11, 2009...................100

17   No. 23..Email February 18, 2008..............111

18   No. 24..Email April 8, 2008..................111

19   No. 25..Email April 19, 2008.................111

20   No. 26..Email April 21, 2008.................111

21   No. 27..Email April 25, 2008.................111

22   No. 28..Email Letter April 28, 2008..........111

♀

7

1   EXHIBITS (Continued)

2   SCHULTZ DEPOSITION EXHIBIT                    PAGE

3   No. 29..Email July 1, 2008...................111

SCHULTZ  – CONFIDENTIAL, ED

4  No. 30..Email July 2, 2008...................111

5  No. 31..Email April 22,2008..................111

6  No. 32..Email May 10, 2011...................119

7  No. 33..Email October 21, 2010...............120

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

⚲

8

1           P R O C E E D I N G S

2

3           THE VIDEOGRAPHER:   This begins

4  videotape number one in the deposition of Ed

5  Schultz in the matter of Michael Queen versus Ed

6  Schultz filed in the United States District

7  Court for the District of Columbia.   Civil

8  Action No. 1:11-CV-00871.

9           Today's date is November 10th, 2011.

SCHULTZ - CONFIDENTIAL, ED

10    The time on the video monitor is 10:13 a.m.   The

11    video operator is Rick Sanborn employed by

12    Olender Reporting Company, Washington, D.C.   The

13    court reporter is Cheryl Nicholson, also

14    employed by Olender Reporting.

15              This video deposition is taking place

16    at the offices of Nixon Peabody 401 9th Street

17    NW, Washington, D.C.

18              Will counsel please identify

19    themselves and state whom they represent.

20              MR. LANE:  My name is Mark Lane.  I'm

21    one of the two attorneys representing Mr. Queen,

22    the plaintiff.

♀

9

1              MR. WALTON:   Yes.   My name is Frazer

2    Walton and I'm representing Michael Queen, the

3    plaintiff.

4              MR. LANDA:   Jeff Landa on behalf of

5    Mr. Schultz.

6              THE VIDEOGRAPHER:   Thank you.

7              Will the court reporter please swear

8    in the witness.

9                   ED SCHULTZ,

10     having been duly sworn, testified as follows:

11        EXAMINATION ON BEHALF OF PLAINTIFF

12    BY MR. LANE:

13       Q.   Good morning, Mr. Schultz.  My name is

14    Mark Lane.  I'm one of the attorneys for

15    Mr. Queen, and I'll be taking your deposition

SCHULTZ  - CONFIDENTIAL, ED

16    this morning.

17         At the outset we want to thank Nixon

18    Peabody for making available this space for this

19    deposition.

20         Did you bring any documents with you

21    in response to the deposition notice and the

22    subpoena duces tecum.

♀

10

1     A.    No.

2     Q.    Do you have any e-mail records of any

3     exchange which is in any way related to any of

4     the issues in this case?

5     A.    No.

6     Q.    Have you received and sent a number of

7     e-mails to Mr. Queen and others regarding

8     aspects of this case?

9     A.    Yes.

10    Q.    Where are they now, do you know?

11    A.    I don't know.

12    Q.    Have you received any receipts or

13    payment vouchers regarding anything related to

14    this case?

15    A.    No.

16    Q.    Is it your testimony that you didn't

17    keep any of the e-mail correspondence in this

18    case?

19    A.    I get --

20    Q.    I beg your pardon.

21    A.    I get hundreds of e-mails because of

SCHULTZ  - CONFIDENTIAL, ED

22    my radio show.  They all get deleted.  I have

11

1     not researched any of them.  They're all
2     deleted.  I delete all my e-mails about once a
3     week.
4          Q.    I'm not talking about e-mails from
5     fans or listeners to your show, but e-mails
6     which you answered and wrote back to Mr. Queen
7     about or copied Mr. Landa and others.  They're
8     all deleted also?
9          A.    To the best of my knowledge, yes.
10         Q.    If I ask you any question and it's not
11    clear to you what I mean by the question, feel
12    free to just say I don't understand it, explain
13    it, and I'll do the best I can to make it clear.
14         A.    Okay.
15         Q.    Also, while you are not obligated to
16    answer yes or no and leave it at that, to the
17    extent that you can do that, this deposition
18    will go more quickly if it's appropriate, in
19    your view, for you to do that.
20              And please don't answer questions or
21    make explanations to questions that I have not
22    asked.  Is that all right?

12

1          A.    Certainly.

SCHULTZ – CONFIDENTIAL, ED

2     Q.   All right.  Have you ever been

3  suspended from work?

4     A.   Yes.  Now, where?  At my current

5  employer?

6     Q.   Ever been suspend from work?

7     A.   In my career?

8     Q.   In your career.

9     A.   Yes.

10    Q.   Under what circum- -- when was that?

11    A.   1988.

12    Q.   And where were you suspended from?

13    A.   I was suspended from WDAY Radio and

14  Television for a few days.

15    Q.   What was the reason for the

16  suspension?

17    A.   I was doing a football game at Dakota

18  Field in Fargo, North Dakota.  North Dakota

19  State was playing Northern Michigan, and it was

20  the fourth quarter and the crowd was liquored up

21  and a drunk fan threw a whiskey bottle through

22  the window.

♀

13

1     Q.   The window of your booth?

2     A.   Yes.

3     Q.   Yes.  And?

4     A.   Broken glass came all over me, so I

5  took my headsets off and I went out into the

6  crowd looking for the perpetrator.

7     Q.   Did you catch him?

SCHULTZ  – CONFIDENTIAL, ED

8      A.    No, sir.

9      Q.    Okay.  And why were you suspended?

10     A.    It was the determination of the

11  company at the time that I should not have left

12  the broadcast booth.  And there was a great deal

13  of conversation in the community and talk radio

14  atmosphere fueled a lot of emotions, and so the

15  company thought that it was proper for me to

16  take a few days off.

17     Q.    Have you ever been suspended since

18  you've been at MSNBC?

19     A.    No, I haven't.

20     Q.    All right.  Have you been cautioned

21  about your conduct by anyone in management at

22  MSNBC or NBC?

°

14

1      A.    Please define "cautioned."

2      Q.    Has anyone in management ever told you

3  that you did something wrong and you should not

4  repeat it?

5      A.    Yes.

6      Q.    What was that circumstance?

7      A.    I was told to be aware of my comments

8  on the air.

9      Q.    When was that?

10     A.    It was this past -- I believe it was

11  April.

12     Q.    What were the comments about?  I don't

13  want to hear the whole story, just tell me if

Page 11

SCHULTZ  - CONFIDENTIAL, ED

14    you can, briefly, but the subject matter --

15        A.    I described another person in the

16    industry in a disparaging matter.

17        Q.    You called someone a right wing slut?

18        A.    Correct.

19        Q.    And you were not suspended?

20        A.    I voluntarily took myself off the air

21    for one week.

22        Q.    So you suspended yourself?

♀

15

1         A.    "Suspension" is not the correct word,

2    sir.

3         Q.    Okay.  Did you ever meet with any

4    management since you have been at MSNBC where

5    you were told that your conduct was

6    inappropriate, other than this one matter

7    regarding the "right wing slut" allegation?

8         A.    Yes.

9         Q.    What was that about?

10        A.    I had a phone conversation in the

11    workplace when I was upset about a particular

12    promotional spot that was on the air.  And

13    following the conversation I made a comment that

14    was overheard by other employees, and I left the

15    building.

16        Q.    What was your comment?

17        A.    It was a comment that I was going to

18    torch the place.

19        Q.    Meaning the NBC building?

Page 12

SCHULTZ  - CONFIDENTIAL, ED

20      A.   Yes.   The quote was "I should torch

21   this place."

22      Q.   What was the reason that you were

16

1   angry with NBC or MSNBC at that time?

2      A.   Respectfully, I just told you.

3      Q.   You said something about a promotion.

4   What was that about?

5      A.   I said it was a promotional spot that

6   was on the air --

7      Q.   Yes.

8      A.   -- that I saw.

9      Q.   And what was your objection to it is

10   my question?

11      A.   I was not included.

12      Q.   Did you talk to Mr. Capus about that?

13      A.   I did.

14      Q.   Who is Mr. Capus?

15      A.   President of NBC news.

16      Q.   Have you talked to Phil Griffin about

17   that?

18      A.   I did.

19      Q.   And who is Mr. Griffin?

20      A.   He is the president of MSNBC.

21      Q.   Did they tell you -- did either of

22   them tell you that you would be fired if you did

17

SCHULTZ  - CONFIDENTIAL, ED

1  anything like that again?

2      A.    No, they did not.

3      Q.    Do you know that was reported in the

4  media, that that's what they said; is that

5  correct?

6          MR. LANDA:  Calls for -- I object.

7  Calls for speculation.

8          MR. LANE:  No.  I'm asking what he

9  knows.

10  BY MR. LANE:

11      Q.    Do you know if it was reported in the

12  media that it was said that you -- they told you

13  you would be fired if you did anything like that

14  again?

15      A.    I'm not aware of that.

16      Q.    You're not?  Has there ever been a

17  restraining order against you filed in any

18  court?

19      A.    I'm going to have to plead a 5th on

20  that.  I don't -- I don't remember.

21      Q.    Well, those are two different answers.

22      A.    I don't -- I mean, I cannot

♀

18

1  definitively say if a restraining order has ever

2  been filed against me.  I -- possibly.  I

3  honestly can't remember.

4          MR. LANDA:  I'm also going to object

5  as not calculated to lead to admissible

6  evidence.

Page 14

SCHULTZ  - CONFIDENTIAL, ED

7            THE WITNESS:  Can you and I talk?

8            MR. LANE:  Yes.

9            THE VIDEOGRAPHER:  Off the record at

10    10:25.

11            (Off the record.)

12            THE VIDEOGRAPHER:  On the record at

13    10:25.

14    BY MR. LANE:

15       Q.    Did you ever attend a hearing where a

16    protective order was sought against you?  You

17    actually can't consult Mr. Landa.

18            MR. LANDA:  Actually, he wasn't.

19            MR. LANE:  He was looking at you and

20    then shrugging.

21            MR. LANDA:  Excuse me.  Are you

22    telling him he can't look at me?  He wasn't

19

1    consulting me and I'm going to make an objection

2    that it --

3            MR. LANE:  You are entitled to your

4    objection.

5    BY MR. LANE:

6       Q.    Would you please answer my question,

7    Mr. Schultz?

8            MR. LANDA:  It's not calculated --

9    don't interrupt me, please.

10            It's not calculated to lead to

11    admissible evidence.

12    BY MR. LANE:

SCHULTZ  - CONFIDENTIAL, ED

13    Q.    Please answer the question.

14    A.    Your question is?

15          MR. LANE:  Would you read back the

16    question, please.

17          THE REPORTER:  Question:  Did you ever

18    attend a hearing where a protective order was

19    sought against you?

20          THE WITNESS:  What is your definition

21    of a protective order?

22    BY MR. LANE:

♀

20

1     Q.    Were you married to a woman who sought

2     an order against you at one point?

3     A.    I went through a divorce almost

4     20 years ago.  I can't remember ever motion that

5     was in that divorce case.

6           MR. LANDA:  We're going to go off the

7     record.  I want to get this cleared up with the

8     judge.  We're not going to talk about --

9           MR. LANE:  We're not going to

10    trouble --

11          MR. LANDA:  I'm going to call the

12    judge right now.

13          MR. LANE:  Call the judge if you want.

14          MR. LANDA:  Okay.

15          MR. LANE:  As I said, I'm not asking

16    any more questions.  I'll accept his answer he

17    can't remember.

18          MR. LANDA:  Well, we're not going to

SCHULTZ  - CONFIDENTIAL, ED

19    go into things that happened 20 years ago --

20             MR. LANE:  Well --

21             MR. LANDA:  -- or with his first wife.

22    They have nothing to do with the complaint.

⚲

21

 1    It's just harassment and --

 2             MR. LANE:  As I said, I finished the

 3    area --

 4             MR. LANDA:  I'm not done, Mr. Whatever

 5    -- Mr. Lane.  We're going to go off the record,

 6    please, and get this straightened out.

 7             MR. LANE:  No.  We're not going off

 8    the record because I'm not asking anything more

 9    about that.  That matter is closed.

10    BY MR. LANE:

11        Q.   What was the circumstance of your

12    first meeting with Mr. Queen?  That's what I'd

13    like to know now.

14             MR. LANDA:  You could answer.

15    BY MR. LANE:

16        Q.   Do you recall when you first met

17    Mr. Queen?

18        A.   Do I recall when I first met Mr.

19    Queen?

20        Q.   Yes, that is the question.

21        A.   Yes, I do.

22        Q.   When was that?

⚲

Page 17

1      A.    It was in January of 2008.

2      Q.    Where did you meet him?

3      A.    I met him in the hallway of NBC at

4    Nebraska Avenue in Washington, D.C.

5      Q.    And was anyone else present for that

6    meeting?

7      A.    Yes.

8      Q.    Who else was there?

9      A.    My wife, Wendy Schultz, and my radio

10   producer and employee, James Holm.

11     Q.    Did you have a conversation with

12   Mr. Queen at that meeting?

13     A.    What's your definition of a "meeting"?

14     Q.    When you met Mr. Queen, did you have a

15   conversation with him?

16     A.    In the hallway, I did.

17     Q.    What was the substance of that

18   conversation, if you recall?

19     A.    Mr. Queen intercepted us in the

20   hallway before we left the building.  He was

21   very complimentary of my talent and my

22   performance, because I had just gotten off

♀

23

1    Hardball with Chris Matthews as a guest.

2      Q.    Was there any discussion about

3    anything besides him saying he liked your work?

4      A.    He said I should have my own show.

SCHULTZ - CONFIDENTIAL, ED

 5        Q.      Television show?

 6        A.      Correct.

 7        Q.      Did he ask you if you would be

 8   interested in having a television show?

 9        A.      He did.

10        Q.      What did you say?

11        A.      I shrugged my shoulders and I said,

12   yeah, anybody would.

13        Q.      Did you ask him if he could do

14   something to help bring that about, a television

15   show for you?

16        A.      I don't recall that question.

17        Q.      Do you recall saying -- do you recall

18   Mr. Queen asking you if anybody else represented

19   you in that kind of a matter, that is trying to

20   get a television show for you?  Do you recall

21   him asking you that question?

22        A.      Do I recall him asking me?

♀

 1        Q.      Yes, that's my question.

 2        A.      No, I don't.

 3        Q.      Then you don't recall, I guess, and

 4   you're saying, well, you're it, you don't recall

 5   that conversation?

 6        A.      "You're it" pertaining to what?

 7        Q.      What I just said, that he asked you if

 8   anybody was representing you in trying to get a

 9   TV show.  You said no.  And then you said

10   "you're it," meaning you are the person who will

                    SCHULTZ  - CONFIDENTIAL, ED
11   represent me.

12            Do you recall that conversation?

13      A.    The conversation did not reach that

14   level of depth as to who was representing what.

15   The man stopped me in the hallway, he

16   complimented my talent.  He said -- he made

17   reference to my radio show.  He said I should

18   have my own show.

19      Q.    Television show?

20      A.    Yes, sir.

21      Q.    Okay.

22      A.    And he asked for my business card, so

                                                    25

1    I gave it to him.  Now, that's what I recall of

2    the conversation.

3       Q.    Are you saying that either that

4    Mr. Queen never said would you like me to

5    represent you and you said yes, you're it, you

6    can represent me?  Are you saying that didn't

7    happen or that you don't recall if it happened?

8            MR. LANDA:  Objection.  Asked and

9    answered.

10           MR. LANE:  No, it wasn't.

11   BY MR. LANE:

12      Q.    I want to know if you're saying that

13   never happened or you don't recall if that ever

14   happened?

15      A.    Are we taking about the first time

16   that I met Michael Queen?

                    Page 20

SCHULTZ - CONFIDENTIAL, ED

17     Q.    Yes, that's what we're taking about.

18     A.    I've given you my answer to the best

19  of my recollection of what we talked about.

20     Q.    I understand that.  Now, I'm going to

21  -- what I'm asking you is if you are saying

22  that's your best recollection or are you saying

♀

26

 1  that that never took place, the part that I just

 2  talked to you about?

 3          MR. LANDA:  Objection.  Asked and

 4  answered.

 5  BY MR. LANE:

 6     Q.    Could you answer the question, please?

 7     A.    I did.  I just told you the

 8  conversation, sir.

 9     Q.    You told me what you recall.  So now

10  I'm asking you if you're saying that what

11  Mr. Queen has testified to, which I've

12  summarized to you, never happened or you don't

13  recall if it happened?  It's just that simple;

14  one or the other?

15          MR. LANDA:  I object.  It's been asked

16  and answered.

17  BY MR. LANE:

18     Q.    Please answer the question.

19     A.    You're asking me, if I have this

20  correct, if we had a conversation about

21  representation in the hallway.  Do I have that

22  correct?

Page 21

SCHULTZ  - CONFIDENTIAL, ED

♀

27

1      Q.    You know exactly what I said.

2      A.    No, I don't, because I did -- we

3    didn't --

4           MR. LANDA:   Stop.   That's

5    argumentative.   Stop.

6           MR. LANE:   All right.   Don't tell him,

7    he knows exactly -- (Simultaneous talking)

8    BY MR. LANE:

9      Q.    Let me put it this way, Mr. Schultz:

10   Mr. Queen has testified that the conversation

11   included him asking you if anybody represented

12   you in trying to get a television show.   You

13   said no.   And then you said to Mr. Queen, well,

14   you're it.   Meaning you are the one who could

15   represent me.

16           I'm asking you if you're saying that

17   never took place or you don't recall if that

18   took place?

19      A.    That did not take place.

20      Q.    Okay.   Now, we've got that.

21      A.    That did not take place.   And I want

22   to --

♀

28

1           MR. LANDA:   You answered the question.

2           THE WITNESS:   And -- but we have to

3    put on the record --

Page 22

SCHULTZ  - CONFIDENTIAL, ED

4          MR. LANDA:   No.   You answered the

5   question.

6          THE WITNESS:   -- that was the first

7   conversation that I ever had.

8   BY MR. LANE:

9      Q.   Mr. Schultz, please just answer the

10   questions that I ask you.

11      A.   I gave you the answer, sir.

12      Q.   Did you ever ask or approve of

13   Mr. Queen acting on your behalf in relationship

14   to trying to find a television show for you on

15   CNN?

16      A.   Yes.

17      Q.   Did you ever ask or approve of

18   Mr. Queen to act on your behalf in seeking to

19   find a television program for you on CBS?

20      A.   Yes.

21      Q.   Did you ever ask Mr. Queen to act to

22   try find a television show for you on FOX?

♀

                                                    29

1      A.   I need a definition of "television

2   show."

3      Q.   You want to know what a television

4   show is?

5      A.   Yes, sir, because there are different

6   types of television shows.

7      Q.   Any show starring you on television.

8      A.   Any show?

9      Q.   Did you ever have a discussion with

SCHULTZ  - CONFIDENTIAL, ED

10    Mr. Queen where you approved or asked him to try

11    to find a television show, talk show for you on

12    FOX?

13         A.    I don't recall that.

14         Q.    All right.  Same question about NBC.

15    Do you understand what --

16         A.    Yes.

17         Q.    -- I mean by the same question?

18         A.    Yes.

19         Q.    And what's the answer?

20         A.    Because your question is any

21    television show?

22         Q.    Yes.  A television show.

⚲

30

1          A.    So that would in -- yes.

2          Q.    Okay.  Talking about a television show

3     for you on -- in which you are the star.  That's

4     what we are taking about, right?

5          A.    Host.

6          Q.    Host.  All right.

7                Did you ever ask or approve of

8     Mr. Queen seeking to find a television show for

9     you where you are the host for MSNBC?

10         A.    No.

11         Q.    You are sure of that?

12         A.    To my knowledge, Mr. Queen and I were

13    trying to develop a syndicated show.

14         Q.    Did Mr. Queen make arrangements to

15    shoot a pilot for you regarding the prospective

SCHULTZ  – CONFIDENTIAL, ED

16    show?

17         A.    That was a joint venture and the

18    answer to that is correct, he did partake in

19    that, as I did.

20         Q.    Who originally paid for it, that

21    pilot?

22         A.    Originally?

♀

31

1          Q.    Yes.   Who made the payment to NBC

2    first?

3          A.    I found out after he paid it that he

4    did, but that was not the agreement.

5          Q.    You agreed to pay for it, didn't you?

6          A.    I did agreed to pay and did pay for

7    everything.

8          Q.    Did you write to Mr. Queen and say

9    that "Jeff and I will pay for the pilot"?

10         A.    I did.

11         Q.    And who is Jeff?

12         A.    Jeff Landa is my attorney.

13         Q.    All right.   Was he part of the

14    operation with you?

15         A.    No.

16         Q.    Why would Mr. Landa pay for the show?

17         A.    He wouldn't.   He never has.

18         Q.    Why did you say to Mr. Queen that

19    "Jeff and I will pay for the show"?

20         A.    Mr. Queen was -- notified me -- I

21    notified Mr. Queen on numerous occasions that

SCHULTZ  - CONFIDENTIAL, ED

22    Jeff Landa was my attorney and that I was not

♀

32

1     going to enter into any agreement without

2     counsel.

3             And so I believe the e-mail that you

4     are referring to is one where we were in

5     conversation to come to agreement and I said

6     that I wanted to make it perfectly clear that I

7     was going to pay for everything.

8     Q.    Did you write an e-mail to Mr. Queen

9     in which you said "Jeff and I will pay for the

10    pilot"?

11    A.    There was a sentence in my e-mail that

12    referenced Jeff Landa, but that was not my

13    intention to say that Jeff was going to be

14    paying for anything.

15    Q.    I'm asking if there was a sentence in

16    there where you wrote an e-mail to Mr. Queen in

17    which you said "Jeff and I will pay for the

18    pilot"?

19            I'm not asking about your intention.

20    I'm asking if that sentence was written by you.

21            MR. LANDA:  Objection.  Asked and

22    answered.

♀

33

1     BY MR. LANE:

Page 26

SCHULTZ  - CONFIDENTIAL, ED

2      Q.    Answer the question, please.

3      A.    Yes, there was a sentence in an e-mail

4    that said that.

5      Q.    How many people worked in creating

6    that pilot?

7            MR. LANDA:  Calls for speculation.

8            MR. LANE:  He said he produced it with

9    Mr. Queen.

10   BY MR. LANE:

11     Q.    How many people worked in producing

12   that pilot?

13           MR. LANDA:  Objection.  Calls for

14   speculation.

15   BY MR. LANE:

16     Q.    Please answer the question.

17     A.    I can't give you a specific number.

18     Q.    Did Mr. Queen recruit everyone who

19   worked on that pilot?

20     A.    Everyone?

21     Q.    Everyone who worked on that pilot?

22     A.    No.

♀

34

1      Q.    Did you recruit some people for that

2    pilot?

3      A.    Yes, sir.

4      Q.    Who did you recruit?

5      A.    Byron Dorgan.

6      Q.    Who else?

7      A.    Tom Daschle.  Richard Vigueri.

SCHULTZ  - CONFIDENTIAL, ED

8      Q.    They were all part of the pilot?

9      A.    They were on the pilot.

10     Q.    Yes.  And --

11     A.    They were on the show.

12     Q.    I'm talking about people who worked to

13   put it together, not the people who appeared on

14   it.  Who --

15     A.    Well, you didn't ask me that.

16     Q.    I'm asking you that now.

17     A.    Okay.  The people that worked on the

18   show?

19     Q.    Yes.  I'm asking you, did Mr. Queen

20   recruit all those who worked on the pilot?  That

21   was the question.  I'm asking you that same

22   question again.

♀

35

1           MR. LANDA:  Asked and answered.

2           THE WITNESS:  To my knowledge, Michael

3    Queen was involved in putting the pilot

4    together.

5           Now, whether he had other people do

6    things to get people involved, I don't know.  I

7    worked to put it together, because if I hadn't

8    called the people to be on the show, which is

9    constituted as work, they would have never

10   appeared.

11   BY MR. LANE:

12     Q.    Other than the people who appeared on

13   the show, I'm talking about the people who did

Page 28

SCHULTZ - CONFIDENTIAL, ED

14  the actual worked; the camera people, directors,

15  all of that.  Did Mr. Queen recruit all of them?

16       A.   I don't --

17            MR. LANDA:  Objection.  Asked and

18  answered.

19  BY MR. LANE:

20       Q.   What's the answer?

21       A.   Everyone?

22       Q.   Other than those who appeared on the

♀

36

1   program?

2        A.   Everyone?

3        Q.   Yes.

4        A.   I'm not aware that he did.

5        Q.   Okay.

6        A.   I mean, you're -- I mean, you're

7   asking was he -- I need a more specific

8   question.

9        Q.   Okay.

10       A.   Did you use the word everyone?

11       Q.   Yes.  Hold on.  I have your answer.

12            MR. LANDA:  Mr. Lane, you commented to

13  me a couple of times about smirking and smiling.

14  You're doing that to my client.  All right.  So

15  if you're so opposed to that, please stop.  We

16  don't mind you asking any questions you want.

17            MR. LANE:  Make an objection if you'd

18  like.  Don't make a speech.

19            MR. LANDA:  I'm going to finish.  Quit

SCHULTZ  - CONFIDENTIAL, ED

20    smirking at my client.

21             MR. LANE:  I never smirked at anyone.

22             MR. LANDA:  Well, strange looking

                                                              37

1    faces.

2    BY MR. LANE:

3        Q.    Did Mr. Queen make copies of the pilot

4    and distribute them to various television

5    stations and networks to promote you?

6        A.    To my knowledge, he did.

7        Q.    Did Mr. Queen at any time, to your

8    knowledge, follow you around to different events

9    where you were talking, speaking, and stalk you?

10             I'm not talking about a meeting, I'm

11   not talking about anything at NBC itself, but

12   other than that, did Mr. Queen ever follow you

13   around to events and stalk you?

14             MR. LANDA:  Objection.  Calls for a

15   legal conclusion.

16   BY MR. LANE:

17       Q.    Answer the question, please.

18       A.    Yes.

19       Q.    All right.  Tell us the events where

20   Mr. Queen followed you around, other than the

21   building at NBC?

22       A.    He -- well, there are none.

                                                              38

SCHULTZ  - CONFIDENTIAL, ED

1      Q.    There are none?

2      A.    Well, you know, you ask me a question

3   and then you pare it down.

4      Q.    No.  This was my original question,

5   Mr. Schultz.  I'll ask it again to make it

6   clear.

7            Other than what you claim took place

8   at NBC, at that building, did Mr. Queen ever

9   follow you around at any event at which you

10  spoke?

11     A.    Not to my knowledge.

12     Q.    Did you hear Mr. Landa state on the

13  air or elsewhere that Mr. Queen followed you

14  around at various events and stalked you?  Did

15  you ever here Mr. Landa say that?

16     A.    No, I didn't.

17     Q.    Did you ever tell Mr. Landa that that

18  had taken place, that Mr. Queen had followed you

19  around to various events and stalked you?

20     A.    "Various events," no.

21     Q.    Okay.  Any event?

22     A.    Yes.

♀

39

1      Q.    Other than the one meeting at NBC, I'm

2   not talking about that one.  Did he follow you

3   to any other event?

4      A.    Not to my knowledge.

5      Q.    Was Mr. Queen ever at any event where

6   you spoke?

Page 31

SCHULTZ - CONFIDENTIAL, ED

7      A.   Not to my knowledge.

8      Q.   Did Mr. Queen pick you up at the

9   airport and take you to an apartment and then

10   take you and your wife to George Washington

11   University, where you spoke?  Do you recall

12   that?

13      A.   I don't recall that, sir.

14      Q.   All right.  To your knowledge, did

15   Mr. Landa, on your behalf, ever file a criminal

16   complaint in any state or the District of

17   Columbia against Michael Queen for acting as an

18   employment agency?

19           MR. LANDA:  I would instruct you not

20   to answer.  It's privileged communication

21   between us and he's not answering that question.

22   BY MR. LANE:

⚲

40

1      Q.   Have you, Mr. Schultz, ever authorized

2   anyone to file a criminal complaint against

3   Mr. Queen for any reason?

4      A.   Yes.

5      Q.   When was that?

6      A.   Several months ago, I think.

7      Q.   What were the circumstances?

8      A.   Well, Michael Queen was acting as an

9   agent on my behalf illegally.

10      Q.   And did you file a complaint against

11   him for acting illegally as your agent?  Did you

12   file a complaint?

Page 32

SCHULTZ - CONFIDENTIAL, ED

13        MR. LANDA:  I'm going to object.

14  Don't comment on anything that I may have done.

15  He asked you if you did.

16        THE WITNESS:  I didn't file a

17  complaint.

18  BY MR. LANE:

19    Q.    Did you authorize anyone to file a

20  complaint?

21        MR. LANDA:  I'm going to object.

22  Referring to conversations with me.  Don't

♀

41

1  answer.  It's privileged.

2  BY MR. LANE:

3    Q.    You refuse to answer the question?

4        MR. LANDA:  Yes, he does.

5        MR. LANE:  I'm asking Mr. Schultz.

6  BY MR. LANE:

7    Q.    You refuse to answer the question

8  based on advice of counsel?

9        MR. LANDA:  Yes.

10        THE WITNESS:  I do.

11  BY MR. LANE:

12    Q.    Is that correct?

13    A.    Yes, sir.

14    Q.    All right.  Did Mr. Queen or anyone

15  associated with him, to your knowledge, arrange

16  for an apartment for you in Washington, D.C.?

17    A.    What's your definition of "arrange"?

18    Q.    Make any effort at all to find an

SCHULTZ  – CONFIDENTIAL, ED

19    apartment for you and your wife in the District

20    of Columbia?

21        A.    Yes.

22        Q.    And did Mr. Queen find an apartment

                                                            42

1    for you in the District of Columbia, which you

2    accepted?

3        A.    Yes.

4              MR. LANE:   Mark this.

5              (Schultz Exhibit No. 1 was marked for

6    identification.)

7    BY MR. LANE:

8        Q.    I'll show you what's been marked as

9    Exhibit 1 to your deposition.

10             (Discussion held off the record.)

11    BY MR. LANE:

12        Q.    And we have a copy for Mr. Landa and

13    an original for you.   I'm only going to ask you

14    about -- you can read it all, of course, because

15    it's an exhibit.

16             I'm only going to ask you about the

17    bottom part, where it says, "Jeffrey Landa,

18    JBLlawyer," and it indicates a copy was sent to

19    you, and then the content.

20        A.    (Witness perusing document.)

21             MR. LANDA:   Is there a question

22    pending?

SCHULTZ  - CONFIDENTIAL, ED

43

1    BY MR. LANE:

2        Q.    Have you ever seen Exhibit 1 before.

3    I'm referring only to the bottom portion of it?

4        A.    I have seen this before.

5        Q.    And does it read -- is it a letter

6    from Jeffrey Landa to Michael Anderson?  I'm

7    talking about the bottom document.  Is that what

8    it is?

9              MR. LANDA:  You mean the bottom

10   e-mail?  There's only one e-mail.

11             MR. LANE:  Yeah, the bottom e-mail.

12             THE WITNESS:  "I would agree to having

13   Ed sign the following"?

14   BY MR. LANE:

15       Q.    No.  I'm asking, is this a letter --

16   yes, it begins that way.  Is that what you're

17   asking?  Yes, it does begin that way.  Is this a

18   letter -- my question is:  Is this a letter from

19   Mr. Landa to Michael Anderson?

20       A.    It is.

21       Q.    And was a copy sent to you?

22       A.    Yes, sir.  It's CC'd right there.

44

1    It's very clear it was sent to me.

2        Q.    And was a copy sent to your wife?

3        A.    It's CC'd that, yes, it was sent to

4    Wendy as well.

Page 35

SCHULTZ  - CONFIDENTIAL, ED

5      Q.    Does the e-mail say, "This document

6  serves as a letter of understanding in which Ed

7  Schultz, Michael Queen and Max Schindler agree

8  to form a partnership or a corporation under the

9  name Ed Schultz Productions --" that was in

10  quotes, Ed Schultz Productions, for any -- close

11  quote, "-- for any television broadcast

12  opportunities that occur as a result of this

13  agreement."

14          MR. LANDA:  I'm going to object to

15  misstate --

16  BY MR. LANE:

17      Q.    Does it say that?

18          MR. LANDA:  I'm going to object

19  that you misstated that -- this part of the

20  e-mail starts out, "I would agree to having Ed

21  sign the following."  You omitted that part.

22          You can answer.

♀

45

1  BY MR. LANE:

2      Q.    I'm asking if that's -- if I read

3  correctly what is in that document.  I'm not

4  saying did I read the entire document.  Later,

5  when Mr. Landa questions you, he could put in

6  the whole -- he can discuss the whole document.

7          I'm just asking, did I read that

8  correctly, what's in that document?

9      A.    Mr. Lane, this is an e-mail from my

10  counsel to Michael

Page 36

SCHULTZ  - CONFIDENTIAL, ED
11   Anderson/Queen@inspire808@gmail.com that says,

12   from my counsel, I would agree to having Ed sign

13   the following.

14            This document serves as a letter of

15   understanding in which Ed Schultz, Michael Queen

16   and Max Schindler agree to form a partnership or

17   corporation under the name Ed Schultz

18   Productions for any television broadcast

19   opportunities that recur -- that occur as a

20   result of this agreement, articles of

21   incorporation and/or final terms of the

22   partnership agreement will be negotiated and

♀

46

1   executed within 30 days.

2        Q.    Within the next 30 days, is that what

3   it says?

4        A.    That's right, within the next 30 days.

5        Q.    Yes.

6        A.    Which --

7        Q.    No. I'm just asking if that is what it

8   says.  I'm not asking --

9        A.    That's what it says.  Well, I mean --

10       Q.    Fine.

11       A.    -- you could read it, it's right

12   there.  That's what it says.

13            MR. LANE:  And now you're laughing,

14   Mr. Landa, I think we should note for the

15   record.

16            THE WITNESS:  I mean, you just asked

Page 37

SCHULTZ - CONFIDENTIAL, ED

17    me to read an e-mail, which I did.

18    BY MR. LANE:

19        Q.    That's correct.  And I thank you for

20    doing that.

21            Did Mr. Queen record a number of

22    appearances by you on other programs at your

♀

47

1    request?

2        A.    At my request?

3        Q.    Yes.

4        A.    I know that Michael was watching every

5    appearance that I had.  I know he was recording

6    them.

7        Q.    Did he do it at your request?

8        A.    He made it known that he was doing it

9    and I had no problem with it.

10        Q.    Didn't you keep on writing to

11    Mr. Queen and telling him where your next

12    appearance was going to be?

13        A.    I did, correct.

14        Q.    And then --

15        A.    I knew he was recording it, yes.

16        Q.    And then did he then tell you that,

17    okay, I'll record it, in essence, or that I have

18    recorded it?  In response to your first telling

19    him where you're going to appear.

20        A.    Yes.  I know that he was recording my

21    appearances on various show.

22        Q.    An he got that information from you;

Page 38

SCHULTZ  - CONFIDENTIAL, ED

♀

48

1    is that correct?  You would send him an e-mail

2    saying, I'm going to appear on this program, I'm

3    going to appear on that program, and then he

4    said thanks, I'm going to record it?

5        A.    There were, to my knowledge, a few

6    occasions where I alerted him I was going to be

7    on a certain show.

8        Q.    Did you alert him about being on the

9    Larry King Show?

10       A.    Correct.

11       Q.    Did you alert him about being on

12   Hardball?

13       A.    Correct.

14       Q.    Did you alert him about being on

15   Reliable Sources, CNN with Howard Kurtz?

16       A.    You know, Mr. Lane, I did --

17       Q.    Well --

18       A.    Well, wait a minute now, this is

19   important.  I was getting requests from a lot of

20   different shows --

21       Q.    Just please answer my question.  I

22   asked a very simple question.

♀

49

1        A.    I am answering it.  I just told you I

2    was being requested on a lot of different shows.

3        Q.    That's not what I asked you.

SCHULTZ  - CONFIDENTIAL, ED

4        A.     And I'm acknowledging that he recorded

5    a lot of them.  Did he record all of them?  I

6    don't know.  I know he recorded some of them.  I

7    had no problem with him recording any of the

8    shows.  And yes I did alert him that I was going

9    to be on some shows.

10       Q.     Did you alert him so he could record

11   it and build a library for you?

12       A.     Yes.

13              (Schultz Exhibit No. 2 was marked for

14   identification.)

15              MR. LANDA:   Thank you.

16   BY MR. LANE:

17       Q.     Do you and your attorney each have a

18   copy of Exhibit 2?  You have the original, I

19   think, Mr. Schultz.

20              Have you seen that document before?

21   It's entitled Straight Talk with Ed Schultz.

22              MR. LANDA:   Hold on a minute.   This

50

1    does not have a Bates stamp on it.  The Bates

2    numbers that -- you produced documents with

3    Bates numbers on them and I would like to make

4    sure this document without a Bates number is

5    identical to the Bates -- the document that you

6    gave me that's been Bates stamped.

7              So would you give me the Bates stamp

8    number for this document, please, so I can look

9    it up?

SCHULTZ  - CONFIDENTIAL, ED

10          MR. LANE:  No.  We're going to go on

11    with this anyway --

12          MR. LANDA:  I'm not going to let him

13    answer any questions on a document that I don't

14    know was produced.

15          MR. LANE:  I'm just asking Mr. Schultz

16    if he ever saw this document before.

17          MR. LANDA:  Read it.  If you remember,

18    tell him.

19          THE WITNESS:  You're asking me, sir,

20    if I have ever seen this document before?

21    BY MR. LANE:

22     Q.    That's exactly the words that I used.

♀

51

1      A.    I don't recall ever seeing this

2    document.

3      Q.    All right.  Do you know anything about

4    that document?  Have you ever discussed that

5    document with anyone?

6          MR. LANDA:  Objection.

7          THE WITNESS:  How could I discuss that

8    document if I just told you I don't recall ever

9    seeing it?

10    BY MR. LANE:

11     Q.    Did you discuss it with someone before

12    it was created about I would like a document

13    called Straight Talk with Ed Schultz?  Did you

14    discuss any aspect of this document with anyone

15    even though you don't recall whether or not you

SCHULTZ  - CONFIDENTIAL, ED

16    saw it?

17            MR. LANDA:   Objection.

18    BY MR. LANE:

19        Q.   Do you understand the question?

20        A.   I understand the question.  I've never

21    see that document, sir.  I don't recall ever

22    seeing that document.

♀

                                                          52

1        Q.   Did you recall having any discussions

2     with Mr. Queen about preparing that document?

3            MR. LANDA:   Objection.

4            THE WITNESS:   No, I don't.  I mean, I

5     don't -- I've never seen that document.

6     BY MR. LANE:

7        Q.   That's not my question.  Did you ever

8     talk to Mr. Queen and say, I would like to

9     prepare a document which we can use as a promo

10    to go to various television stations?

11        A.   Now you're asking a different

12    question, Mr. Lane.

13        Q.   Answer that one, please.

14        A.   Yes.

15        Q.   Did you ask him to prepare a document

16    for that purpose?

17        A.   Did I ask Michael Queen to prepare a

18    document?  No.

19        Q.   Did you ask Michael Queen at any time

20    to prepare a document which could be used as a

21    pitch to various television stations for

SCHULTZ - CONFIDENTIAL, ED

22    creating a program for you where you would be

♀

53

1    the host on television?

2         (Witness confers with Counsel.)

3    BY MR. LANE:

4    Q.    You're not supposed to be talking to

5    Mr. Landa.  You have to just answer the

6    question.

7    A.    Did you use the word "pitch" in your

8    question?

9    Q.    Yes.

10    A.    Yes, I was aware that Mr. Queen was

11    pitching a syndicated television show.

12    Q.    Okay.

13         (Schultz Exhibit No. 3 was marked for

14    identification.)

15    BY MR. LANE:

16    Q.    I'm showing you Exhibit 3, Mr.

17    Schultz, and ask you have you ever seen this

18    before?

19         MR. LANDA:  Objection.  Again, another

20    non-Bates stamped number, and I'll just have the

21    same objection I made to the last one.

22         MR. LANE:  Fine.

♀

54

1         MR. LANDA:  I know it's fine,

SCHULTZ  - CONFIDENTIAL, ED

2    Mr. Lane.

3              THE WITNESS:  Your question, sir?

4    BY MR. LANE:

5        Q.    Have you ever seen that before?

6        A.    Yes, I have.

7        Q.    And that is a letter, is it not, from

8    Michael Queen to you?

9        A.    Yes, sir.  It's an e-mail.

10       Q.    Yes.  And in it does he say he would

11   like to put together a letterhead that is

12   appropriate to what we are about?  And did he

13   also say at the end of that letter -- e-mail,

14   thank you for letting me know of your upcoming

15   TV shots.  Please continue to do so and I will

16   continue to grow the library?

17       A.    Yes.

18       Q.    Did he say that to you?

19       A.    Correct.

20             MR. LANDA:  I'm going to -- give me

21   time to make an objection.  I'm going to object

22   that the document speaks for itself.

♀

55

1    BY MR. LANE:

2        Q.    Did you ever propose to Mr. Queen that

3    Jeff Landa be a partner in the effort -- in the

4    organization you were talking of creating to

5    pitch your show?

6        A.    No.

7        Q.    You never did.

Page 44

                    SCHULTZ  - CONFIDENTIAL, ED
 8          (Schultz Exhibit No. 4 was marked for

 9    identification.)

10          MR. LANDA:   That is Exhibit 4?

11          MR. LANE:   Yes, it's Exhibit 4.

12          MR. LANDA:   I make the same objection,

13    no Bates stamp.

14          MR. LANE:   You could have a continuing

15    objection.  You don't have to say it, or if you

16    like -- you can if you wish.

17          MR. LANDA:   I know I can and I will.

18    Thank you, Mr. Lane.

19    BY MR. LANE:

20      Q.    Did you read it?

21      A.    I did, sir.

22      Q.    And in it does Mr. Queen state to you

⚥

                                                        56

 1    that he was thinking of your mentioning bringing

 2    in Jeff as your partner?  Is that what he said?

 3      A.    That's what he wrote.

 4      Q.    Yes, I understand.  Does that refresh

 5    your recollection about any conversation you

 6    might have had with Mr. Queen where you made a

 7    suggestion that you wanted Mr. Landa to be a

 8    partner?

 9      A.    No, it doesn't.

10          MR. LANDA:   I'm going to object that

11    it misstates the last question.

12          MR. LANE:   Okay.

13          (Schultz Exhibit No. 5 was marked for

                        SCHULTZ  - CONFIDENTIAL, ED
14   identification.)

15   BY MR. LANE:

16        Q.    You have before you Exhibit 5,

17   Mr. Schultz, and your counsel has a copy.  Is

18   that a letter that you sent to -- an e-mail that

19   you sent to Michael Queen on March 5th, 2008?

20             MR. LANDA:  I'm going to make the same

21   objection, there's no Bates stamp on this.

22             MR. LANE:  You already offered this --

♀

57

 1             MR. LANDA:  Mine had a Bates stamp on

 2   it, Mr. Lane.  This is different.  I know you're

 3   laughing now --

 4             MR. LANE:  I'm not laughing, but

 5   this --

 6             MR. LANDA:  Let me tell you something.

 7   My documents were marked and with your

 8   handwriting or one of your people wrote a number

 9   in every corner.  That's the purpose of having

10   these documents marked.

11             You're producing documents that aren't

12   identified and I have every right to make the

13   objection.

14             MR. LANE:  Make the objection.

15             MR. LANDA:  I just did.

16   BY MR. LANE:

17        Q.    Have you -- is that a letter you sent

18   to Mr. Queen?

19        A.    Correct.

                      Page 46

SCHULTZ  - CONFIDENTIAL, ED

20      Q.    Did you state to him that the industry

21  standard for agents is no more than 25 percent?

22           MR. LANDA:  Objection.  The document

                                                                58

1  speaks for itself.

2  BY MR. LANE:

3      Q.    Did you state that, Mr. Schultz?

4  That's a yes or no if --

5      A.    Yes.  It's written there, sir.

6      Q.    Did you also say that some people even

7  get as little as 10 percent?

8      A.    Correct.

9      Q.    Did you say, "I will agree to a

10  50-25-25 percentage formula of profits after

11  expenses of the show?

12      A.    It's written right there, Mr. Lane.

13  Yes, I did.

14      Q.    Okay.

15           (Schultz Exhibit No. 6 was marked for

16  identification.)

17           MR. LANDA:  If there's no question

18  pending, I want to comment to you on something.

19  Let me get a glass of water.

20           Ed, do you want a glass of water?

21           THE WITNESS:  No, I'm fine.  Thank

22  you.

                                                                59

Page 47

SCHULTZ  - CONFIDENTIAL, ED

1   BY MR. LANE:

2       Q.   You have before you Exhibit 6,

3   Mr. Schultz?

4           MR. LANDA:  Just a minute.  I haven't

5   seen it.  (Perusing document.)

6           Same objection, no Bates stamp on

7   this.

8           THE WITNESS:  I have the document in

9   front of me.

10  BY MR. LANE:

11      Q.   All right.  And this is a letter from

12  you to Michael Queen dated March 15th, 2008?

13      A.   It is an e-mail.

14      Q.   Yeah.  A letter.

15          And did you state to him "Great

16  conversation this morning, let's keep it going"?

17          MR. LANDA:  Objection.  Document

18  speaks for itself.

19  BY MR. LANE:

20      Q.   Did you state that?

21      A.   Yes, sir.  It's stated right there.

22      Q.   Do you know what that conversation

♀

60

1   was?  Does that refresh your recollection about

2   the great conversation you had with Mr. Queen?

3       A.   We had numerous conversations about a

4   syndicated show that we were trying to develop.

5       Q.   And was this in reference -- was that

6   conversation in reference to a show on CNN?

SCHULTZ  - CONFIDENTIAL, ED

7      A.   Yes, it was.  Our focus needs to be

8  good material getting in front of this guy.

9  Michael Queen had told me --

10      Q.   I'm not asking you that.  I'm just

11  asking --

12           MR. LANDA:  He could answer the

13  question --

14           THE WITNESS:  I could answer any way I

15  want.

16           MR. LANDA:  Wait.  Let me argue for

17  you.  And you're smirking again, Mr. Lane.

18           MR. LANE:  I'm just wondering when we

19  can proceed and you can stop talking to --

20           MR. LANDA:  We're going to proceed

21  after -- you can answer the question any way

22  you'd like to, without interruption from

♀

61

1  Mr. Lane.

2           Go ahead.

3           THE WITNESS:  The question?

4  BY MR. LANE:

5      Q.   Well, you were speaking.  Did you have

6  an answer other than what I asked you?

7           MR. LANDA:  Would you please read the

8  question back.

9           MR. LANE:  No, no.

10  BY MR. LANE:

11      Q.   Do you have an answer to the question

12  that's pending now?  Because I think you

SCHULTZ  - CONFIDENTIAL, ED

13    answered the question.  If you want to say

14    something else, you may.

15              MR. LANDA:  Would you read his last

16    answer back?

17              MR. LANE:  No, we don't want that read

18    back now.

19              MR. LANDA:  Well, I want it read back.

20              MR. LANE:  It's not your deposition,

21    it's mine --

22              THE REPORTER:  You both can't talk at

♀

                                                        62

1    the same time.  I can't take down simultaneous

2    talking.

3              MR. LANDA:  It's not your deposition,

4    it's Mr. Schultz's deposition.  It's not your

5    deposition.

6              MR. LANE:  I'm conducting this

7    deposition.  You will be able to exam

8    Mr. Schultz as soon as I'm finished and you can

9    bring up anything you think I left out.

10             MR. LANDA:  I would like you to read

11    that back, please.

12             MR. LANE:  Please do not read it back.

13    Let's go on.

14             THE WITNESS:  I would like to add --

15    BY MR. LANE:

16        Q.    Okay.  You have something more to say?

17        A.    "Our focus needs to be good material,

18    getting front of this guy."

                        Page 50

SCHULTZ  – CONFIDENTIAL, ED

19    BY MR. LANE:

20        Q.    In front, isn't it?

21        A.    Well, I move left out a word.  "Our

22    focus needs to be good material, getting front

63

1    of this guy."  I must have left out a word.

2              Queen told me he knew people at CNN

3    and that he could get me in front of someone at

4    CNN, which never happened, because he didn't

5    have that connection.

6        Q.    Is your answer finished now?

7        A.    Yeah.  And for the record -- no, I

8    want to --

9              (Witness confers with Counsel.)

10             THE WITNESS:  And for the record, I

11    never met with anyone at CNN.  Never.  No one.

12    No employee.  No manager.  I never met with

13    anyone at CNN.

14    BY MR. LANE:

15        Q.    Have you finished?  Is that the end of

16    your answer?

17        A.    Got it.

18             (Schultz Exhibit No. 7 was marked for

19    identification.)

20    BY MR. LANE:

21        Q.    You have in front of you what's been

22    marked as Exhibit 7 to your deposition,

64

1    Mr. Schultz.

2         Do you recall that letter from you to

3    Mr. Queen?

4         A.    This is an e-mail, and I did send this

5    to Mr. Queen.  Mr. Anderson Queen

6    inspire808@gmail.com.  I did send -- I did write

7    that.

8         Q.    When you say, "Max needs to know this

9    project can move forward without him."  Do you

10   know who that "Max" is?

11        A.    I do.

12        Q.    Who is that "Max"?  What is his name?

13        A.    It's either Schindler or Swindler?  I

14   swear, I'm not sure of his last name.

15        Q.    Schindler or Swindler?

16        A.    Yeah.  No, seriously.  I think it's

17   Schindler or -- I'm not sure of the spelling,

18   but I know that he was a director.  I was told

19   by Mr. Queen that he was a director at NBC of

20   Meet the Press, of many years.

21        Q.    You don't know if that's true or not;

22   is that what you're saying?

♀

65

1         A.    I never met the man in my life.

2         Q.    Did you talk with him on the

3    telephone?

4         A.    I did.

SCHULTZ  - CONFIDENTIAL, ED

5      Q.    You don't know anything about his

6  background?

7      A.    I just told you.

8      Q.    Refresh --

9      A.    I was told that he was a director at

10  NBC, and I was told that he was the director of

11  Meet the Press for a number of years.  I was

12  also told that he won an award for directing the

13  Reagan funeral.

14            But I never met the man.  I had a few

15  conversations with him on the phone, which

16  included Mr. Queen.  I have never spoken to this

17  gentleman individually, on the phone or face to

18  face.

19      Q.    How many conversations did you have

20  with him?  You said "a few," can you give us an

21  approximate?  Approximately how many

22  conversations you had where Mr. Schindler, his

♀

66

1  name is, was a participant?

2      A.    Probably five.  I mean, it wasn't

3  double figures, I know that.  But it was

4  probably three, four, five, something like that.

5  Not a lot.

6      Q.    And you say he got hung up on

7  percentages.  What does that mean?

8      A.    Well, from the very first conversation

9  that I had had with Max, whatever his last name

10  is, all he could talk about was money and an

Page 53

SCHULTZ  - CONFIDENTIAL, ED

11   agreement.  He wanted to move forward with an

12   agreement.

13          And I said I'm not getting involved in

14   any agreement because we don't have a show.  And

15   so the conversations that I had, which were

16   basically conference calls, because Queen was

17   involved in it, constantly centered around

18   percentages.  Who was going to get what.  Who

19   was going to get paid.  Who was going to be

20   doing what.

21          And Max just kept frustrating me

22   because he would always say, "Well, I got to

♀

67

1    have this percentage."  And I said I'm not going

2    to agree to anything because we don't have a

3    show.

4          You want me to enter into an agreement

5    with you with something we don't have and I

6    refuse to do that.  So this e-mail to Michael

7    Queen is correct.  "Max needs to know this

8    project can move forward without him."

9          I mean, who the hell is Max whatever?

10   I don't need him.  We were looking for somebody,

11   I guess, to direct the show.  And so based on

12   what Queen told me about Max, that it was

13   important for him to be involved because of who

14   he was, I was willing to listen, but I was not

15   willing to enter into an agreement when we had

16   no show.

Page 54

SCHULTZ  - CONFIDENTIAL, ED

17          For him to get hung up on percentages

18   this early makes me wonder about his motivation.

19   What was his motivation?

20       Q.    Are you finished?  I don't answer

21   questions here, I ask the questions.  You know

22   that.

                                                              68

1        A.    Yeah.

2        Q.    You have anything else to say?

3        A.    No.

4        Q.    Okay.

5              (Schultz Exhibit No. 8 was marked for

6    identification.)

7              MR. LANDA:  I make the same objection.

8    This is not identified with a Bates number.

9    BY MR. LANE:

10       Q.    You have before you Exhibit 8 to your

11   deposition, Mr. Schultz?

12       A.    I have Exhibit 8, yes, sir.

13       Q.    Let me know when you are finished

14   reading it?

15       A.    I have read it, sir.

16       Q.    You have.  All right.

17             Is it a letter from you to Mr. Queen?

18       A.    It is an e-mail from me to Michael

19   Anderson slash Queen at his e-mail address,

20   inspire808@gmail.com, yes, sir.

21       Q.    Was that sent on April 5th, 2008?

22       A.    That's what it stated.

SCHULTZ  - CONFIDENTIAL, ED

⚲

69

1        Q.    Does this sentence appear in that

2    e-mail from you:  "However, any TV deal will

3    obviously involve you"?  And does this sentence

4    follow that:  "I will not do a TV deal without

5    your involvement, and that includes a financial

6    involvement"?  And does that sentence -- is that

7    sentence followed by this sentence:  "Rest

8    assured, we are together on this."  And the last

9    sentence that I'm asking about now is, did you

10   write:  "I hope this works for you at this

11   point"?

12            MR. LANDA:  I'm going to object and

13   say it's an incomplete reading of the e-mail.

14            You can answer.

15            THE WITNESS:  It is stated there, as

16   you said.

17   BY MR. LANE:

18       Q.    Thank you.

19            (Schultz Exhibit No. 9 was marked for

20   identification.)

21            MR. LANDA:  I make the same objection.

22   It is not identified with a Bates number.  What

⚲

70

1    exhibit is this, 9?

2            THE WITNESS:  I read it.

3    BY MR. LANE:

Page 56

SCHULTZ  - CONFIDENTIAL, ED

4       Q.   Is this an e-mail from Mr. Queen to

5   you on April 5th, 2008?

6       A.   Well, no.  It's from Michael Anderson.

7   That's what it says at the top.  It doesn't say

8   Queen.

9       Q.   Is this an e-mail from Michael Queen

10  to you?  Do you know who Michael Queen is?

11      A.   Yeah, I know who he is.

12      Q.   And sometimes he has the name Anderson

13  and sometimes he has the name Queen; is that

14  correct?

15      A.   Yeah, I guess.  I don't know if he's

16  got any other names.  You're asking me if this

17  is from Mr. Queen and I'm saying it's from

18  Michael Anderson.  That's what's stated in the

19  e-mail.

20      Q.   Do you know Michael Queen's full name?

21      A.   I do not.

22      Q.   Did you know it's Michael Anderson

♀

71

1   Queen?

2       A.   I did not know that, sir.

3       Q.   All right.  And is this from Michael

4   Anderson Queen, a letter from him to you, on

5   April 5th, 2008?

6            MR. LANDA:  I'm going to object, it

7   misstates the e-mail.

8            You could answer.

9            THE WITNESS:  It's from Michael

Page 57

SCHULTZ  - CONFIDENTIAL, ED

10   Anderson.

11   BY MR. LANE:

12       Q.   Okay.  And does it appear to be a

13   response to Exhibit 8, your letter?

14            MR. LANDA:  I'm going to object.  The

15   e-mail speaks for itself.

16   BY MR. LANE:

17       Q.   Please answer the question,

18   Mr. Schultz?

19            MR. LANDA:  You want to look at

20   Exhibit 8?

21            THE WITNESS:  Yeah.   Where's

22   Exhibit 8?  Okay.

♀

72

1    BY MR. LANE:

2        Q.   Does this appear to be a response to

3    your letter to him, which is Exhibit 8 to your

4    deposition?

5        A.   It does.

6        Q.   All right.  And does he say at the

7    beginning of that letter "Thanks so much for the

8    supportive e-mail, it means a lot to me"?  Is

9    that what he said?

10       A.   It's in the document.

11       Q.   I'm sorry?

12       A.   It's in the e-mail, sir.

13            (Schultz Exhibit No. 10 was marked for

14   identification.)

15            MR. LANDA:  Same objection, it's not

SCHULTZ  - CONFIDENTIAL, ED

16    identified with a Bates number.

17            THE WITNESS:  I read it.

18    BY MR. LANE:

19        Q.    All right.  Is this a letter from you

20    to Mr. Queen dated May 28th, 2008?

21        A.    Yes, sir.

22        Q.    And did you say "Jef," it's J-E-F,

♀

73

1     single F, "Jef is busting my balls about a

2     conversation we had about you getting 10

3     percent."

4             Is that the opening line?

5        A.    It's in the e-mail, sir.

6        Q.    Who is to "Jef" you're referring to?

7        A.    My counsel.

8        Q.    Jeff -- Jeff Landa?

9        A.    Jeff Landa, my counsel, yes.

10       Q.    And what does that mean that Jeff is

11    busting your balls about a conversation "we

12    had," meaning you and Jeff, I take it, about you

13    getting 10 percent?

14       A.    Well, again, we didn't have a show.

15    We had nothing.  We had an idea.  We had hope.

16    We were working towards a show.  And Michael

17    kept hounding me about an agreement and I was

18    not prepared to sign an agreement and he knew

19    that.  My counsel had told me --

20            MR. LANDA:  Stop.

21            THE WITNESS:  I mean, we didn't have

SCHULTZ  – CONFIDENTIAL, ED

22    an agreement.

♀

74

1    BY MR. LANE:

2        Q.    All right.  I'm asking you what it

3    means that "Jef is busting my balls about a

4    conversation we had about you getting 10

5    percent"?

6        A.    That was in reference to my counsel

7    advising me not to enter into an agreement with

8    anyone without a show.

9        Q.    And did you say in your next to last

10    sentence in that e-mail -- it starts out dot,

11    dot, dot "I'm not going to screw you or work

12    with anyone else"?

13        A.    That is correct.

14        Q.    Okay.

15        A.    Because Michael Queen repeatedly was

16    nervous that I was going to go and do a deal

17    with somebody else because I would not enter

18    into an agreement with him.  And I repeatedly

19    told him that I was not going to do a deal with

20    anyone else.  And for the record, I did not.

21            (Schultz Exhibit No. 11 was marked for

22    identification.)

♀

75

1    BY MR. LANE:

SCHULTZ  - CONFIDENTIAL, ED

2      Q.    Do you have Exhibit 11 in front of

3  you, Mr. Schultz?

4            MR. LANDA:  Hold on.  I'm going to

5  make the same objection.  It's not identified

6  with a Bates number.

7            THE WITNESS:  I have 11 in front of

8  me.

9  BY MR. LANE:

10     Q.    All right.  Is that a letter from

11  Mr. Queen to Mr. Landa -- an e-mail --

12     A.    It is --

13     Q.    -- dated May 31st, 2008?

14     A.    It is an e-mail from Michael Anderson

15  to Jeff Landa, my counsel, dated May 31, 2008.

16     Q.    And in that e-mail did Mr. Queen state

17  "I am willing to move forward without a signed

18  contract on the condition that Ed will cover all

19  cost of production"?

20     A.    Correct.  That's what's in the e-mail.

21           MR. LANE:  Okay.  We're going to take

22  a short break now for ten minutes.

76

1            THE VIDEOGRAPHER:  This concludes tape

2  one in the deposition of Ed Schultz.  Off the

3  record at 11:27.

4            (Off the record.)

5            THE VIDEOGRAPHER:  This begins tape

6  two in the deposition of Ed Schultz.  On the

7  record at 11:40.

SCHULTZ  – CONFIDENTIAL, ED

8          (Schultz Exhibit No. 12 was marked for

9     identification.)

10    BY MR. LANE:

11         Q.    This is Exhibit 12 to your deposition,

12    Mr. Schultz.  Would you read it, please.

13              MR. LANDA:   Same objection, not

14    identified with the Bates number.

15              THE WITNESS:   Okay.  I got it.

16    BY MR. LANE:

17         Q.    Okay.  Did you receive a letter from

18    -- this letter from Michael Queen, this e-mail

19    letter on June 1st, 2008?

20              MR. LANDA:   I'm going to object.  It's

21    not addressed to him.

22    BY MR. LANE:

♀

77

1          Q.    I said did you receive it, this

2     letter, from Michael Queen?

3          A.    Well, this is an e-mail, sir.

4          Q.    Yeah.  That's what I'm talking about.

5     It's an e-mail letter.  Did you receive this

6     from Michael Queen?

7          A.    It states that I did not.  This is not

8     addressed to me.

9          Q.    I understand.  Did you ever see it

10    before?

11         A.    I don't recall seeing this.

12         Q.    All right.  Fine.

13              (Schultz Exhibit No. 13 was marked for

                    SCHULTZ  - CONFIDENTIAL, ED
14  identification.)

15  BY MR. LANE:

16      Q.    This is Exhibit 13 to your deposition.

17            MR. LANDA:   The same objection to

18  Exhibit 13.

19  BY MR. LANE:

20      Q.    Have you read it, Mr. Schultz?

21      A.    I'm reading it now, sir.

22      Q.    All right.  Let me know when you're

♀

78

 1  finished, please.

 2      A.    (Witness perusing document.)  Okay.

 3  I've read it.

 4      Q.    All right.  Is this a letter from

 5  Mr. Landa dated June 6th, 2008, to Mr. Queen's

 6  website -- e-mail address and to you and to your

 7  wife?

 8            MR. LANDA:  I'm going to object.

 9  BY MR. LANE:

10      Q.    That's copies to you and to your wife.

11            MR. LANDA:  I'm going to object.  It

12  misstates the -- who it was addressed to.  It

13  misstates -- misstated who it was addressed to.

14            MR. LANE:   Okay.

15            MR. LANDA:  I'm objecting.

16            THE WITNESS:  It's a -- it's an e-mail

17  from my counsel to Michael Anderson.  And I was

18  copied on it and my wife was copied on it.

19  BY MR. LANE:

                    Page 63

SCHULTZ  - CONFIDENTIAL, ED

20      Q.    All right.  And does it begin by

21   saying, "Mike, I am disappointed that you chose

22   to leave me out of the loop during your latest

79

1   round of" quote in a quote, "negotiations" close

2   inner quote, "with Ed.  I'm especially

3   disappointed that your conversation seems to be

4   distinctly different from our conversations."

5           Is that what it says?

6      A.    Correct.

7      Q.    Did you have conversations with

8   Mr. Queen in which Mr. Landa was not a

9   participant?

10      A.    Yes.

11      Q.    All right.  And further on does it

12   state -- does Mr. Landa state "There is

13   absolutely no per se conflict of interest in my

14   owning part of the show because I represent Ed"?

15      A.    Correct.

16      Q.    At that time were the discussions

17   between you and Mr. Landa about him owning part

18   of the show?

19      A.    We had a wide ranging -- we had

20   wide-ranging discussions about the show; how it

21   would be structured, what the ownership would

22   be, what the responsibilities would be.

80

Page 64

SCHULTZ - CONFIDENTIAL, ED

1          Jeff Landa was my counsel on this and
2    I think -- well, and I do -- well, I do know
3    that my counsel was clarifying to Mr. Queen the
4    parameters of what could and could not be done.
5          Q.   Is that your answer?
6          A.   There's --
7          Q.   I'm sorry.
8          A.   "There's absolutely no per se conflict
9    of interest in my owning any part of the show
10   because I represent Ed."
11         That was a clarification.  That wasn't
12   a demand.
13         Q.   Is that your answer?  I mean, have you
14   finished?
15         A.   Yeah.
16         Q.   All right.  Were there discussions
17   between you and Mr. Landa about Mr. Landa owning
18   part of the show?
19         A.   No.
20         Q.   All right.  Who's idea was the show?
21   The idea of a television show where you are the
22   host, who's idea was that?

♀

81

1          A.   It was my idea --
2          Q.   All right.
3          A.   -- depending upon what show you're
4    talking about.  Now you have to clarify what
5    show you're talking about.
6          Q.   Oh, a show where you're the host and

SCHULTZ  - CONFIDENTIAL, ED

7      it's television.  Who's idea was it to have such

8      a show?

9          A.    Mine.

10         Q.    All right.

11               (Schultz Exhibit No. 14 was marked for

12     identification.)

13               THE WITNESS:  Just a minute, please.

14               MR. LANE:  All right.

15               (Witness confers with Counsel.)

16               THE WITNESS:   Thank you.

17     BY MR. LANE:

18         Q.    This is Exhibit 14 to your deposition,

19     a copy has been given to Mr. Landa.

20               MR. LANDA:   Same objection, it's not

21     identified by a Bates number.

22               THE WITNESS:  I have read it.

                                                           82

1      BY MR. LANE:

2          Q.    Is this a letter -- an e-mail letter

3      from you to Michael Queen?

4          A.    Yes, it is.

5          Q.    And is this about the show that was

6      being considered by the two of you?

7          A.    The show, yes.

8          Q.    And that was the show where you would

9      be a host; is that correct, on television?

10         A.    On a syndicated show, correct.

11         Q.    Does this say syndicated show?

12         A.    No, it doesn't.

SCHULTZ  - CONFIDENTIAL, ED

13    Q.    All right.  Do you say it was your

14  idea?

15    A.    That was in reference --

16    Q.    Excuse me, I haven't finished yet.

17          Do you say in your letter it was your

18  idea?  "What's that worth?"  Did you say that?

19    A.    Correct.

20    Q.    Okay.  Did you say, "We need to decide

21  how we do this pilot with no legal concerns that

22  Jeff talks about.  I'm back to my original

83

1  position, let's draw up a short letter to join

2  forces to produce the pilot with the intention

3  of doing a struc- -- structured deal down the

4  road, if the show has potential."

5    A.    Correct.

6    Q.    That's what you wrote?

7    A.    Correct.

8    Q.    Okay.

9    A.    And let me make reference, when I

10  wrote "it was your idea," we were focused in on

11  a specific project, which was a syndicated show

12  that we would own, that we would have an

13  agreement.

14          This was the project.  This wasn't

15  about Ed's career.  I have a radio show.  I have

16  Ed Schultz Broadcasting, LLC.  I had written

17  books.  I had done speaking engagements.  This

18  was focused on this particular project, this

SCHULTZ  - CONFIDENTIAL, ED

19    syndicated show.  And yes, my answer is

20    completed.

21         Q.    And was the syndicated show going to

22    be pitched to CNN?  Is that what you testified

♀

84

1    to earlier?

2         A.    Correct.

3         Q.    Does CNN have syndicated shows?

4         A.    I'm not sure what their programming --

5         Q.    Okay.

6         A.    -- dynamic is --

7         Q.    All right.

8         A.    -- because I've never met with anyone

9    at CNN.

10         (Schultz Exhibit No. 15 was marked for

11    identification.)

12    BY MR. LANE:

13         Q.    Do you have Exhibit 15 --

14         A.    I do.

15         Q.    -- to your deposition in front of you?

16         A.    Yes, sir.

17         Q.    Mr. Landa has a copy of it.

18         MR. LANDA:  I'm going to object.  Same

19    objection.  No Bates number on it or handwritten

20    number, whatever.

21         THE WITNESS:  Okay.

22    BY MR. LANE:

♀

SCHULTZ   - CONFIDENTIAL, ED

85

1      Q.    Is this a letter from you to

2  Mike Queen?

3      A.    It's an e-mail, yes.

4      Q.    Yeah.   Did you state in it, "The

5  mission was to start a talk show, not squabble

6  over shares and money"?

7      A.    Correct.

8      Q.    Is that what you wrote?

9      A.    Correct.

10      Q.    Okay.

11            (Schultz Exhibit No. 16 was marked for

12  identification.)

13  BY MR. LANE:

14      Q.    Do you have Exhibit 16 to your

15  deposition in front of you, Mr. Schultz?

16      A.    I do.

17            MR. LANDA:   I'm going to make an

18  objection.   Same objection.   Not identified as

19  being produced.

20            THE WITNESS:   I read it.

21  BY MR. LANE:

22      Q.    All right.   In this letter -- did you

86

1  write this e-mail letter -- did you write "Jeff

2  Landa is not your enemy.   He is not.   He is only

3  looking out for our legal interest"?

4      A.    Correct.

SCHULTZ - CONFIDENTIAL, ED

5      Q.    Who is the "our"?

6      A.    My wife and I.  Mr. Queen knows and

7   has known all along that my wife and I are

8   partners.  She is an employee of Ed Schultz

9   Broadcasting.  She works with me on the radio

10  show.  My wife is consulted on everything I do.

11        My counsel had advised me repeatedly

12  not to move forward with any agreement unless we

13  had a show.  And as you can see, Mr. Lane, from

14  this e-mail, and the date of June 8, 2008, we

15  are now into the sixth month and we still don't

16  have anything concrete.

17        You can sign or pass and I'll move

18  forward.  I state in there that this is my name,

19  my reputation and --

20     Q.    Are you finished?

21     A.    No, I'm not finished.

22     Q.    Okay.

♀

87

1      A.    I wrote "I'm getting wore out.  Jeff

2   Landa is not your enemy."  Mr. Queen had a hard

3   time dealing or talking to anyone else except me

4   on this.  He didn't trust anybody and he

5   couldn't accept the fact that Jeff Landa was my

6   counsel.  I'm done.

7      Q.    Now, you just said you would not have

8   an agreement until there was a show.  Is that

9   what you just testified to a minute ago?

10     A.    Correct.

Page 70

                    SCHULTZ  - CONFIDENTIAL, ED
11          MR. LANDA:  I'm going to object.

12          THE WITNESS:  Correct.

13          MR. LANDA:  Misstates his testimony.

14   BY MR. LANE:

15          Q.    And did you write in this letter, "I

16   will send you an agreement this week"?  Did you

17   write that in that letter?

18          A.    The agreement was never signed,

19   Mr. Lane.

20          Q.    I asked a simple question.

21          A.    And I'm answering your question.  Do

22   you have an agreement in hand that I signed?

⚥

                                                        88

1    And the answer is no, you do not.  I do not.  We

2    do not.

3          Q.    This is a very simple question,

4    Mr. Schultz.  I'll say it very slowly.  Did you

5    write in this e-mail, which is Exhibit 16 to

6    your deposition --

7          A.    Yes, sir.

8          Q.    -- to Mr. Queen, "I will send you an

9    agreement this week"?  Did you write that?

10          A.    Yes, sir.

11          Q.    Okay.  Did you send an agreement?

12          A.    Not to my knowledge.

13          Q.    Did you say in this letter "Jeff and I

14   will pay for it," referring to the pilot?

15          A.    I did.  Meaning I would pay for it and

16   I would not pay for it until I reviewed it with

SCHULTZ  - CONFIDENTIAL, ED

17    counsel.

18         Q.    Is that what it says?

19         A.    That's what was -- the intention of it

20    was, sir.

21         Q.    All right.

22         A.    That's what I was pointing across,

⚦

89

1    that I would pay for it.

2              MR. LANDA:   You answered the question.

3    BY MR. LANE:

4         Q.   All right.  Did you write in this

5    e-mail, "I really want you to be a partner, but

6    you seem to have a hard time trusting me and

7    understanding that"?

8         A.    Correct.

9              MR. LANDA:   Excuse me a minute.   Give

10    me time to object before you --

11              THE WITNESS:   Okay.

12              MR. LANDA:   All right.

13              (Schultz Exhibit No. 17 was marked for

14    identification.)

15              MR. LANDA:   I'm going to make the same

16    objection regarding it not being labeled as

17    being produced.

18    BY MR. LANE:

19         Q.    Do you have Exhibit 17 to your

20    deposition in front of you, Mr. Schultz?

21         A.    I do.

22         Q.    Okay.

SCHULTZ  – CONFIDENTIAL, ED

♀

90

1         MR. LANDA:  Before you answer.  I
2    don't think this document was produced.
3         Can I have a Bates stamp number on
4    this, please?  It's February 11th, 2009.
5         MR. WALTON:  What's the time Bates
6    stamp 795.
7         MR. LANDA:  Let me see it.  Okay.  Go
8    ahead.
9         MR. LANE:  Do you withdraw your
10   statement that this was not produced?
11        MR. LANDA:  I don't withdraw it.  I
12   said I don't think it was produced.
13        MR. LANE:  Well, are you satisfied now
14   that it has been produced?
15        MR. LANDA:  Are you going to let me
16   finish?  That's one of problems, Mr. Lane, when
17   you refuse to give us Bates stamp numbers, we
18   don't know if they're produced or not.
19        You produced 1400 pages of documents.
20   I can't remember all of them.  It would be very
21   helpful if you would give me a Bates stamp
22   number the way you produced them to me.

♀

91

1         Now I'm finished.
2         MR. LANE:  I don't want to argue with
3    you and I just want to move on, but there is no

SCHULTZ  - CONFIDENTIAL, ED

 4    rule in the District of Columbia that a document

 5    has to be Bates stamped during a depos- -- when

 6    it's presented -- during a exhibit, during a

 7    deposition.  There's no such rule.

 8            MR. LANDA:  You're absolutely right,

 9    there isn't a rule.

10            MR. LANE:  Okay.

11            MR. LANDA:  I'm just telling you what

12    makes it convenient for everybody, and that way

13    I don't have to ask your co-counsel for Bates

14    numbers so I can see if it's been produced.

15            If you prefer doing it that way, I'll

16    ask for a Bates number on all the documents.

17    BY MR. LANE:

18      Q.    Mr. Schultz, have you read Exhibit 17

19    in your deposition?

20      A.    Yes, sir, I have.

21      Q.    And who is that a letter from?

22      A.    This is an e-mail from me, Ed Schultz,

                                                    92

 1    edkfgo@aol.com.

 2      Q.    And who is it to?

 3      A.    It's addressed to Michael

 4    Anderson/Queen at Inspire, his e-mail address.

 5      Q.    And it also -- does it begin "Hey,

 6    Ron"?

 7      A.    Yes, it does.

 8      Q.    And who is that?  Who is Ron?

 9      A.    Ron Hartenbaum.

                      Page 74

SCHULTZ  - CONFIDENTIAL, ED

10      Q.    Who is that?

11      A.    He's a radio executive and owner of

12   the business of whosyourdaddymedia.com.   That's

13   his e-mail address.   He owns and operates Who's

14   Your Daddy Media, which is a radio company.

15      Q.    All right.   And did you write to him,

16   quote, I'm going to have my associate Mike

17   Queen, who's been working on this TV project

18   with me, send you the production budget?

19      A.    Correct.

20      Q.    All right.

21            (Discussion held off the record.)

22            (Schultz Exhibit No. 18 was marked for

⚨

93

1   identification.)

2   BY MR. LANE:

3      Q.    Mr. Schultz, I think you have before

4   you Exhibit 18 to your deposition --

5      A.    Uh-huh.

6      Q.    -- is that correct?

7      A.    Uh-huh.

8      Q.    All right.

9            MR. LANDA:   Same objection.   It is not

10   identified as being -- ever having been

11   produced.

12            THE WITNESS:   I have read it.

13   BY MR. LANE:

14      Q.    All right.   Is it a letter -- e-mail

15   letter from you to Michael Queen?

SCHULTZ  – CONFIDENTIAL, ED

16      A.    E-mail from me to Michael Queen,

17  correct?

18      Q.    February 22nd, 2009?

19      A.    Correct.

20      Q.    Does it read "You are a great

21  friend --"

22      A.    Correct.

♀

94

1      Q.    "-- I appreciate your fight and

2   determination and genuine belief in my ability.

3   I know we can do this, but the constant hurdles

4   sometimes seem overwhelming.  Tomorrow is

5   another day.  I know we can't give up.  We have

6   to keep working.

7           "Yes, next week let's sit down with

8   Horlick and get a roadmap to success.  You have

9   done a great job putting the team together and

10  getting things ready.  I feel we are weeks away.

11  There will be no break.  We have to keep going.

12  Ed."

13          Did you write that letter?

14      A.    Correct.

15      Q.    Who is Horlick?

16      A.    Allan Horlick, the general manager --

17  I don't know if he is now, but at the time, in

18  2009, at the date of this e-mail, he was the

19  general manager and I believe vice president of

20  WUSA, the CBS affiliate here in Washington D.C.

21  Who he had discussions with over a period of

SCHULTZ  - CONFIDENTIAL, ED

22    time for WUSA to allow us to purchase air time

♀

95

1    to put on a syndicated show.

2              (Schultz Exhibit No. 19 was marked for

3    identification.)

4              THE WITNESS:  I have read it.

5    BY MR. LANE:

6         Q.    Is it a letter from Mr. Queen to you

7    dated -- e-mail letter dated March 13th, 2009?

8         A.    From Michael Anderson, correct.

9         Q.    Does he state, "We have discussed and

10   agreed to ownership.  That is, my remuneration

11   would be 12 percent."

12             Did he state that?

13        A.    He did write that, correct.

14        Q.    Was that correct or incorrect?

15        A.    We discussed a lot of things.

16        Q.    Yes.  I'm asking about one thing now.

17        A.    "We have discussed and agreed to

18   ownership."  That's incorrect.  We had not

19   agreed to anything.

20        Q.    All right.  In this letter did

21   Mr. Queen state that you should have a first

22   rate agent represent you?

♀

96

1              MR. LANDA:  Objection.  The e-mail

Page 77

SCHULTZ - CONFIDENTIAL, ED

2  speaks for itself.  You can answer.  No

3  objection.

4  BY MR. LANE:

5      Q.   I'm referring to the last paragraph,

6  Mr. Schultz, where it -- does it say, "If you

7  want, I could get the names of some top agents

8  that some of the network correspondents use.

9           "This would be advisable, as they

10  would know all the players at NBC.  In this

11  market I know of no on-air talent who does not

12  have a rep."

13           In other words, was he suggesting to

14  you that he -- you should get a first rate or

15  top agent to represent you?

16           MR. LANDA:  Objection.  Calls for

17  speculation.

18  BY MR. LANE:

19      Q.   Is that what he said?

20      A.   I'm not sure what he meant, sir.

21      Q.   You don't know what that means?  Okay.

22           (Schultz Exhibit No. 20 was marked for

♀

97

1  identification.)

2           MR. LANDA:  Same objection.  Not

3  identified as having been produced.

4  BY MR. LANE:

5      Q.   Did you read Exhibit 20, Mr. Schultz?

6      A.   I did, sir.

7      Q.   All right.  And is that a letter from

Page 78

SCHULTZ  - CONFIDENTIAL, ED

8    Mike Queen to you?

9       A.   Yes, sir.

10      Q.   And it is dated March 20 -- an e-mail

11   letter dated March 21st, 2009?

12      A.   From Michael Anderson, correct, on

13   that date.

14      Q.   And did he say to you, "My goal, with

15   your permission, in the next phase is to make

16   the name Ed Schultz a household word.  The MSNBC

17   gig is only part of that plan."

18           Did he say that?

19      A.   He wrote that, yeah.

20           (Schultz Exhibit No. 21 was marked for

21   identification.)

22   BY MR. LANE:

⚲

98

1       Q.   And you received it, right?

2       A.   I received it.  He wrote it.

3       Q.   Yes.

4            MR. LANDA:  Same objection.

5            MR. LANE:  Okay.

6            MR. LANDA:  It's not Bates stamped or

7    shows that it's been produced.

8            THE WITNESS:  I have read it.

9    BY MR. LANE:

10      Q.   All right.  And is this an e-mail

11   letter from you to Michael Queen?

12      A.   Correct.

13      Q.   And did you say, "I will speak with

Page 79

SCHULTZ  - CONFIDENTIAL, ED

14    Phil Griffin and make sure he knows the

15    connection"?

16        A.    Correct.

17        Q.    Who's Phil Griffin?

18        A.    Phil Griffin is the president of

19    MSNBC.

20        Q.    And what connection were you referring

21    to?

22        A.    I was referring to the connection that

⚲

99

1    Michael Queen and I were working on a syndicated

2    show.

3        Q.    Okay.  Do you have a single document

4    which states that, that you were working on a

5    syndicated show?

6        A.    No.  It was a verbal understanding we

7    were working on a -- on a show.

8        Q.    You had an exchange of many letters

9    with Mr. Queen, haven't you?

10        A.    Correct.

11        Q.    In any of them did you refer to a

12    syndicated show?

13        A.    Well, it was an understanding that it

14    had to be a syndicated show.

15        Q.    Do you remember my question?

16        A.    No, I don't.

17            MR. LANE:  Would you read back my

18    question, please?

19            THE WITNESS:  It was about a

SCHULTZ  - CONFIDENTIAL, ED

20    syndicated show --

21    BY MR. LANE:

22        Q.    Excuse me.  We're having the question

♀

100

1    read back.  I asked the reporter to read the

2    question back.

3                THE REPORTER: Question:  In any of

4    them did you refer to a syndicated show?

5                THE WITNESS:  Did not use the term

6    "syndicated," no.

7                (Schultz Exhibit No. 22 was marked for

8    identification.)

9                THE WITNESS:  Excuse me.  Just a

10    minute.

11                (Witness confers with Counsel.)

12    BY MR. LANE:

13        Q.    All right.  You have Exhibit 22 to

14    your deposition in front of you, Mr. Schultz?

15                MR. LANDA:  Wait a minute.  I haven't

16    seen it yet.  Hold on.  Same objection, not

17    identified as being produced.

18                THE WITNESS:  I read it.

19    BY MR. LANE:

20        Q.    And what is it?

21                MR. LANDA:  Objection.  It speaks for

22    itself.

♀

101

SCHULTZ  - CONFIDENTIAL, ED

1    BY MR. LANE:

2        Q.    What is it, Mr. Schultz?

3        A.    It's an e-mail from me to

4    inspire808@gmail.com, which is Michael Anderson

5    Queen's e-mail address.

6        Q.    And did you write in there "I was

7    trying for a TV deal long before I met you"?

8        A.    Correct.

9        Q.    And is that true?

10       A.    That is very true, sir.

11       Q.    Tell us all the efforts you made for a

12   TV deal long before you met Michael Queen.

13       A.    I started my network radio show in

14   January of 2004.  At that particular time there

15   was an effort to get me on television.

16            In 2006, of September, my wife and I

17   purchased a satellite camera for $150,000.  We

18   paid for it exclusively.  That gave us an

19   ability, from Fargo, North Dakota, to be on all

20   of the shows that were requesting me, because at

21   the time I was the number one liberal talker in

22   America.

♀

1            The midterm elections were coming up,

2    I was getting a great deal of interest from the

3    networks.  So on three different occasions there

4    were people who connected with my radio show who

5    went in to see Phil Griffin at MSNBC.

6    Stu Crane, who was a partner in my radio show,

SCHULTZ - CONFIDENTIAL, ED

7     took my book, Straight Talk From the Heartland,

8     and went in and made a pitch to Phil Griffin.

9          Q.     Now, who did that?

10         A.     Stu Crane.

11         Q.     And --

12         A.     He was a radio partner, an owner with

13    me at the time.

14         Q.     And when did he take that in to

15    Mr. Griffin?

16         A.     I can't recall the exact date off the

17    top of my head, but I could produce that for

18    you.  It was a meeting in Mr. Griffin's office.

19         Q.     How can you produce that?  What do you

20    mean?

21         A.     Well, I can, you know, get the date

22    for you.  I mean, I don't want to give you

                                                        103

1     incorrect information.

2          Q.     I appreciate that.  I'm asking can you

3     do that this coming week, have your lawyer send

4     a letter to me based upon the information you

5     give him?

6          A.     Absolutely.

7          Q.     Fine.  Okay.  That was the first --

8          A.     That was the first time.

9          Q.     Yeah.  That's the first time.  Tell me

10    about the second time?

11         A.     The second time, Paul Woodhull, who

12    was also a radio partner with me involved in the

Page 83

SCHULTZ  - CONFIDENTIAL, ED

13     Ed Schultz's radio show, also had a meeting with

14     Phil Griffin, the president of MSNBC.

15          Q.    And when was that?

16          A.    I will have to get that date and time.

17     That too was a face-to-face meeting.

18               There was also a telephone call from

19     my now radio partner Chesley Maddox of Access

20     One Media in New York to a person in the office

21     at MSNBC who knew Phil Griffin.

22          Q.    When was that?

♀

104

1          A.    I will get you the date on that as

2     well.  But those are the three, in succession,

3     and I can't give you verbatim exactly the date,

4     but I will produce those for you.

5          Q.    Okay.

6          A.    I will -- I will produce that they did

7     make the contact and meet and call Mr. Griffin.

8          Q.    With a date?

9          A.    I will try to get you the date.

10          Q.    I appreciate that.

11          A.    So to follow up to your question, "I

12     was trying for a TV deal long before I met you."

13     I wrote that to Michael Queen --

14          Q.    Yes, I know.

15          A.    -- factually stating that other people

16     had gone in to meet -- to try to get me, quote,

17     a TV deal long before I had any contact at all

18     with Michael Queen.

SCHULTZ  - CONFIDENTIAL, ED

19     Q.    Are you finished now?  Have you

20   finished that answer?

21     A.    Correct.

22     Q.    All right.  Did any or all of the

105

1    three people who were trying to get you a

2    television deal that you referred to produce a

3    pilot of what the show might be like?

4      A.    They did not.

5      Q.    Is Michael Queen the first person to

6    do that?

7      A.    For syndication?

8      Q.    No.  Is he the first person -- that's

9    not my question.

10     A.    Well, what's your question?

11     Q.    Was Michael Queen the first person to

12   produce a pilot which could be used to pitch a

13   television show for you?

14     A.    No.

15     Q.    Who else did it?

16     A.    Well, Mr. Lane --

17     Q.    No.  Who else did it?

18     A.    I'm giving you an answer, sir.  It

19   needs to be put into context.  I have been in

20   this business since 1978, both television and

21   radio.

22             I have done college football shows.  I

SCHULTZ  - CONFIDENTIAL, ED

106

1    have done college basketball shows.  I have done

2    syndicated outdoor shows.  The Great Outdoors

3    with Ed Schultz, that played for ten years in

4    the Midwest.  There were pilots put together for

5    those shows.

6            So is Michael Queen the first one that

7    ever did a pilot for Ed's show -- for

8    Ed Schultz, no.

9        Q.   My question is:  Who else -- give me

10   the name of any person who did a pilot for a

11   television show for you to be a host?

12       A.   Jim Heilman.

13       Q.   And when was that done?

14       A.   This was -- I can't give you an exact

15   date.  It was back in the 1980s.

16       Q.   1980s?

17       A.   Yeah.  As I told you, I've been in the

18   business since 1978.

19       Q.   Yes.  And --

20            MR. LANDA:  Hold on.  This isn't a

21   conversation between the two of you.  Let him

22   answer -- and you don't have to repeat back.

107

1    Let him answer the question and then you can

2    make your comment.

3            MR. LANE:  Thank you for your

4    instructions, Mr. Landa.  Strike that.

SCHULTZ  - CONFIDENTIAL, ED

5   BY MR. LANE:

6       Q.   Would you answer the question,

7   Mr. Schultz?

8           MR. LANDA:  No, he won't yet, because

9   I'm not done.  It's discourteous, along with

10  your smirks and your smiles.  It's very

11  discourteous.  You interrupt him all the time

12  and -- you know, calm down.  Relax.

13          MR. LANE:  If it is your statement

14  that I've interrupted Mr. Schultz all the time,

15  we're going to send this transcript to the Court

16  and let the Court see if that is an accurate

17  statement.

18  BY MR. LANE:

19      Q.   Do you have anything else to say,

20  Mr. Schultz?

21      A.   No.

22      Q.   All right.  Did anyone else produce a

⚲

108

1   television pilot for a television program for

2   you to be the host of the television program?

3       A.   Well, I just told you yes.  You're

4   asking the same question again, sir.

5       Q.   Anyone other than who you have just

6   identified?  I'm asking -- that's why I said

7   "anyone else."

8       A.   No.

9       Q.   Okay.  And do you have a copy of that

10  pilot?

SCHULTZ  - CONFIDENTIAL, ED
11     A.   I do not.

12     Q.   When was the last time you saw any

13   pilot produced for you -- for a television show

14   for you?  When was the last time other than the

15   one done by Mr. Queen?  What other one did you

16   last see?

17     A.   It was The Great Outdoors with Ed

18   Schultz.  It was produced back in, I think, 19

19   -- the mid-1980s.

20          It was accepted by Midwest Sports

21   Channel and it was produced by the WDAY sports

22   department in Fargo and it ran on Midwest Sports

♀

109

1   Channel for ten years.

2          So that was the last pilot I saw,

3   other than Mr. Queen's involvement with me with

4   a pilot.

5     Q.   Okay.  We can take a short break here.

6          THE VIDEOGRAPHER:  Off the record at

7   12:20 p.m.

8          (Off the record.)

9          THE VIDEOGRAPHER:  On the record at

10   12:28.

11          MR. LANE:  We're going to take a break

12   for lunch now, for one hour, we have a court

13   reporter who's working hard, and we'll be back

14   in one hour.

15          MR. LANDA:  He has to be on television

16   at 3 o'clock today.

SCHULTZ - CONFIDENTIAL, ED

17          MR. LANE:  Well, the deposition goes

18   on and on until it's finished.

19          MR. LANDA:  You said it would be a

20   couple hours and you would do both of them is

21   what you told us.

22          MR. LANE:  I never said that, a couple

♀

                                                      110


1   of hours and I'd do both of them.  I never said

2   anything like that.

3          (Simultaneous speaking.)

4          MR. LANE:  In any event, we have to

5   continue it.  We'll take a break for lunch.

6   We'll be back at 1:30 and we'll finish

7   Mr. Schultz before three.

8          MR. LANDA:  Okay.

9          THE VIDEOGRAPHER:  This concludes tape

10   two in the deposition of Ed Schultz.  Off the

11   record at 12:29.

12          (Off the record.)

13          (Whereupon, at 12:29 p.m., the

14   deposition was suspended, to reconvene at

15   1:28 p.m., this same day.)

16

17

18

19

20

21

22

SCHULTZ – CONFIDENTIAL, ED

♀

111

```
 1                  AFTERNOON SESSION
 2                              (1:28 p.m.)
 3   Whereupon,
 4                   ED SCHULTZ,
 5   the witness at the time of recess, having been
 6   previously duly sworn, was further examined and
 7   testified as follows:
 8    EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)
 9             THE VIDEOGRAPHER:  This begins tape
10   three in the deposition of Ed Schultz.  On the
11   record at 1:27.
12   BY MR. LANE:
13        Q.   Thank you.  Mr. Schultz, we are going
14   to do everything we can to accommodate you so
15   that you can leave at three o'clock.
16             So I'll ask questions.  If you can
17   answer them without making further comments,
18   just answer yes or no, if you can.  That will
19   help us out and we'll try to get out of here.
20             MR. LANE:  Okay.  23.  Marked for
21   identification 23 through 31.
22             (Schultz Exhibit Nos. 23 through 31
```

♀

112

```
 1   were marked for identification.)
 2   BY MR. LANE:
 3        Q.   My question is merely:  Did you
```

SCHULTZ  - CONFIDENTIAL, ED

4    receive this letter, this mail letter from

5    Mr. Queen?

6         A.   I know there was some communication

7    between Michael Queen and Tim Russert, but I was

8    not, to my knowledge, copied on the detail of

9    those communications.

10        Q.   All right.   24.   Did you receive this

11   e-mail, Exhibit 24 to your deposition, from

12   Mr. Queen?

13             MR. LANDA:   I'm going to object.

14   There's not numbered as being produced.

15             You could answer.

16             THE WITNESS:   Yes, I did receive this

17   from Michael Queen.

18   BY MR. LANE:

19        Q.   25.   Do you have 25 in front of you,

20   Mr. Schultz?

21        A.   Yes, sir.

22        Q.   After you read it, the question is

♀

113

1    going to be the same:   Did you receive this

2    letter from Mr. Queen?

3             MR. LANDA:   Okay.   Don't answer yet.

4    I'm going to object.   It's not numbered as being

5    produced.

6             THE WITNESS:   Yes.

7    BY MR. LANE:

8         Q.   Thank you.   This is Exhibit 26,

9    Mr. Schultz.   When you finish reading it,

Page 91

SCHULTZ  – CONFIDENTIAL, ED

10  Mr. Schultz, my only question is:  Did you

11  receive this letter from Mr. Queen, Exhibit 26?

12        MR. LANDA:  Same objection, wasn't

13  numbered as produced.

14        THE WITNESS:  Yep.

15  BY MR. LANE:

16    Q.  This is Exhibit 27, and it's the same

17  question after you finish reading it.  That is,

18  did you see a copy of this letter from Michael

19  Queen to Mr. Russert?

20    A.  I have never seen this letter.  As I

21  stated moments ago, I know that there was some

22  communication between Mike Queen and Tim

114

1  Russert, but I have not seen this letter.  This

2  is the first time I have seen this letter.

3    Q.  Have you discussed this letter or

4  anything about this letter with Mr. Queen, if

5  you recall?

6    A.  Mr. Queen informed me that he had

7  spoken to Tim Russert.

8    Q.  All right.  And the next exhibit is

9  28.

10        MR. LANDA:  Same objection.

11  BY MR. LANE:

12    Q.  Exhibit 28 to your deposition, it's

13  dated April 28, 2008.  It's from Michael Queen

14  to Phil Griffin.

15        Have you ever seen this letter before?

SCHULTZ  – CONFIDENTIAL, ED

16     A.    No, sir, I have not.

17     Q.    Have you heard about this letter in

18  talking to Mr. Queen?

19     A.    I heard about this letter.  I know

20  Mr. Queen was trying to get in touch with Phil

21  Griffin.

22     Q.    Okay.  29 is a letter from Michael

♀

115

1  Queen to -- you know, it says on the top of it,

2  the first line says Michael Anderson and his

3  e-mail address and then it starts to Steve Capus

4  from Michael Queen.

5           Did you ever receive a copy of this

6  letter?

7           MR. LANDA:  I'm going to object.  The

8  same objection, it's not labeled as having been

9  produced.

10          THE WITNESS:  This is an e-mail from

11  Michael Queen to Steve Capus.  I have never seen

12  this before.

13  BY MR. LANE:

14     Q.    Have you heard about this letter in

15  talking --

16     A.    No, I didn't.  I didn't know there was

17  any communication between Michael Queen and

18  Mr. Capus.

19     Q.    Mr. Queen never mentioned that to you;

20  is that what you're saying?

21     A.    I can't recall that he did, but to my

Page 93

SCHULTZ  – CONFIDENTIAL, ED

22    knowledge there wasn't communication directly

♀

116

1     between those two gentlemen.

2         Q.    All right.  Exhibit 30, Mr. Schultz.

3              MR. LANDA:   Same objection.

4     BY MR. LANE:

5         Q.    This letter, as you could see, from

6     Michael Queen to Mr. Capus.  It starts out

7     Michael Anderson to Michael Queen.

8         A.    Correct.

9         Q.    All right.  Did you ever see this

10    letter or hear about this letter?

11        A.    I have not.

12        Q.    Either one?

13        A.    I have not seen this mail before and I

14    don't recall reading it.

15             MR. LANDA:   Just a minute.  Did you

16    say neither one?  Are there two?

17             MR. LANE:   No, no. The first one is

18    whether he's seen it, that would be sort of the

19    same as reading it.

20    BY MR. LANE:

21        Q.    The second question is did you ever

22    discuss this with Mr. Queen, this letter?

♀

117

1         A.    I never had any discussions that I can

SCHULTZ  - CONFIDENTIAL, ED

2  recall that dealt with Mr. Capus.

3  BY MR. LANE:

4      Q.   Not even -- Mr. Queen never told you

5  that he was going to show the pilot to him or

6  offered to show the pilot to him?  You hadn't

7  heard that?

8      A.   No, I never had any -- to my

9  recollection, I didn't have any discussions that

10  involved Mr. Capus.

11      Q.   All right.  31.  Exhibit 31 appears to

12  be a letter from you.

13      A.   This is correct.

14      Q.   Did you write that e-mail letter?

15      A.   I did.

16      Q.   You said, "Hopefully FOX or MSNBC will

17  come through.  I appreciate all your help, and

18  faith.  We need it."  Is that correct?

19      A.   Correct.

20      Q.   All right.  Did you appear on the Ed

21  Schultz Radio Show on May 10th, 2011?  That's a

22  day you probably saw the compl- -- heard about

118

1  the case being filed, because you discussed it.

2  Do you recall that?

3      A.   I don't recall that.  I'm not saying

4  it didn't happen, but I don't recall it.  I do

5  15 hours of radio a week.  I've done it for

6  30 years.  I don't recall what I did on a

7  certain date.

Page 95

SCHULTZ  - CONFIDENTIAL, ED

8      Q.    Okay.  Do you recall discussing the

9   complaint the day you read the press release

10   about the complaint, discussing that on your

11   radio show?

12      A.    I don't recall -- I don't recall.  No,

13   I don't.  I don't recall the date of doing it.

14      Q.    I'm not asking about date, sir.

15      A.    Okay.

16      Q.    I'm just asking about the substance.

17          Do you recall that you got a press

18   release announcing the complaint and that you

19   discussed that on the air?

20      A.    I believe it was mentioned on the air.

21      Q.    Well, that's how you opened the top of

22   the second hour of your show, isn't it, by

♀

119

1   discussing --

2      A.    I don't recall.

3      Q.    Okay.  And did you say, regarding the

4   complaints, I have not seen the complaint and

5   gone on to say I don't know anything about it,

6   but all you know is you got a press release.  Do

7   you recall saying that?

8      A.    I know at some time I had talked about

9   a complaint.

10      Q.    Yeah.

11      A.    And I don't recall talking about the

12   complaint in detail.

13      Q.    Okay.

SCHULTZ  - CONFIDENTIAL, ED

14          (Schultz Exhibit No. 32 was marked for

15    identification.)

16    BY MR. LANE:

17          Q.    I represent to you that a transcript

18    shows -- you don't have to rely upon this.  I'm

19    just telling you this is my representation, that

20    you did say that I've not seen the complaint,

21    and you talk about you only have this press

22    release.

♀

120

1                Does that refresh your recollection at

2    all that you said something like that?

3                MR. LANDA:  Do you have the transcript

4    here?  Don't answer that.  Will you read that

5    question back to me, please?

6                THE REPORTER:  Question:  I represent

7    to you that a transcript shows -- you don't have

8    to rely upon this.  I'm just telling you this is

9    my representation, that you did say that I've

10    not seen the complaint, and you talk about you

11    only have this press release.

12                Does that refresh your recollection at

13    all that you said something like that.

14    BY MR. LANE:

15          Q.    Are you looking at Exhibit 32,

16    Mr. Schultz?

17          A.    I am.

18          Q.    Is that a copy --

19          A.    I don't recall ever seeing that

Page 97

                        SCHULTZ  - CONFIDENTIAL, ED
20   communication before.

21        Q.    Okay.  Let's forgot about that.

22              (Schultz Exhibit No. 33 was marked for

♀

                                                              121

 1   identification.)

 2   BY MR. LANE:

 3        Q.    I'll show you Exhibit 33 to your

 4   deposition, which is a letter -- a copy of a

 5   letter that I sent to Mr. Landa on October 21st,

 6   2010.

 7              Have you ever heard about that letter?

 8   You weren't copied, Mr. Schultz, because I was

 9   not allowed to talk to you because you were

10   represented by counsel, but I did write your

11   attorney.

12              MR. LANDA:  I'm going to object.

13   Calls for attorney-client-privileged

14   communication.  Don't answer.

15   BY MR. LANE:

16        Q.    Did you know a copy of the draft of

17   the complaint was sent to your attorney six

18   months before you appeared on the radio and said

19   you hadn't seen the complaint?  Did you know

20   that?

21              MR. LANDA:  Don't answer that.  You

22   can answer that as long as you aren't repeating

♀

                                                              122

SCHULTZ  - CONFIDENTIAL, ED

1    anything that you may or may have heard from me.
2    If you heard it from somebody else, you could
3    answer.
4            THE WITNESS:  I cannot recall when I
5    first saw the complaint.  I cannot recall the
6    exact day of when it was mentioned on my radio
7    show.
8            I will emphatically state that when I
9    found out that there was a complaint being filed
10   against me, I totally got out of it because it
11   was of my opinion it was completely frivolous
12   and unwarranted and not substantiated, nor
13   credible.
14           So to focus on my job and my career,
15   this was all handled by my counsel, Jeff Landa.
16   And so once this complaint was filed, I threw my
17   hands up, you know, I'm not going to handle
18   this, you're going to have to handle this.  That
19   was my response.
20           And so I can't give you verbatim,
21   because my focus was elsewhere.
22   BY MR. LANE:

♀

123

1        Q.   All right.  On May 10th, 2011, did you
2    say on your radio program, "I wasn't going to
3    sign a contract with an agent.  I wasn't going
4    to sign a contract with anybody because we
5    didn't have a TV show"?  Did you say that?
6        A.   I don't recall.

Page 99

SCHULTZ  – CONFIDENTIAL, ED

7     Q.   All right.

8     A.   Now let me be very specific.   You

9   know, in 15 hours a week of radio over

10   nine years on a syndicated radio show, I don't

11   think any human being could be expected to

12   recall verbatim what they said on a particular

13   day.

14     Q.   I think that's completely true.

15          How many times have you discussed a

16   complaint filed against you in the United States

17   District Court?   How many times have you

18   discussed that on a radio show?

19     A.   I don't know.

20     Q.   Often?

21     A.   Often?  I would say no.   What's your

22   definition of "often"?

♀

124

1     Q.   Well, let's forget about that.   Has

2   anyone --

3     A.   Well, you asked it.

4     Q.   Yes.   At more than one time have you

5   ever discussed on your radio program the fact

6   that a complaint was filed against you in the

7   United States District Court?

8     A.   More than once?

9     Q.   Yes.

10     A.   I'm not sure of that either.

11     Q.   How many different complains have been

12   filed against you in the United States District

SCHULTZ  - CONFIDENTIAL, ED

13    Court since you had a radio program?

14         A.    I'm not sure.

15         Q.    All right.

16         A.    Could be zero.  Could be one.  I don't

17    know how many complaints have been filed against

18    me.  Have I ever been sued before this?  No.

19         Q.    You're distinguishing between being

20    sued and having a complaint filed?

21         A.    Well --

22         Q.    Is that what you're saying?

                                                    125

1          MR. LANDA:  Wait a minute.  I'm going

2     to object.  It calls for a legal conclusion.

3     You could answer.

4          THE WITNESS:  In our industry, there

5     are people that call management, people that

6     write letters to the editor, people that, you

7     know, complain.

8          So what is your defin- -- you know,

9     you're talking to a broadcaster that deals with

10    people that call up all the time, that call up

11    radio stations and compliment and they might

12    complain.  What is your definition of

13    "complaint"?

14    BY MR. LANE:

15         Q.    A compliant filed in the United States

16    District Court is a full proceeding in which an

17    allegation is made by one party against the

18    other, by a plaintiff against defendant.  This

SCHULTZ  - CONFIDENTIAL, ED

19    particular case is an allegation made by

20    Mr. Queen against you, Ed Schultz.  That's the

21    complaint.

22        A.    Okay.

○

126

1         Q.    The complaint -- I'm not talking about

2    somebody calling up and complaining.

3         A.    All right.  Well, I'm just, you know,

4    clarifying here.

5         Q.    When I talk about a complaint filed in

6    the United States District Court.  I'm talking

7    about a lawsuit.  Somebody suing you.

8         A.    Thank you, sir.  You said "lawsuit."

9    No, I have never been sued before.

10        Q.    You said you had the number one -- you

11   were the nation's number one liberal voice; is

12   that correct?

13        A.    Correct.

14        Q.    Did you at one point mock homeless

15   people by saying "Why don't you get a job?"  Did

16   you ever say that on the air?

17             MR. LANDA:  Objection.  Irrelevant and

18   not calculated to lead to admissible evidence.

19   BY MR. LANE:

20        Q.    Please answer the question, Mr.

21   Schultz.  Did you ever say that?

22             MR. LANDA:  Remember, that was our

○

SCHULTZ  – CONFIDENTIAL, ED

127

1    deal.  I'll tell him when to answer the

2    question.

3              MR. LANE:  Did you tell him not to

4    answer?

5              MR. LANDA:  No.  I will tell him when

6    to answer.

7              You can answer the question.

8              Well, you're smiling --

9              MR. LANE:  I am smiling.

10             MR. LANDA:  You told me to do that,

11   remember, Mr. Lane.

12             MR. LANE:  I'm not having discourse

13   with you.  I'm asking the questions of the

14   witness.

15             MR. LANDA:  You could answer the

16   question.

17   BY MR. LANE:

18       Q.   Did you ever say that on the air?

19       A.   Mr. Lane, I have been in broadcasting

20   for 32 years.  I can't recall comments that were

21   specifically made last week or last year or ten

22   years ago or 32 years ago.

128

1        Q.   Is that the end of the answer?

2        A.   That is.

3        Q.   Okay.  Did you ever say on the air,

4    "I'd like to see the president get all the

Page 103

SCHULTZ  - CONFIDENTIAL, ED

5    illegals out of the country so we could start

6    all over again."

7              Did you ever say that on the air?

8         A.   I don't recall.  I -- you're -- I

9    don't know.

10        Q.   You don't know.  Okay.

11             Now, did you ever say on the air that

12   I -- in talking about this case, on the day you

13   got the press release and said you didn't have

14   the complaint, that day did you also say that "I

15   was never going to sign a contract with an

16   agent"?

17             MR. LANDA:  I'm going to object.  It

18   misstates his testimony.

19             You could answer, if you understand.

20             THE WITNESS:  I don't recall --

21   BY MR. LANE:

22        Q.   Okay.

♀

129

1         A.    -- the details of the conversation

2    about the subject matter that you're asking me.

3              MR. LANE:  Very well.  We're going to

4    talk about financial matters, and this is

5    subject to an agreement that we have, so various

6    people are going to have to leave the room.

7              The court reporter can remain, the

8    camera person can remain, my paralegal can

9    remain, because she's employed by me, but

10   everybody else has to leave, except for counsel.

                    SCHULTZ  - CONFIDENTIAL, ED
11            MR. LANDA:  All right.  Let's go off

12    the record because John is going to handle this

13    because I don't know what he talked to you

14    about.  He told me to e-mail him and get him

15    down here.

16            THE VIDEOGRAPHER:  Off the record at

17    1:46.

18            (Off the record.)

19

20                              *

21                              *

22                              *

♀

                                                    130


1            (Whereupon, the conclusion of the Ed

2    Schultz deposition (pages 134 through 159) was

3    marked CONFIDENTIAL -- ATTORNEYS' EYES ONLY and

4    placed under separate cover.)

5

6

7

8

9

10

11

12

13

14

15

16

SCHULTZ  – CONFIDENTIAL, ED

17
18
19
20
21
22

♀

131

1                    CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read the

4    foregoing pages of my deposition testimony in

5    this proceeding, and with the exception of

6    changes and/or corrections, if any, find them to

7    be a true and correct transcription thereof.

8

9          _____

10                         Deponent

11

12         _____

13                           Date

14

15                    NOTARY PUBLIC

16         Subscribed and sworn to before me this

17    _____ day of _____, 20___.

18

19    _____

20                    Notary Republic

21         My Commission Expires:_____

22

Page 106

⚥

132

1                    ERRATA SHEET

2

3

4            In Re:  Queen vs. Schultz

5    Deposition of:  Ed Schultz

6            Taken:  November 10, 2011

7

8    PAGE    LINE    ERROR   CORRECTION     REASON

9

10

11

12

13

14

15

16

17

18

19

20

21    Signature: _____

22    Date Signed: _____

⚥

133

1    UNITED STATES OF AMERICA )

2    DISTRICT OF COLUMBIA )

3              I, Cheryl Nicholson, the reporter

SCHULTZ – CONFIDENTIAL, ED

4    before whom the foregoing deposition was taken,

5    do hereby certify that the witness whose

6    testimony appears in said deposition was sworn

7    by me; that the testimony of the witness was

8    taken by me in machine shorthand and thereafter

9    transcribed at my direction; that said

10   deposition is a true record of the testimony

11   given by said witness; that I am neither counsel

12   for, related to, nor employed by any party to

13   the action in which this deposition was taken;

14   and, further, that I am not a relative or

15   employee of any attorney or counsel employed by

16   any party hereto, or financially or otherwise

17   interested in the outcome of this action.

18                    _____

                      Cheryl Nicholson

19                    Notary Public in and for the

                      District of Columbia

20   My Commission expires September 14, 2013.

21

22

Page 108