## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL QUEEN, | |
| Plaintiff, | Civil Action No. (BAH) 11-0871 |
| v. | Judge Beryl A. Howell |
| ED SCHULTZ, | |
| Defendant. | |

## MEMORANDUM OPINION

The parties in this lawsuit first met in a hallway at an NBC television studio in January 2008, when the plaintiff, Michael Queen, approached Ed Schultz, the defendant. *See* May 13, 2015 Tr. at 13, ECF No. 169 (Testimony of Michael Queen). From all outward appearances, the plaintiff seemed to be a "nice guy," yet his demeanor was "aggressive" and his clothing "Army fatigues." *See* May 15, 2015 AM Tr. at 65, ECF No. 183 (Testimony of Ed Schultz). The plaintiff was a fan of a popular nationally syndicated radio program, "The Ed Schultz Radio Show," and seized the opportunity to speak with its host. After exchanging greetings, the plaintiff and defendant had a brief, five to ten minute conversation, in which the plaintiff praised the defendant's radio show and told the defendant "you've got to be on TV." *Id.* at 65–66 (Testimony of Ed Schultz); *see also* May 13, 2015 Tr. at 13, 108–11 (Testimony of Michael Queen). The defendant responded, "I agree," *id.*, since he had been trying seriously for nearly two years to host a national television program. *See* May 14, 2015 AM Tr. at 94, ECF No. 188 (Testimony of Paul Woodhull). Without prompting, the plaintiff asked the defendant whether he was "working with anybody" in order to get a television show. May 15, 2015 AM Tr. at 66 (Testimony of Ed Schultz). "No. You're it," the defendant replied, as a good-natured response to

1

one of his fans.  *Id.*  This seemingly innocent exchange clenched a multi-year business partnership between the plaintiff and the defendant—at least according to the plaintiff's trial testimony.  *See* May 13, 2015 Tr. at 108–11 (Testimony of Michael Queen).  After hearing five days of testimony, and needing only two hours of deliberation, the jury reached an alternate conclusion:  The parties *never* formed a business partnership.  *See* Verdict Form, ECF No. 178.

The plaintiff now seeks to turn aside the jury verdict and present his claim anew for jury consideration.  *See* Pl.'s Mot. & Mem. New Trial ("Pl.'s Mem."), ECF No. 192.  For the reasons stated below, the plaintiff's request for yet another opportunity to convince a fact-finder of the merits of his claim is denied.

## I.    BACKGROUND

### A.    Factual Background

In 2008, the defendant was a political radio host based in Fargo, North Dakota.  *See* May 12, 2015 AM Tr. at 98, ECF No. 186 (Testimony of Ed Schultz).  He aspired to host a television show and, to that end, made frequent guest appearances on television news commentary programs.  *See* May 15, 2015 AM Tr. at 60 (Testimony of Ed Schultz).  On the day the parties met, the defendant had just made a guest appearance on "Hardball with Chris Matthews" and was leaving an NBC studio in Washington D.C.  *See id.* at 64 (Testimony of Ed Schultz).  The plaintiff, who worked at NBC as a cameraman, *see* May 13, 2015 Tr. at 11 (Testimony of Michael Queen), approached the defendant and introduced himself, *see* May 15, 2015 AM Tr. at 65 (Testimony of Ed Schultz).[1]  The two had a fleeting five-to-ten minute conversation, during which the plaintiff showed the defendant the studio of the "Meet the Press."  *Id.*

---

[1] The plaintiff had been a fan of the defendant since hearing his radio show for the first time while driving to work.  *See* May 13, 2015 PM Tr. at 12–13 (Testimony of Michael Queen) ("I can recall driving to work and listening to this guy on the radio.  At first I thought he sounded like Rush Limbaugh.  I continued to listen, and I really liked what I

During this brief encounter, the plaintiff urged the defendant to get his own television show. *See* May 13, 2015 Tr. at 13 (Testimony of Michael Queen); May 15, 2015 AM Tr. at 66 (Testimony of Ed Schultz) ("[Y]ou've got to have your own TV show."). The defendant agreed. "Are you working with anybody" to get a television show, the plaintiff asked. May 15, 2015 AM Tr. at 66 (Testimony of Ed Schultz). "No. You're it," the defendant responded, in what the defendant characterized as a general response to a fan. *Id.* The plaintiff then asked the defendant for his business card. *Id.* at 67. To be "courteous," the defendant's wife provided the plaintiff with the defendant's card, as the defendant did not want to "come off as a jerk" by refusing to give out his business card. *Id.*

Following this initial exchange and over the ensuing months, the plaintiff and defendant continued to communicate. The plaintiff called the defendant and the two launched "exploratory conversations about . . . a TV show." *Id.* These included teleconferences among the plaintiff, the defendant and a third person, Max Schindler, whom the plaintiff had recruited to participate because of Mr. Schindler's prior experience directing television programs.[2] *Id.* at 68–69. During these teleconferences, the parties discussed the possibility of producing a syndicated talk show that would air on local stations, akin to the popular "McLaughlin Group."[3] *See* May 12, 2015 PM Tr. at 83–84 (Testimony of Ed Schultz). Shortly after these discussions began, Mr.

---

was hearing. Although he was in the Midwest, I didn't think our paths would ever cross, but I thought if one fine day that would happen, maybe I could, you know, speak to him. . . . I liked what I was hearing.").

[2] Mr. Schindler had been a director for several television programs, including "Meet the Press," and had met the plaintiff when the plaintiff worked as a temporary cameraman on one of those programs. *See* May 12, 2015 PM Tr. at 47–50, ECF No. 187 (Testimony of Max Schindler). Until trial, the defendant had never met or seen Mr. Schindler. *See* May 15, 2015 AM Tr. at 70 (Testimony of Ed Schultz).

[3] The parties cannot recall with specificity the number of teleconferences in which they participated. *See* May 12, 2015 AM Tr. at 43 (Testimony of Ed Schultz) ("I know we had three [teleconferences]. I think we might have had four, maybe five. Certainly not anywhere near double figures because it was just a few."); May 12, 2015 PM Tr. at 52 (Testimony of Max Schindler) ("There were many teleconference calls and I guess somewhere between 5 and 15 . . . ."); May 13, 2015 PM Tr. at 26 (Testimony of Michael Queen) ("It's hard for me to remember exactly how many [teleconferences] there were. I'm going to say five to ten perhaps.").

Schindler insisted on a signed written agreement between the parties. *See* May 15, 2015 AM Tr. at 70 (Testimony of Ed Schultz).

As a result, in March 2008, less than three months after their first brief introduction, the plaintiff put together a proposed partnership agreement and sent it, unsigned by either the plaintiff or Mr. Schindler, to the defendant for his consideration. *Id.* at 71. Upon receipt, the defendant forwarded the agreement to his personal attorney, Jeffrey Landa. *Id.* Mr. Landa's response was immediate and definite: "Ed, please do not sign that agreement." *Id.* Mr. Landa need not have feared, the defendant knew immediately that the proposed agreement was a "non-starter." *See* May 12, 2015 AM Tr. at 70–75. During trial, at plaintiff's counsel's express invitation and using a red pen supplied by plaintiff's counsel, the defendant explained all of his problems with the plaintiff's proposed partnership agreement. *See id.* at 67.[4] Describing the terms on one page as "terrible" and "horrendous," the defendant proceeded to describe the fundamental unfairness and problems with the central terms of the proposed agreement. *See id.* at 69.

First, the defendant criticized the agreement's proposal for joint creative decision making. The proposal required creative decision making to be split between the defendant, the plaintiff, and Mr. Schindler (whom the plaintiff had yet to meet). Permitting the plaintiff and Mr. Schindler an effective veto over creative decision making was a "non-starter" for the defendant because "after 35 years of . . . being in [the entertainment] business, [the defendant was not] going to turn . . . control of [a] television show over to a man that [he has] never met

---

[4] Plaintiff's counsel made the odd tactical decision to provide the defendant—a noted political radio host—with an open forum, off the witness stand and directly in front of the jury, to discuss his views of the plaintiff's proposed partnership terms. *See* May 12, 2015 AM Tr. at 66–83 ("Mr. Abbott: Could the witness step down, Your Honor? . . . Mr. Abbott: Would you circle for the jury with this red pen what you disagreed with? . . . Mr. Abbott: Would you do me favor and write terrible on there too? . . . Mr. Abbott: Could you explain what is terrible or horrendous about paragraph number one?")

before." *Id.* at 70.  Second, the defendant criticized the agreement's contemplation of "Ed Schultz T-Shirts" and other related Ed Schultz paraphernalia.  The defendant felt that such a term would permit Mr. Queen and Mr. Schindler to "invad[e] his career" and that he would be required to "turn everything over to them." *Id.* at 71–73.  Third, the defendant criticized the term relating to salaries, which permitted "[s]alaries paid to individual partners [to] be negotiated on an individual basis by each individual without the approval of the other partners." *Id.* at 74–75.  The defendant noted that such a term would permit the plaintiff and Mr. Schindler "to dictate . . . what their salary [was] going to be without [his] approval." *Id.* at 75.  Fourth, the defendant criticized the requirement that all partners live in Washington D.C. and approve of all business-related travel, worrying that such a provision would permit the other partners to veto news stories the defendant might wish to pursue outside of Washington D.C. *Id.* at 78–80.  Finally, the defendant criticized the termination provision of the agreement, which stated that the agreement would stay in effect until the defendant was off the air for a period of three years. *Id.* at 80.  The defendant noted that television shows are frequently cancelled and that such a term would mean he was "done in the industry for the next three years" should any show be cancelled. *Id.* Needless to say, the defendant never signed the draft agreement and, indeed, the parties never signed any agreement. *See* May 15, 2015 AM Tr. at 73 (Testimony of Ed Schultz).

Around this same time, the parties also discussed the possibility of dividing any profits from a potential partnership fifty percent for the defendant, twenty-five percent for the plaintiff, and twenty-five percent for Mr. Schindler. *See* May 12, 2015 AM Tr. at 84 (Testimony of Ed Schultz) (testifying regarding email in which he stated that he would "agree to a 50, 25, 25 percentage formula of profits after expenses of the show").[5]  Although the parties discussed such

---

[5] This discussion formed the basis for the plaintiff's theory of the partnership presented to the D.C. Circuit. *See Queen v. Schultz* (*Queen II*), 747 F.3d 879, 886 (D.C. Cir. 2014).

a potential division of profits, they never entered into a final agreement.  *See id.* at 41.  Due to

the defendant's continued refusal to sign any agreement, Mr. Schindler stopped participating in

the discussions between the plaintiff and the defendant.  *See* May 12, 2015 PM Tr. at 78–79

(Testimony of Max Schindler).

On April 5, 2008, following Mr. Schindler's departure, the defendant sent the plaintiff an

email:

> I understand your concern about a financial arrangement moving forward. I can't
> give you specifics at this time. We do not know what we are dealing with at this
> point and what kind of opportunity may present itself. However, any TV deal will
> obviously involve you. I will not do a TV deal without your involvement and that
> includes a financial involvement. Rest assured, we are together on this. I hope this
> works for you at this point.

*Queen II*, 747 F.3d at 883.  Despite the relevance of this email to the plaintiff's theory, and the

fact that the email was specifically identified by the D.C. Circuit in its opinion on summary

judgment as a critical piece of evidence, *see id.*, plaintiff's counsel failed to ask the defendant

during his direct examination about the email, and, as discussed below, failed to introduce the

email into evidence until after he rested his case in chief.[6]  *See* May 14, 2015 AM Tr. at 196–97.

Discussions between the parties continued even after Mr. Schindler ceased participating,

but the plaintiff's frustration boiled over in early June.  Bothered by the involvement of the

defendant's personal attorney, Mr. Landa, the plaintiff sent the defendant an email informing him

that he "can't do this."  May 14, 2015 AM Tr. at 153–54 (Testimony of Michael Queen).  The

defendant understood the plaintiff's communication to mean that the plaintiff "had given up" and

would not be involved in any more efforts related to a potential television show.  *See* May 15,

2015 AM Tr. at 78 (Testimony of Ed Schultz).  The following day, the defendant responded to

---

[6] As noted *infra*, the plaintiff was permitted to reopen his case to introduce a binder of approximately 300 emails,
one of which was the email from April 5, 2008.  *See* May 14, 2015 AM Tr. at 175–85.

the plaintiff's email, stating "I'm sorry we can't make this work.  I appreciate all your efforts." *Id.* at 80.  Later that same afternoon, the defendant again emailed the plaintiff and stated: "I'm back to my original position. Let's draw up a short letter and join forces to produce the pilot."  *Id.* at 83.

As a result, the plaintiff and the defendant did agree together to produce a television pilot starring the defendant.  *See* May 12, 2015 AM Tr. at 87 (Testimony of Ed Schultz) (testifying regarding "a verbal agreement [between the parties] to make the pilot and send it out to television stations . . . .").  The defendant provided all the content for the pilot, including the music, the political commentary, and interviews with three political figures, whose appearances the defendant arranged.[7]  *See* May 11, 2015 PM Tr. at 74–76, ECF No. 166 (Testimony of Ed Schultz).  The plaintiff arranged for the use of his employer's studio at a discounted rate and paid the upfront costs of the pilot, approximately $11,000, which the defendant subsequently reimbursed along with other expenses.  *See* May 11, 2015 PM Tr. at 82–83 (Testimony of Ed Schultz); May 13, 2015 Tr. at 23 (Testimony of Michael Queen).  Upon completion, the plaintiff mailed copies of the pilot to various television executives, including executives at CNN, CBS, MSNBC.  *See* May 13, 2015 Tr. at 48 (Testimony of Michael Queen).[8]  The plaintiff also sought funding for the potential show by soliciting funds from wealthy individuals, such as T. Boone

---

[7] The defendant interviewed for the pilot former South Dakota Senator Tom Daschle, then-North Dakota Senator Byron Dorgan, and Richard Viguerie.  *See* May 12, 2015 AM Tr. at 91.

[8] At trial, the plaintiff argued to the jury that the plaintiff submitted two copies of the pilot to NBC and that NBC received the pilot but never returned at least one of the copies.  *See* May 11, 2015 PM Tr. at 38 (Plaintiff's Opening Statement) ("They get the pilot, they get the package, and they have this log.  You're going to see it.  It's coming into evidence.  And the log says 'Received.'  And the log also says 'Date Returned,' and there's no date on it.  So the evidence from the documents in this case is going to be that he sent the pilot to the president of MSNBC, and they also sent it to California, and that it never came back.").  The plaintiff, however, failed to lay a foundation for the admission of the NBC submission logs as business records.  *See* May 14, 2015 AM Tr. at 187–90 (denying admission to plaintiff's exhibit 63 because the plaintiff did not offer a proper custodian, qualified witness, or proper certification as required under Federal Rule of Evidence 803(6)).

Pickens, without prompting or approval from the defendant.  *See* May 14, 2015 AM Tr. at 151–52 (Testimony of Michael Queen).

Subsequently, in November 2008, the defendant appeared as a reporter at President-Elect Barack Obama's first press conference following his election.  *See* May 15, 2015 AM Tr. at 105–07 (Testimony of Ed Schultz).  The defendant sat in the front row and was visible to those watching on television.  *Id.*  Fortunately for the defendant, among those watching was Phil Griffin, the president of MSNBC.  *Id.*  Later, Mr. Griffin contacted the defendant, impressed that the defendant had a front-row seat at the first press conference, and the two discussed the possibility of the defendant hosting his own television show on MSNBC.[9]  *Id.* at 108–09.  As a test run, the defendant was required to appear three times as a guest host of various programs.  *Id.* at 111.  Due to his success during these temporary positions, the plaintiff entered into an agreement with MSNBC to host "The Ed Show."  *Id.* at 115–16.

After agreeing to host "The Ed Show," communications between the defendant and the plaintiff dropped off.  In his pleadings, the defendant attributed the falling out to the plaintiff's "bizarre conduct," and the fact that he was "stalking Schultz and Schultz['s] wife."  Answer ¶ 71, ECF No. 5.[10]  In particular, the defendant alleged that the plaintiff began to harass him and his wife with communications threatening litigation and blackmail if the defendant did not accede to his compensation demands, which resulted in a cease-and-desist letter being sent to the plaintiff

---

[9] The plaintiff's theory of the case appeared to be that Mr. Griffin lied about his reasons for contacting the defendant and that his actual interest in the defendant stemmed from watching the pilot that the parties had collaborated in making.  The plaintiff conceded, however, that he does "not have any evidence that [Mr. Griffin] actually saw the pilot." May 14, 2015 AM Tr. at 160 (Testimony of Michael Queen).  Testimony from the defendant's business partner, Paul Woodhull suggests an alternative basis for Mr. Griffin's familiarity with the defendant.  In 2006, Mr. Woodhull met with Mr. Griffin regarding the defendant's potential television prospects and continued to maintain contact and "keep the opportunity warm" over the next several years. *See id.* at 94–95 (Testimony of Paul Woodhull).

[10] The plaintiff's pretrial motion *in limine* to exclude use of the word "stalker" or "stalking" in reference to the plaintiff, was granted. *See* Minute Order, dated May 1, 2015 (granting plaintiff's motion *in limine*, ECF No. 94).

on July 30, 2009.  *Id.*  The defendant further alleged that, on July 21, 2010, the plaintiff "read a defamatory statement publically accusing Schultz of, among other things, stealing and causing him to finance his home to pay for the pilot."  *Id.*  The plaintiff was permitted at trial to show video footage of the plaintiff's accusations, which he made at a company "town hall" meeting directly to the President of the NBC News Division and to the CEO of NBC Universal Media, LLC.  *See* May 13, 2015 Tr. at 67–68. The defendant also claimed in his original pleading that on or before May 20, 2010, the plaintiff "caused to be written a 'press release' containing the false and slanderous statements," *i.e.*, "that Schultz had a business contract with Queen and that Schultz reneged on or otherwise breached that contract;" "that Schultz defrauded Queen and that Schultz owed Queen money for, among other things, producing a pilot for a proposed television show; and, that Schultz caused Queen to mortgage his house to finance the pilot for a proposed television show project."  Countercl. ¶¶ 11, 20–23, ECF No. 5.[11]

On May 10, 2011, the plaintiff filed suit.

## B.    Procedural Background

The ever-shifting nature of the plaintiff's claims has resulted in a tortured procedural history.  The plaintiff's Complaint asserts five causes of action: Breach of Contract; Breach of Implied-in-Fact Contract; Fraud in the Inducement; Tortious Interference with Business Relationships; and Intentional Infliction of Emotional Distress.  *See* Compl., ECF No. 1. Throughout the proceedings, and even up to and during trial, "the nature of this alleged contract [between the parties] has eluded precise definition and has been characterized by the plaintiff in a variety of ways."  *Queen I*, 888 F. Supp. 2d at 158.

---

[11] Based on these events, the defendant filed a counterclaim against the plaintiff alleging fraud, slander, and libel. *See* Countercl.  Summary judgment was granted to the plaintiff on the defendant's counterclaim.  *See Queen v. Schultz (Queen I)*, 888 F. Supp. 2d 145, 175 (D.D.C. 2012) *aff'd in part, rev'd in part and remanded*, 747 F.3d 879 (D.C. Cir. 2014).

In the plaintiff's Complaint, the plaintiff alleged that he entered into a contract to serve as the defendant's agent.  *See* Compl. ¶ 53 ("During December 2008 and January 2009, Michael Queen acted *as Ed Schultz's agent* in Washington DC . . . .") (emphasis added); *id.* ¶ 76 ("To date, Schultz has refused to compensate Queen with a percentage of the income that Queen is entitled to as part owner of the show and as *an agent* for Schultz.") (emphasis added).  In opposition to the defendant's first motion for summary judgment, the plaintiff changed course and characterized the contract as an "'oral, written, and implied in fact contract to form *a partnership* for the sole purpose of pitching the concept of a TV show featuring the defendant as host.'"  *Queen I*, 888 F. Supp. 2d at 158 (emphasis added) (citing Pl.'s Opp'n Def.'s Mot. Summ J., ECF No. 24).  In the plaintiff's own motion for partial summary judgment, however, despite passing references to a partnership, the plaintiff described a contract "to create, produce and pitch the show" and, again, as an "agreement to have [the plaintiff] develop and pitch the concept of a TV show with [the defendant] as host."  *See* Pl.'s Mem. Supp. Pl.'s Mot. Partial Summ. J. at 17–18, ECF No. 30.  At several points in the plaintiff's own motion for partial summary judgment and in opposing the defendant's second motion for summary judgment, the plaintiff also referred to the alleged contract as a "joint venture."  *See id.* at 19 ("During the course of the TV project, the parties agreed to basic compensation terms for *the joint venture*, which was a 50–25–25 split.") (emphasis added); Pl.'s Second Opp'n Def.'s Second Mot. Summ. J. at 33, ECF No. 32 (same).  Despite the different theories of liability, the plaintiff did not plead these allegations as separate causes of action.  Instead, the plaintiff pled a single breach of contract claim.

This Court previously granted summary judgment to the defendant on all counts in the plaintiff's Complaint.  Due to the imprecision in the plaintiff's Complaint, at summary judgment,

the Court considered the plaintiff's breach of contract allegation under two distinct frameworks. The Court considered whether the defendant breached a contract under an agency theory and under a partnership theory. *See Queen I*, 888 F. Supp. 2d at 159 ("[T]he Court discerns two distinct, potential agreements: (1) an agreement whereby the plaintiff developed and pitched a show on behalf of the defendant; and (2) an agreement whereby the plaintiff produced and pitched a show in partnership with the defendant."). Under an agency theory, this Court concluded that the plaintiff "failed to create a genuine issue of material fact regarding the absence of agreement on the material terms of the alleged contract." *Id.* at 162. This Court also concluded that a reasonable factfinder could not "conclude that the defendant ever objectively manifested an intent to be bound." *Queen I*, 888 F. Supp. 2d at 163. With respect to the partnership theory—as noted, first urged in the plaintiff's opposition to the defendant's motion for summary judgment—the Court concluded that the plaintiff "failed to create a genuine issue of fact regarding whether the parties intended to form a partnership" given that the parties' "relationship . . . was devoid of any indicia of a partnership." *Id.* at 166.

The D.C. Circuit disagreed. The Circuit affirmed the dismissal of the breach of contract and other claims in the Complaint, but held that "a reasonable jury could conclude from the parties' conduct and communications that Queen and Schultz intended to, and did, form a partnership to develop a television show." *Queen II*, 747 F.3d at 888. The Circuit acknowledged that the plaintiff's "complaint contains no assertion of a breach of partnership duties, and in fact nowhere uses the word 'partnership.'" *Queen II*, 747 F.3d at 886. Nonetheless, at the urging of both parties during appellate oral argument, the Circuit addressed the plaintiff's breach of contract claim under a partnership theory. The Circuit concluded that the plaintiff's efforts to arrange the pilot, the sworn statements from Mr. Schindler regarding Mr. Schindler's agreement

to partner in the project,[12] and the defendant's statement in an April 5, 2008 email that the

plaintiff would have "a financial involvement" in a subsequent television deal, provided

sufficient evidence to warrant a jury trial on whether the parties "formed a partnership to develop

a television show" and whether the defendant "breached his duty of loyalty under District of

Columbia partnership law." *Id.* at 888–89.  Although dismissing the plaintiff's breach of

contract claim, which asserted a verbal contract entitling the plaintiff to twenty five percent of

any profits, the Circuit permitted a partnership claim to go forward for a "50/50 split of profits

with [the defendant.]"  *See id.* at 889 (acknowledging that "[i]t might seem counterintuitive that

Queen, having failed to demonstrate the existence of an enforceable agreement entitling him to

25% of the income after expenses from 'The Ed Show,' can nonetheless pursue a partnership

theory that could entitle him to a 50/50 split of profits with Schultz.").  Accordingly, the Circuit

concluded that the plaintiff was "entitled to present his case to a jury," that the plaintiff and the

defendant "formed a partnership to develop a television show and that [the defendant] breached

his duty of loyalty under District of Columbia partnership law."  *Id.*

Before the case could proceed to trial, however, this Court was left with a procedural

predicament: What claim from the plaintiff's Complaint survived summary judgment?  The D.C.

Circuit had affirmed the dismissal of the plaintiff's breach of contract claim, *see Queen II*, 747

F.3d at 889 ("We conclude that the district court correctly granted summary judgment to Schultz

on Queen's claim that he, Schindler, and Schultz entered into an enforceable contract . . . ."), and

the plaintiff's original Complaint did not mention a partnership, *see* Compl.  Having never

alleged a partnership, the defendant was now forced to defend himself against a theory of

---

[12] The D.C. Circuit does not explain how Mr. Schindler's sworn statement that Mr. Schindler "'agreed to partner in the project'" bears on the issue of whether *the defendant* agreed to partner in the project—the central issue of the dispute.  *Queen II*, 747 F.3d at 886–89.

liability of which he had no notice during discovery prior to the first round of summary judgment motions.  Consequently, upon remand, discovery was reopened for a period of three months on the issue of partnership formation and breach, *see* Minute Order, dated May 27, 2014, to supplement the previous five months of discovery leading up to the first round of summary judgement motions, *see* Minute Order, dated July 8, 2011.

Following discovery on the plaintiff's partnership theory, the defendant again sought summary judgment.  Mindful of the Circuit's admonition, based on evidence that remained unchanged, that the plaintiff was "entitled to present his claim to a jury," *Queen II*, 747 F.3d at 889, this Court concluded that there were "sufficient disputed issues of material fact regarding the formation, duration, and alleged withdrawal from" the purported partnership to deny summary judgment.  *See* Minute Order, dated November 26, 2014.  In doing so, however, the Court also noted the irony of the plaintiff's criticism that the defendant's "argument underlying his Motion for Summary Judgment clearly underscores his precise misunderstanding of the issues to be tried" because "the plaintiff [had] not yet moved to amend his pleading to include a partnership claim, leaving 'the defendant and the court . . . to speculate about the precise parameters of the claim.'" *Id.* (quoting Def.'s Reply Pl.'s Opp'n Def.'s Mot. Summ. J. at 4, ECF No. 73).  Thus, the Court afforded the plaintiff the opportunity to clarify his breach of partnership claim and instructed the plaintiff to amend his Complaint to provide the defendant proper notice regarding the claim alleged.  *Id.*  Rather than seize the opportunity to detail his side of the story and allege clearly the circumstances giving rise to the alleged partnership, the plaintiff obfuscated.[13]

---

[13] The plaintiff's failure to properly amend his Complaint, and the resultant prejudice to the defendant, serve as the foundation for the defendant's request for attorneys' fees for the plaintiff's "bad faith" litigation conduct.  *See* Def.'s Mem. Supp. Mot. Award Att'ys Fees at 5, ECF No. 92-1.  To be sure, the plaintiff's conduct throughout the litigation has caused concern, including his repeated failure to identify his theory that the alleged partnership formed

The plaintiff's proposed amended complaint simply substituted the word "partnership" for "contract" and sprinkled the words "as part of his services provided to the Partnership as a partner" throughout his otherwise unchanged pre-existing allegations.  *See* First Am. Compl., ECF No. 78-1; *see also* Feb. 27, 2015 Hearing Tr. at 34, ECF No. 88 ("The Court: [W]hat you've essentially done is just scatter the word 'partner' or 'partnership' where it previously talked about a contract.  Have I got that pretty much right?  [Plaintiff's Counsel]: Yes, your honor.").  Although leave to amend should be freely given, the plaintiff could not meet even the generous standards afforded to him under Rule 15.  At a hearing on February 27, 2015, the Court denied the plaintiff's motion to amend his Complaint due to "undue delay" and "undue prejudice."  Feb. 27, 2015 Hearing Tr. at 46.  The Court also determined that it was a "close question" whether the plaintiff's submission was made in bad faith.  *See id.* at 44 ("Considering the pattern of shifting theories and allegations the plaintiff has exhibited throughout this suit, it's arguable that the plaintiff's failure to amend his complaint was an actual exercise of bad faith or dilatory motive, since the vagueness of the plaintiff's claims has prevented the defendant from addressing the plaintiff's charges directly, and every time the defendant has managed to do so, the plaintiff's claims have been dismissed.").  As a result of the plaintiff's utter failure to comply with the requirements of Rule 15, the plaintiff never alleged before trial the specifics regarding the formation, duration, and scope of any partnership between the parties. The precise nature of the plaintiff's view of the alleged partnership only became clear at trial.

---

after a brief, casual, first-meeting conversation in a hallway of a television studio.   Nonetheless, the Court is not convinced that the plaintiff's or plaintiff's counsel's actions have amounted to bad faith and deliberate misconduct. Accordingly, the defendant's Motion for an Award of Attorney's Fees, ECF No. 194, is denied.  The plaintiff's corresponding Motion to Strike Defendant's Motion for Award of Attorney's Fees, ECF No. 198, is denied as moot.

### C.      Trial

Over the course of the trial, the plaintiff presented eight witnesses (including both the plaintiff and the defendant), while the defense presented six witnesses (also including both the plaintiff and the defendant).

The plaintiff's theory at trial differed from the meager details the plaintiff offered prior to trial.[14] Although the D.C. Circuit treated the plaintiff's partnership claim as an oral agreement between the plaintiff, the defendant, and Mr. Schindler, *see Queen II*, 747 F.3d at 886, at trial, the plaintiff argued that the plaintiff and the defendant formed a partnership during their brief conversation at their initial encounter in the hallway of a television studio. *See* May 13, 2015 Tr. at 109–11 (Defense Counsel: "Did the partnership between you and Mr. Schultz come into existence in the hallway at Channel 4 in January of 2008?  That's a yes, or that's a no."  The Plaintiff: "He told me we were to work together, and I took that as a yes."  Defense Counsel: "You took that as yes, you have a partnership.  Is that what you're telling us?"  The Plaintiff: "That's what he told me, yes."  Defense Counsel: "[A]s far as you're concerned, that's when the partnership came into existence?"  The Plaintiff: "If what I said satisfies your definition of a partnership, that would be a yes."  Defense Counsel: "I'm simply asking you, as a matter of fact, whether that's when you think . . . the partnership came into existence.  That's the only question I'm asking you."  The Plaintiff: "It seems reasonable.").  Not done, the plaintiff further argued that the alleged partnership lasted up through, and including, trial (and even after trial since the defendant had not filed a formal dissolution of the partnership).  *See* May 15, 2015 PM Tr. at 74, ECF No. 168 ("The Court: So you're asking for a judgment as a matter of law because it's your

---

[14] Had the plaintiff properly identified his partnership theory at the outset of proceedings, the defendant asserts that "such a claim . . . would have had little or no chance to survive scrutiny by the defendant or the Court."  Def.'s Mem. Supp. Mot. Award Att'ys Fees at 2, ECF No. 194–1.

theory that the partnership began in January 2008, the very first time the plaintiff met the defendant, and continues up until this day?  [Plaintiff's Counsel]: If there is a partnership, yes, ma'am.").[15]

The plaintiff's case raised not only such theoretical difficulties but also suffered from practical difficulties in the presentation of evidence.  As just one example, following opening statements, the plaintiff called his first witness, the defendant.  Prior to asking *any* questions, laying *any* foundation, or discussing the issue in advance with defense counsel, the plaintiff moved, in front of the jury, to admit approximately 1,200 pages of emails contained in two large binders.  *See* May 11, 2015 PM Tr. at 52.  The defendant, of course, objected.  Thus launched an arduous process over the next four trial days during which the plaintiff repeatedly attempted to admit binders of emails without foundation and over hearsay objections.[16]  *See, e.g.*, May 12, 2015 AM Tr. at 7–9, 93–94; May 13, 2015 Tr. at 7; May 14, 2015 AM Tr. at 167–171.  It was only *after* the plaintiff rested his case, and at the discretion of the Court, that the plaintiff was permitted to reopen his case and admit approximately 300 pages of unindexed emails between himself and the defendant.  *See* May 14, 2015 AM Tr. at 175–85.  Indeed, defense counsel was generally unable to describe the number of emails included amongst this package of emails.  *See id.* at 168–69.  This is just one example of the opportunities afforded to the plaintiff to ensure

---

[15] The plaintiff's theory of the case, as presented at trial, raised numerous issues, including how to determine the amount of damages claimed by the plaintiff and over what period of time those damages accrued, since the parties never agreed to any material terms of the partnership.  Would the plaintiff be entitled to half or some other percentage of the defendant's salary up to a date certain or continuing on into the future, or would some other measure determine the value of the defendant's alleged breach?

[16] Throughout trial, plaintiff's counsel showed a fundamental misunderstanding of the hearsay rule.  For example:
    The Court: What's the hearsay [exception] you're relying on since you are offering the out-of-court statement of your own client.  So what's your hearsay exception?
    [Plaintiff's Counsel]: I believe it's not hearsay, Your Honor.  I believe it's not.
    The Court: And you believe it's not hearsay because of why?
    [Plaintiff's Counsel]: Because the person who said it is here to testify.
May 14, 2015 AM Tr. at 171–72.

that the plaintiff received the benefit of every procedural doubt in order to present his claim fully to the jury.

After hearing testimony and assessing the evidence, the jury needed only two hours to return a defense verdict.  Now pending before the Court is the plaintiff's Motion and Memorandum for New Trial.[17]

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 59, following a jury trial, the court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  FED. R. CIV. P. 59(a)(1)(A); *see also Radtke v. Lifecare Mgmt. Partners*, 2015 WL 4528494, at *2 (D.C. Cir. July 28, 2015).  Rather than define the precise circumstances justifying a new trial, Rule 59 turns to case law and permits a new trial in those circumstances traditionally viewed as permitting a new trial.  *ABM Marking, Inc. v. Zanasi Fratelli, SRL*, 353 F.3d 541, 543 (7th Cir. 2003) ("Rule 59(a), in a bit of a circular way, allows new trials in cases where new trials have been traditionally allowed at law.").  "The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice."  11 Charles Alan Wright & Arthur R. Miller, et al., *Federal Practice and*

---

[17] The plaintiff also urges the Court to recuse itself from consideration of this motion and all future proceedings under 28 U.S.C. § 455, which requires recusal "in any proceeding in which [any justice, judge, or magistrate judge] might reasonably be questioned."  *See* Pl.'s Mot. Recusal, ECF No. 191.  In support of his motion, the plaintiff cites some of the same reasons used to support his motion for a new trial, including defense counsel's closing statements, the jury selection process, comments made at trial to plaintiff's counsel regarding the basis for the plaintiff's objections, as well as general "bias and lack of partiality" based upon unfavorable rulings and courtroom demeanor. *Id.*  The plaintiff fails to note, however, the tactics and uncooperative conduct employed by counsel throughout these proceedings, *see* Def.'s Notice Regarding Letter to Court, ECF No. 121 (discussing failure by the plaintiff to cooperate in creation of joint pretrial statement), which required the Court at the pretrial conference to remind *both* plaintiff's counsel and defense counsel of the D.C. Bar Voluntary Standards for Civility in Professional Conduct, *see* May 1, 2015 Rough Hr. Tr. at 12–14.  Ultimately, the plaintiff's motion points to no extrajudicial source of bias and instead relies on "routine trial administration efforts, and ordinary admonishments . . . to counsel and to witnesses," all of which occurred "in the course of judicial proceedings" and none of which "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible."  *Liteky v. United States*, 510 U.S. 540, 556 (1994).  The plaintiff's motion is denied.

*Procedure* § 2805 (3d ed. 2012).  Accordingly, motions for a new trial are granted only when "the court is convinced that the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage of justice.'"  *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 87 (D.D.C. 2006) (citation omitted); *see also Rice v. Dist. of Columbia*, 818 F. Supp. 2d 47, 60 (D.D.C. 2011) ("The standard for granting a new trial is not whether minor evidentiary errors were made but rather whether there was a clear miscarriage of justice.") (citation omitted); *Nyman v. FDIC*, 967 F. Supp. 1562, 1569 (D.D.C. 1997) (same).  A new trial is almost never justified "on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result."  *See* Wright & Miller, *supra*, § 2805, at 73.

The high threshold for a new trial reflects the "well-settled" principle that "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'"  *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998); *see also Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1106, 1113 (5th Cir. 1983).  "Although parties may certainly request a new trial or amended findings where clear errors or manifest injustice threaten, in the absence of such corruption of the judicial processes, where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."  *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1287 (2d Cir. 1994) (internal quotations and citation omitted).

"The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court."  *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 646 (D.C. Cir. 1988) ("The

decision whether to grant a motion for a new trial is ordinarily 'entrusted to the sound discretion of the trial court.'" (quoting *Grogan v. Gen. Maint. Serv. Co.*, 763 F.2d 444, 447 (D.C. Cir. 1985)).  In exercising this discretion, the court must "be mindful of the jury's special function in our legal system and hesitate to disturb its finding." *Long v. Howard Univ.*, 512 F. Supp. 2d 1, 6 (D.D.C. 2007) (internal quotation marks and citations omitted).

The Supreme Court has made clear that "'[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 553 (1984) (quoting *Brown v. United States*, 411 U.S. 223, 231–32 (1973)).  This principle is predicated on the sound pragmatic reasons that "[t]rials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials.  It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing caseload." *Id.*

"A new trial is unwarranted if the trial error is harmless." *Caudle v. Dist. of Columbia*, 707 F.3d 354, 359 (D.C. Cir. 2013) (citing *United States v. Whitmore,* 359 F.3d 609, 624 (D.C. Cir. 2004)); *see also* Wright & Miller, *supra*, § 2882 ("[A] district court in passing on a motion for a new trial . . . must be guided by what substantial justice requires and must disregard errors that were harmless.").  To determine whether an error is harmless, a court must "'measur[e] the harm in terms of whether the error had substantial and injurious effect or influence in determining the jury's verdict, not merely whether the record evidence is sufficient absent the error to warrant [the jury verdict].  Consequently, an evidentiary error is harmless if (1) the case is not close, (2) the issue not central, or (3) effective steps were taken to mitigate the effects of

the error.'"  *Caudle*, 707 F.3d at 361 (quoting *Ashcraft & Gerel v. Coady,* 244 F.3d 948, 953

(D.C. Cir. 2001)).

## III.    DISCUSSION

The plaintiff presents three principal grounds of alleged error as his basis for a new trial.

Specifically, the plaintiff finds fault in (1) the jury selection and composition; (2) certain

evidentiary rulings made during trial; and (3) certain instructions provided to the jury.  *See*

*generally* Pl.'s Mem.  According to the plaintiff, each alleged error, both on its own and taken

together, subverted the plaintiff's substantial rights and warrants a new trial.  *See* Pl.'s Mem. at

1–2.  As discussed below, none of the grounds urged by the plaintiff warrants upsetting the well-

founded jury verdict in this case.  Each allegation of error will be addressed *seriatim* below.

### A.    Jury Selection and Composition

The plaintiff objects to both the jury selection process and the subsequent refusal to strike

a member of the jury mid-trial.  Neither objection withstands scrutiny.

#### 1.    *Jury Selection Process*

To ensure jury impartiality, at the parties' suggestion, during *voir dire*, the Court asked

every potential juror whether they possessed "any view" on "whether a business partnership

must be in writing in order to be legally binding and enforced?"  Attachment B, Final Pretrial

Order, ¶ 18, ECF No. 140; *see also* Parties Agreed Proposed *Voir Dire* ¶ 13, ECF No. 119-3.

Unsurprisingly, many jurors expressed a view that a partnership or other business arrangement

required a writing.  The plaintiff complains that the Court should have struck for cause any juror

who expressed an indication during *voir dire* that for "a contract to be enforceable[, it] should be

in writing."  *See* Pl.'s Mem. at 13.  The plaintiff also accuses the Court of attempting to

"supplant the jury's view with that of its own" by noting to counsel (outside the presence of any

prospective jurors), after hearing and ruling on the plaintiff's second motion to strike for cause one of the first four prospective jurors, that the "professional, educated, [and] sophisticated jurors [of] the District of Columbia" would likely express the view that a contract should be in writing. Pl.'s Mem. at 13–14.

Perhaps due to his argument's infirmity, the plaintiff's reply fails to address any arguments raised in the defendant's opposition or make any reference to this alleged grounds for a new trial. *See* Pl.'s Reply Def.'s Opp. Pl.'s Mot. New Trial, ECF No. 196 ("Pl.'s Reply").  As a result, the plaintiff has abandoned this argument and the Court need not consider it. *See Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 152 n.2 (D.D.C. 2012) ("The Court, however, need not address [Plaintiff's] argument [because] Plaintiffs' Reply appears to abandon the first challenge . . . ."); *United States v. Locke*, No. 09-CR-0259, 2012 WL 1154084, at *1 (D.D.C. Apr. 9, 2012); ("Locke's reply abandons any reference to § 3572(d)(3) and refers only to § 3664(k).  Accordingly, the Court will consider Locke's request with respect to the latter provision only."); *cf. Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 471 (D.C. Cir. 2014) *cert. denied sub nom. Ass'n of Am. Physicians & Surgeons, Inc. v. Burwell*, 135 S. Ct. 1024 (2015) (noting the "standard rule inferring concession from gaps in a plaintiff's opposition" to uphold district court's acceptance of argument as conceded when plaintiff failed to respond to the argument).  In any event, as explained below, the jury selection process was proper and the plaintiff is not entitled to a new trial on this ground.

"The Supreme Court has stressed repeatedly that the touchstone of the guarantee of an impartial jury is a protection against juror bias."  *United States v. Boney*, 977 F.2d 624, 633 (D.C. Cir. 1992);[18] *see also United States v. Orenuga*, 430 F.3d 1158, 1162–63 (D.C. Cir. 2005)

---

[18] While many of the cases in this Circuit addressing the impartiality or the jury are criminal cases, the same principles apply in the context of civil cases.

(discussing "right to be tried by jurors who are capable of putting aside their personal impressions and opinions and rendering a verdict based solely on the evidence presented in court."). "*Voir dire* . . . serves to screen out jurors whose personal views make them incapable of performing this function." *Orenuga*, 430 F.3d at 1162; *see also McDonough Power*, 464 U.S. at 554 ("*Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors."). A determination of juror bias is "essentially one of credibility, and therefore largely one of demeanor." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). "As with any . . . trial situation where an adversary wishes to exclude a juror because of bias, . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." *Wainwright v. Witt*, 469 U.S. 412, 423 (1985) (citing *Reynolds v. United States*, 98 U.S. 145, 157 (1879)).

The plaintiff relies solely upon a single non-binding case as his authority in support of his challenge to the jury selection process: *Machesney v. Larry Bruni, M.D., P.C.*, 905 F. Supp. 1122 (D.D.C. 1995). *See* Pl.'s Mem. at 13–14. Yet, *Machesney* stands for the wholly unremarkable proposition that in assessing a motion for a new trial, a court should not "supplant the jury's view with that of its own unless the verdict represents a miscarriage of justice." 905 F. Supp. at 1130. Consequently, this case in fact undercuts the plaintiff's position that the jury decision here should be supplanted. The case does not address the *voir dire* issue raised by the plaintiff in any respect and is inapposite.

The failure by the plaintiff to cite any caselaw in support of his motion is unsurprising. Throughout *voir dire*, the Court took great pains to ensure that potential jurors could render a fair decision based on the evidence presented and the law as provided to them by the Court. Thus, where a juror expressed a preference for an agreement to be in writing, the Court specifically

asked the prospective juror whether he or she would be able to follow the law as instructed and, further, gave the plaintiff the opportunity to propose questions for the Court to ask the prospective juror. *See, e.g.*, May 11, 2015 AM Tr. at 40–41, 44–46, ECF No. 182 (denying motion to strike Prospective Juror No. 57 where prospective juror stated that "he would follow [the Court's] instruction . . . not once, but at least twice . . . ."); *id.* at 48–54 (denying motion to strike Prospective Juror No. 490 where prospective juror stated that "he would have no difficulty applying the instructions and the law that [the Court would] give him . . . [and] based on his forthright answers to [the Court's] questions and his demeanor and thoughtfulness . . . ."); *id.* at 57–62 (denying motion to strike Prospective Juror No. 1281 where prospective juror was "an enormously conscientious person, clearly based on her demeanor and the way she[] answered [the Court's] questions, saying that she can fairly apply the law as [given] to her and base her decision on the evidence presented and that law."); *id.* at 111–14 (denying motion to strike Prospective Juror No. 90 where the prospective juror "seems very forthright, very honest[,] . . . . [has] a military bearing and a military background, and . . . says he can follow [the Court's] instructions on the law."). Notably, where a prospective juror expressed hesitation about his or her ability to follow the Court's instructions regarding whether a business partnership needed to be in writing, the Court removed the juror for cause. *See id.* at 72–73 (striking Prospective Juror 949 for cause because "he did express some hesitation and about whether or not he could put out of his mind his strong views about a written contract in applying the law as [the Court] instruct[s] in this case.").

Sensitive to the fact that the plaintiff's theory involved an oral or implied partnership, the Court inquired of prospective jurors their views on the need for a writing in forming a business relationship. Where prospective jurors expressed a view, the Court inquired of their ability to

follow the law as instructed and afforded the plaintiff the opportunity to pose questions to the prospective juror through the Court.  After assessing the answers to the questions, along with the demeanor and expression of the potential jurors, the Court ruled on the motions to strike.  Where jurors' answers and demeanors indicated their willingness and ability to follow legal instructions, the motion to strike was denied.  Where a juror's answer indicated doubt over his or her ability to follow the Court's legal instructions, the motion to strike was granted.  The Court committed no error in denying the plaintiff's motions to strike.  *See United States v. Littlejohn*, 489 F.3d 1335, 1342 (D.C. Cir. 2007) ("[E]mpaneling a jury able to view the evidence dispassionately and follow the law requires the district court to examine sources of potential bias and evaluate the credibility of answers given by prospective jurors . . . .").

### 2. *The Jury Foreman*

The plaintiff also faults the Court for refusing to strike Juror 1358 after this juror raised the possibility during trial of his potential familiarity with a defense witness, Paul Woodhull, and for not allowing the plaintiff to further question the juror regarding potential grounds for dismissal.[19]  *See* Pl.'s Mem. at 14–15.

During *voir dire*, both parties read to the venire panel a list of witnesses, including the name of Mr. Woodhull, and the prospective jurors were asked whether they knew any of the witnesses for either party.  *See* May 11, 2015 AM Tr. at 21.  Juror 1358 did not indicate that he had any knowledge of, or a prior relationship with, Mr. Woodhull.  After the jury was empaneled, the Court instructed the jurors to alert the Court should they recognize any witness whose name had been read when that witness appeared in person to testify.  *See* May 11, 2015 PM Tr. at 25.

---

[19] The juror was subsequently chosen to be foreman.

During the defense case, after the testimony of Mr. Woodhull on the fourth day of trial,

Juror 1358 notified the Court that he might have familiarity with Mr. Woodhull.  *See* May 14,

2015 AM Tr. at 130–31.  The Court paused the trial and proceeded to *voir dire* the juror

individually outside the presence of other jurors to determine whether he should be excused for

cause.  *Id.*  The Court questioned the juror regarding the nature of his potential relationship with

the witness and whether it would affect his ability to render an impartial verdict.  *Id.*  The juror

explained that he resides in the same neighborhood as the business address identified by Mr.

Woodhull during the witness' direct testimony, and that he was aware of an individual by the

name of Paul Woodhull who has six children, some of whom may have played with the juror's

own children.  *Id.*  The juror had "never met" Mr. Woodhull, however, and had never spoken to

Mr. Woodhull.  *Id.*  The juror thought that Mr. Woodhull may have owned a restaurant, despite

no suggestion during Mr. Woodhull's testimony that he owned a restaurant.  *Id.*  The juror

unequivocally expressed that there was nothing about his potential familiarity with Mr.

Woodhull that would affect his ability to evaluate Mr. Woodhull's testimony in the same manner

as any other witness.  *Id.*  Despite the juror's clear statement that his minimal and potential

familiarity with Mr. Woodhull would have no effect on his ability to render a fair and impartial

verdict, the plaintiff argues that it is "quite possible" that the juror might have been biased as a

result of "his acquaintance or even relationship" with Mr. Woodhull and that the plaintiff should

have been permitted to further question the juror regarding the relationship.  Pl.'s Mem. at 14.

Both the Court's *voir dire* and the subsequent refusal to strike the juror were proper.

Where a juror indicates a potential basis for challenge mid-trial, the Court should *voir dire* the

juror to ensure the impartiality of the jury.  *See United States v. West*, 458 F.3d 1, 8–9 (D.C. Cir.

2006) (approving of trial court's use of *voir dire* after two jurors revealed connections to

government witnesses).  In the present case, *voir dire* revealed that the juror in question had "never met" Mr. Woodhull, never spoke to Mr. Woodhull, and averred that his familiarity (if any) with Mr. Woodhull would not impact his "ability to give his testimony and evaluate his testimony in the same way" as any other witness.  May 14, 2015 AM Tr. at 130–31.  Indeed, the juror was unsure whether he was even referring to the Paul Woodhull testifying in court or another Paul Woodhull.[20]  Based on the juror's demeanor and answers to the Court's question, it was clear the juror was "capable of rendering a verdict based solely on the evidence presented in court."  *Orenuga*, 430 F.3d 1158, 1162–63.  Given the juror's responses to the questions posed by the Court, no further questions were needed to ensure the juror's impartiality.

The plaintiff's argument, that he should have been permitted to further question the juror regarding any potential bias, conflicts with the actual record from the *voir dire*.  The plaintiff requested that the Court ask whether Mr. Woodhull was "a neighbor" of the juror, if the juror "lives on Capitol Hill," "would he think the testimony more or less [*sic*] and if he would render a verdict?"  *See* May 14, 2015 AM Tr. at 131; *see also* Pl.'s Mem. at 14.  Yet, when the questions were proffered by the plaintiff, the juror had already indicated that he "live[s] on Capitol Hill" and that he had never met Mr. Woodhull.  *See* May 14, 2015 AM Tr. at 130–31.  Moreover, the Court accepted the plaintiff's suggestion and specifically inquired whether he would give Mr. Woodhull's testimony additional weight because of their potential relationship.  *Id.*

In order to ensure impartiality, the Court conducted *voir dire* of the juror, permitted the plaintiff to propose potential *voir dire* questions, and asked the juror a version of the questions

---

[20] Although the plaintiff claims "on information and belief" that Mr. Woodhull resides in the neighborhood identified by the juror and also owns a restaurant, *see* Pl.'s Reply at 2, the plaintiff's familiarity with the actual residences of defense witnesses has proven to be questionable at best.  *See* May 14, 2015 AM Tr. at 134 (plaintiff's counsel apologizing to jury for falsely accusing defense witness Allan Horlick, the President of WUSA Channel 9 in Washington D.C., of failing to reply to subpoena where plaintiff's counsel sent the subpoena to the address of a different "Allan Horlick").

proffered by the plaintiff. *See* May 14, 2015 AM Tr. at 132. No more was necessary to ensure a fair trial. The plaintiff's attempt to obtain a new trial on this basis is denied.

B.    **Evidentiary Rulings**

The plaintiff also challenges several evidentiary rulings along with the defendant's opening and closing statements. Specifically, the plaintiff challenges: (1) the testimony as a defense witness of Jeffrey Landa; (2) defense counsel's alleged use of "Golden Rule" invocations during his opening statement; and (3) defense counsel's reference to "indentured servitude" during his closing statement. *See* Pl.'s Mem. at 1–2. Although evidentiary issues and improper argument can be a proper basis for an award of a new trial, as previously noted, "[t]he standard for granting a new trial is not whether minor evidentiary errors were made but rather whether there was a clear miscarriage of justice." *Rice*, 818 F. Supp. 2d at 60.

At the outset, the plaintiff's reply fails to address multiple arguments raised in the defendant's opposition. Specifically, the plaintiff's reply does not respond in any way to the defendant's arguments regarding two of the alleged errors proffered as a basis for new trial: (1) the testimony of Jeffrey Landa; and (2) the defendant's alleged use of a "Golden Rule" argument during opening. *See* Pl.'s Reply. As discussed above, by failing to respond to the defendant's opposing arguments in his reply, the plaintiff has abandoned these arguments. *See Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 152 n.2 (D.D.C. 2012); *United States v. Locke*, No. 09-CR-0259, 2012 WL 1154084, at *1 (D.D.C. Apr. 9, 2012); *cf. Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 471 (D.C. Cir. 2014). Even absent this concession, however, and as discussed below, the plaintiff cannot demonstrate a "clear miscarriage of justice" regarding any of the alleged grounds of error.

1. ***Testimony of Jeffrey Landa***

Jeffrey Landa served as the defendant's personal attorney during the events giving rise to this litigation. During trial, he was called as a witness by both the plaintiff and the defendant. *See* May 12, 2015 AM Tr. at 114; May 14, 2015 AM Tr. at 202. In his testimony, Mr. Landa described his first-hand recollections of the negotiations between the parties and the timing and substance of the parties' discussions about a business arrangement. *See* May 12, 2015 AM Tr. at 118. During direct examination by the defense counsel, Mr. Landa was asked whether, as of March 2008, "when all of this takes place, suggestion of exclusive representation, suggestion of agency, suggestion of partnership, suggestion of corporation, was any agreement under any of those formats reached?" and Mr. Landa answered "No." May 15, 2015 AM Tr. at 11–12; *see also* May 14, 2015 PM Tr. at 29–30, ECF No. 189 ("Q: Was any agreement in place between Mr. Queen and Mr. Schultz as of May 29th, 2008? A: No. Q: Partnership, contract, agency, anything? A: Nothing.").

In the present motion, the plaintiff repeats his arguments from trial that Mr. Landa "offer[ed] opinions to the jury on contract and partnership law" and that the plaintiff should have been permitted to "cross examine the witness [on] the basis of his opinions." Pl.'s Mem. at 13. Specifically, the plaintiff attempted to ask Mr. Landa if it were "possible for the defendant and the plaintiff to have a verbal partnership," and, following a sustained objection, proffered that he would ask Mr. Landa "if there could be a verbal partnership [and] if there could be an implied partnership." May 15, 2015 AM Tr. at 20–21. In support of his motion, the plaintiff notes that during his cross-examination by the plaintiff, Mr. Landa agreed that he "rendered numerous opinions to this jury that . . . no partnership agreement [existed]" and thereby opened the door to the questioning proposed by the plaintiff. Pl.'s Mem. at 12 (citing May 15, 2015 AM Tr. at 19).

The difficulty for the plaintiff is that Mr. Landa testified during direct examination as a fact witness regarding the facts in dispute: Did the parties enter into an agreement during a specific month?  *See* May 15, 2015 AM Tr. at 11–12.  It is well-established that attorneys may testify as fact witnesses regarding their personal knowledge of the events in question.  *See, e.g.*, *Tardiff v. Geico Indem. Co.*, 481 F. App'x 584, 587 (11th Cir. 2012) (affirming trial court's ruling regarding attorney testimony because attorney "testified as fact witness[] and confined [his] testimony to statements based on [his] own experiences and personal knowledge"); *Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 282 (2d Cir. 2004) (denying motion for new trial where trial court permitted attorney to "testify merely to facts of which he had personal knowledge"); *United States v. Lawson*, 991 F.2d 806 (10th Cir. 1993), *as amended on denial of reh'g* (June 2, 1993) (upholding trial court's permission of attorney to testify "as a fact witness, not an expert," while denying defendant's request for expert testimony from attorney).  Mr. Landa did *not* testify regarding the state of the law or offer an opinion regarding whether the relationship between the plaintiff and the defendant met the legal requirements for a partnership.  *See Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (holding that witness "may not testify as to whether the legal standard has been satisfied").  Rather, Mr. Landa testified regarding the existence of a fact: Based on his involvement in the negotiations, did the two parties reach an agreement as of a certain date?

Although the plaintiff complains that he was unable to cross examine Mr. Landa regarding the basis for his testimony, the plaintiff's criticism reveals only a lack of legal imagination, not a limitation imposed by the Court.  The plaintiff could have cross-examined Mr. Landa about the foundation for his testimony that the parties never entered into an agreement by

inquiring, for example, whether Mr. Landa was privy to all of the communications between the two sides; whether the defendant consulted with Mr. Landa regarding all of his business transactions; and why Mr. Landa offered legal services to the defendant regarding a business agreement when Mr. Landa focused on employment law.  Instead, the plaintiff sought to have Mr. Landa testify regarding the legal requirements for a partnership and to speculate about the possible application of that law to the parties' dealings.  *See* May 15, 2015 AM Tr. at 20–21 ("[W]ould you agree that it is possible for the defendant and the plaintiff to have a verbal partnership?").  Such questioning impermissibly invades the province of the Court and the jury. *See Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").  The plaintiff's cross examination of Mr. Landa was appropriately limited and does not warrant a new trial.

### 2.    *Opening Statements*

The plaintiff seeks a new trial stemming from the defense counsel's opening statements, which referred to prior rulings by this Court holding that the plaintiff was not the defendant's agent and that the plaintiff did not enter into a contract with the defendant.  *See* Pl.'s Mem. at 16 (citing May 11, 2015 PM Tr. at 41).  The plaintiff did not seek to exclude references to any prior court opinions in his motions *in limine*, nor did the plaintiff object either during or following the defendant's opening statement.  Despite these omissions, the plaintiff now seeks a new trial claiming that the defendant made an impermissible "Golden Rule" argument during his opening statement.  *Id.*  The plaintiff's argument is without merit and evinces a profound misunderstanding of "Golden Rule" arguments.

A golden rule argument "asks 'jurors to place themselves in the position of a party.'" *Caudle v. District of Columbia*, 707 F.3d 354, 359 (D.C. Cir. 2013) (quoting *Ins. Co. of N. Am. v. U.S. Gypsum Co.*, 870 F.2d 148, 154 (4th Cir. 1989)).  Courts forbid appeals to the "golden rule" in order "to prevent the jury from deciding a case based on inappropriate considerations such as emotion." *Id*. at 360.  "The jury may not return a verdict based on personal interest, bias or prejudice and an argument asking it to do so is improper." *Id.* at 359.  A golden rule argument permits "'the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence.'" *Id.* (quoting *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 491 (1st Cir. 2010)).  Where a party makes repeated appeals to the juror's emotional sympathies, the error is heightened and may warrant a new trial even where the court has provided curative instructions. *See Caudle*, 707 F.3d at 361 (noting that a single argument "alone, might not be grounds for reversal" but that reversal was warranted when the party made "three objections to golden rule arguments" and a send a message argument).

In the present case, the defendant made no argument even resembling a "golden rule" argument, nor has the plaintiff proffered any explanation as to how the defendant's statements that the Court previously rejected the plaintiff's agency and contract theories "asks jurors to place themselves in the position of a party." *Caudle*, 707 F.3d at 359.  To be sure, defense counsel's invocation of prior Court rulings in his opening statement might be thought to cloak the opening statement with the Court's imprimatur.  Nonetheless, the plaintiff failed to object on that ground at trial, and fails to object on that ground in his motion for a new trial.  The plaintiff's request for a new trial on this ground is denied.

3.    *Summation*

During summation, the defendant argued to the jury that the plaintiff's theory of the case amounted to a form of "indentured servitude," whereby a ten minute conversation in the hallway of a production studio led to an ongoing obligation to pay the plaintiff a portion of his subsequent earnings for any television show for the remainder of the defendant's professional life. *See* May 18, 2015 AM Tr. at 50, 70, ECF No. 184. As the plaintiff notes, he did not object on the record during or following the defendant's summation, and raises the issue for the first time in his motion for a new trial.[21] *See* Pl.'s Reply at 5. As a result, and as discussed previously, to obtain a new trial "on grounds not called to the court's attention during the trial . . . the error [must be] so fundamental that gross injustice would result." *See* Wright & Miller, *supra*, § 2805, at 73; *Wilson v. Porreco*, No. 11-CV-1113, 2013 WL 2250048, at *2 (D.D.C. May 22, 2013) (Wilkins, J.) (same). In bringing his motion, the plaintiff apparently faults the Court for not *sua sponte* interrupting defense counsel in the midst of closing argument to condemn his argument and instruct the jury to disregard his statements. *See* Pl.'s Reply at 5. The D.C. Circuit has cautioned, however, that "a trial judge should not interrupt every argument which he thinks undesirable." *Harris v. United States*, 402 F.2d 656, 657 n.1 (D.C. Cir. 1968) (Burger, J.).

Closing argument affords counsel the opportunity to present the jury with their theory of the case, to review evidence, and draw inferences. *United States v. Moore*, 651 F.3d 30, 52 (D.C. Cir. 2011) *aff'd in part sub nom. Smith v. United States*, 133 S. Ct. 714 (2013) ("The sole purpose of closing argument is to assist the jury in analyzing the evidence . . . ."). As discussed,

---

[21] Although the plaintiff repeatedly invokes both the 13th Amendment and "involuntary servitude" in his motion for a new trial, *see* Pl.'s Reply at 5, the defendant referred to neither during his closing argument.

during argument, counsel may not improperly ask the jury to return a verdict on the basis of "personal interest, bias or prejudice." *See Caudle*, 707 F.3d at 359–60.

The plaintiff argues that not only did defense counsel cross a line but defendant's closing argument "denied Plaintiff substantial rights to a fair and impartial verdict." Pl.'s Reply at 6. The plaintiff doth protest too much. The defendant employed two brief passing references to indentured servitude in order to highlight the absurdity of the plaintiff's theory that a single brief hallway introduction could result in an open-ended business partnership entitling the plaintiff to the proceeds of any future television show starring the defendant. The comments were not intended, nor did they have the effect of, improperly inflaming the passion of the jury. Instead, the defendant drew a provocative inference from the evidence and theories presented by the plaintiff to showcase the weakness in the plaintiff's claim.

Furthermore, even if the defendant's arguments were prejudicial, the plaintiff's contention that the statement was sufficiently extreme as to warrant a new trial finds little support in this Circuit's case law. Indeed, the D.C. Circuit refused to order a new criminal trial where the prosecutor's summation made comparisons between the defendant and Adolf Hitler. *See United States v. North*, 910 F.2d 843, 895 (D.C. Cir. 1990) *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990) ("To suspect that the reference to Hitler swayed the jury on a close and critical issue would underestimate the common sense that we properly attribute to the jury."). In *North*, the Circuit noted that the defendant suffered little prejudice because he was able to make ample use of the hyperbolic statement during his own closing. *Id.* In the present case, the plaintiff specifically targeted defense counsel's reference to indentured servitude in order to make it a theme of his own closing, referring to indentured servitude three separate times. *See* May 18, 2015 AM Tr. at 71, 75, 78, 79. In fact, the plaintiff

*escalated* the rhetoric, invoking not only indentured servitude but also the 13th Amendment, *see id.* at 71 ("[F]or the defendant, it means they've repealed the 13th Amendment . . . ."), and slavery, *see id.* at 71 ("[W]e're back to slavery.").

The defense counsel's reference to indentured servitude was a reasonable—albeit provocative—inference drawn from the plaintiff's own theory of the case and does not warrant a new trial.

### C.     Jury Instructions

Finally, the plaintiff finds fault with certain instructions provided to the jury.  The plaintiff faults the Court (1) for failing to use the plaintiff's suggested language in its instruction regarding partnership formation; (2) for providing an instruction regarding dissociation; and (3) for providing a curative instruction regarding the defendant's alleged destruction of evidence. Each of plaintiff's alleged errors is addressed below.

#### 1.     *Partnership Formation*

The plaintiff objects to the precise language used in the instruction regarding the formation of a partnership.  *See* Pl.'s Mem. at 4–6.  "Jury instructions are proper if, when viewed as a whole, they fairly present the applicable legal principles and standards."  *Czekalski v. LaHood*, 589 F.3d 449, 453 (D.C. Cir. 2009) (internal quotation marks and citations omitted); *see also Ponce v. Billington*, 679 F.3d 840, 846 (D.C. Cir. 2012) (upholding jury instruction because it "fairly and adequately conveyed the law to the jury").  "'[A]s long as a district judge's instructions are legally correct . . . he is not required to give them in any particular language.'" *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993) (quoting *Miller v. Poretsky*, 595 F.2d 780, 788 (D.C. Cir. 1978)).  Ultimately "[i]t is sufficient if the substance of

the instruction as given be correct in law, adapted to the issues developed at trial and adequate for guidance of the jury." *Heflin v. Silverstein*, 405 F.2d 1075, 1077 (D.C. Cir. 1968).

The plaintiff objects that the jury instruction regarding partnership formation did not simply recite the exact language of the D.C. Code, but instead sought to present the applicable legal principles in a manner susceptible to lay understanding. *See* Pl.'s Mem. at 4. Specifically, the D.C. Code provides that "the association of 2 or more persons to carry on as co-owners of a business for profit shall form a partnership, whether or not the persons intend to form a partnership." D.C. Code § 29-602.02. The plaintiff objects to the jury instructions' exclusion of the phrase "whether or not the persons intend to form a partnership." *See* Pl.'s Mem. at 4. As interpreted by the D.C. Court of Appeals, however, the question of partnership formation "ultimately is an objective one: whether the parties *intended* to do the acts that in law constitute partnership." *Brown v. 1401 New York Ave., Inc.*, 25 A.3d 912, 914 (D.C. 2011) (quotations, citations, and alterations omitted and emphasis added); *see also Beckman v. Farmer*, 579 A.2d 618, 627 (D.C. 1990) ("[F]or a partnership to arise in law, two or more persons must *intend* to associate together to carry on as co-owners for profit." (emphasis added)). Thus, the parties must have intended to do the acts constituting a partnership, *see id.*, but need not have the subjective intent to create a partnership, *see* D.C. Code §29-602.02. Such a nuanced distinction does not easily lend itself to a jury instruction.

To capture the plaintiff's concern regarding the statutory language that a partnership may be formed "whether or not the persons intend to form a partnership," the Court explained in its instruction: "Whether a partnership exists under District of Columbia law is not determined by whether a party has the subjective belief that he is a partner or is in a partnership." *See* Jury Instructions at 6, ECF No. 172. The instruction clarified the essence of the statutory language—that the parties' subjective intent does not control whether they formed a partnership—while staying

35

consistent with governing D.C. case law regarding the requirement that the parties intend to perform

the acts constituting a partnership.  Indeed, the instruction is entirely consistent with the request made

by the plaintiff in his motion for a new trial.  *See* Pl.'s Mem. at 4 (objecting to jury instruction on the

grounds that the "parties can perform those acts that satisfy the elements of a partnership, whether or

not they intend to characterize those acts as a partnership.").

Although the plaintiff requested that the jury instructions include specific language from the

D.C. Code, the jury instructions used alternative language to reflect the legal requirements for

partnership formation.  The Court is not required to use "any particular language" when providing

instructions, *Joy,* 999 F.2d at 556, and the instructions in the present case, "when viewed as a

whole, . . . fairly present the applicable legal principles and standards," *Czekalski*, 589 F.3d at

453.  The plaintiff is not entitled to a new trial on this ground.

### 2.    *Dissociation Instruction*

Prior to trial, the defendant requested a jury instruction regarding dissociation to address

the fact that various individuals potentially entered and exited the alleged partnership.  *See* Def.'s

Proposed Jury Instructions, ECF No. 119-2.  The plaintiff objected to the inclusion of a

dissociation jury instruction at trial, and reiterates his objection in his motion for a new trial,

claiming that the defendant failed to plead dissociation in his answer.  *See* Pl.'s Mem. at 6–11.

The irony of the plaintiff's argument is not lost on the Court, since, despite proceeding to trial,

the plaintiff never pled a partnership claim.  *See Compl.* ¶¶ 79–83 (Breach of Contract); *id.* ¶¶

84–89 (Breach of Implied-in-Fact Contract); *id.* ¶¶ 90–93 (Fraud in the Inducement); *id.* ¶¶ 94–

98 (Tortious Interference with Business Relationships); *id.* ¶¶ 99–103 (Intentional Infliction of

Emotional Distress); *see also* Minute Order, dated February 27, 2015 (denying the plaintiff leave

to amend his complaint to add a partnership theory on the eve of trial because of plaintiff's

"undue delay" and the resultant "undue prejudice to the defendant").  As a result, even were the

defendant required to plead dissociation, the defendant could not have pled dissociation in this case because a partnership was never alleged in the plaintiff's complaint. The plaintiff may not now allege that he was prejudiced by his own shifting theories and factual assertions and should not receive a new trial because of such obfuscation. To reward the plaintiff with a new trial for such behavior would be a miscarriage of justice.

The plaintiff also argues that the jury should have been instructed that the defendant bore the burden to prove dissociation by a preponderance of the evidence. The plaintiff first raised this position in a midnight filing on the eve of the charging conference. *See* Notice of Filing of Memorandum of Supplemental Authority in Support of Plaintiff's Objections Re: Affirmative Defenses and Burden of Proof Directed at Dissociation, ECF No. 171. In both his original filing and in his present motion, the plaintiff cites no case law or pattern instructions where a Court required the defendant to bear the burden in showing dissociation. Most importantly, however, the plaintiff does not explain how the alleged error prejudiced his claim whatsoever. The jury found for the defendant on the issue of partnership formation. In other words, the plaintiff never met his burden to show the existence of a partnership. *See* Verdict Form, ECF No. 178 ("Did the plaintiff establish, by a preponderance of the evidence, that he and the defendant formed a partnership? No."). As a result, the jury did not reach the subsequent issue of whether the defendant remained a member of the partnership at the time of the alleged breach, because the jury found that he never entered into a partnership in the first instance. The evidence at trial revealed that this was not a close case; the evidence for the defendant was overwhelming. Thus, any alleged error from including a dissociation instruction—an issue the jury never reached—did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Caudle*, 707 F.3d at 361.

### 3. *Destruction of Evidence*

The plaintiff also challenges an instruction provided to the jury at the close of summation regarding comments made by plaintiff's counsel about the alleged destruction of evidence by the defendant. As with many of the arguments the plaintiff initially advanced in support of his motion for a new trial, the plaintiff's reply completely abandons this theory of error. *See Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 152 n.2 (D.D.C. 2012); *United States v. Locke*, No. 09-CR-0259, 2012 WL 1154084, at *1 (D.D.C. Apr. 9, 2012); *cf. Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 471 (D.C. Cir. 2014). Even were this argument not abandoned, however, it is unavailing.

Prior to trial, both the plaintiff and the defendant requested sanctions based on the alleged destruction of evidence. *See* Def.'s Mot. Sanctions & Award Att'ys Fees, ECF No. 92; Pl.'s Mot. Sanctions & Award Att'ys Fees, ECF No. 104. The plaintiff sought sanctions because of the defendant's practice, prior to April 2009, of deleting his personal emails. Following testimony at the pretrial conference, the Court denied both parties' motions. *See* Minute Order, dated May 1, 2015. The Court ruled that the defendant was not on notice of potential litigation until April 2009 at the earliest, at which point the defendant retained his emails. Since the defendant did not improperly destroy emails prior to April 2009, no spoliation occurred, and the imposition of sanctions was unwarranted. *See* Pretrial Conference Rough Hearing Tr. at 178–80.

Subsequently, during trial, the plaintiff solicited testimony from the defendant regarding his production of emails during discovery. *See* May 11, 2015 PM Tr. at 65. The plaintiff also made passing reference to the defendant's erasure of emails. *See id.* ("Mr. Schultz: I have not produced any emails. Q: Because you erased them? A: I did."). At the close of trial, the plaintiff requested a jury instruction regarding spoliation, even though the Court previously

found no spoliation.  The plaintiff's request was denied.  *See* May 15, 2015 AM Tr. at 126–27.[22]

Thus, at the time of closing arguments, the Court had rejected the plaintiff's theory of spoliation

in pre-trial motions and denied the plaintiff's request for a jury instruction with respect to

spoliation.

Nonetheless, during summation, the plaintiff argued to the jury that they should find the

plaintiff credible because he "produced 1,200 emails," while the defendant should be found not

credible because, as to the defendant, "the emails were erased."  *See* May 18, 2015 AM Tr. at 73.

At the close of summation, the defendant objected to the plaintiff's characterization and argued

that the reference to the erasure of emails was "directly contrary to [the Court's] pretrial order."

*Id.* at 91.  The defendant requested an instruction for the jury to disregard that portion of the

closing.  *Id.* at 91–92.  At the bench conference, the plaintiff argued only that Mr. Landa testified

that the defendant did not produce any emails as part of the litigation.  *Id.*  The Court specifically

asked the plaintiff if evidence existed in the record that the defendant erased emails.  *Id.*  The

plaintiff noted only that he asked the defendant if he produced emails, and commented that the

Court was "right" that he did not ask the defendant regarding the deletion of emails.  *See id.*

("The Court: You didn't talk to him about erasing emails?  [Plaintiff's Counsel]: Yes, well,

you're right.").  At the defendant's suggestion, and without objection by the plaintiff, the Court

briefly instructed the jury that during the plaintiff's "rebuttal summation, [you heard reference

to] the erasure of emails [by] Mr. Schultz.  You are to disregard that.  There's no evidence in the

record about that."  *Id.* at 92.  Following this brief aside, the Court proceeded to read the final

jury instructions.

---

[22] The plaintiff's motion does not argue that the Court's refusal to provide a spoliation instruction was error.

The plaintiff now argues that this brief jury instruction—made without objection by the plaintiff—warrants a new trial. *See* Pl.'s Mem. at 15–16. A new trial is not warranted on this basis. Prior to trial, the Court heard testimony and explicitly found that the defendant did not purposefully destroy evidence. Despite this clear ruling, the plaintiff was intent on leaving the jury with the (mistaken) impression that the defendant purposefully destroyed evidence in order to hide the truth. *See* May 18, 2015 AM Tr. at 81 ("So when he tells you there's no evidence, I'm telling you that there is."). Moreover, because the plaintiff first raised the issue during his rebuttal closing, the defendant was left with no means to counter the rejected inference that the defendant wrongfully failed to produce and spoliated evidence. Thus, the Court instructed the jury to disregard the plaintiff's comments regarding the destruction of evidence.[23] Although counsel is free to draw reasonable inferences from the evidence, counsel is not permitted to draw inferences explicitly rejected by the Court previously. A new trial will not be granted on this basis.

\*     \*     \*

A jury verdict should not be disturbed lightly. Indeed, a court must be "'mindful of the jury's special function in our legal system and hesitate to disturb its findings.'" *Martinez v. Dist. of Columbia*, 503 F. Supp. 2d 353, 355 (D.D.C. 2007) (quoting *Nyman*, 967 F. Supp. at 1569). In the present case, the jury's verdict accords with the only reasonable interpretation of the evidence: The parties never formed a partnership. In the present case, "the jury fulfilled its function. It considered conflicting evidence, resolved factual disputes, and returned a verdict." *Radtke*, 2015 WL 4528494, at \*7. The Court will not upset the jury verdict in this case.

---

[23] To be sure, the plaintiff did ask the defendant a single off-hand question regarding the deletion of emails, but the theme was not developed during the course of trial and there was no jury instruction regarding the topic. Moreover, given the overwhelming evidence against the plaintiff's partnership theory, any error in this respect was harmless.

## IV.   CONCLUSION

For the foregoing reasons, the plaintiff's motion for a new trial is denied.  An appropriate

Order accompanies this Memorandum Opinion.

Date: August 5, 2015

_____
BERYL A. HOWELL
United States District Judge